**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

SARAH J. PIERCE,

　　　　　　　　　　　　*Plaintiff,*

　　　　v.

BETTER HOLDCO, INC., VISHAL GARG, and
NICHOLAS CALAMARI,

　　　　　　　　　　　　*Defendants.*

No. 1:22-cv-04748 (AT) (OTW)

**Oral Argument Requested**

# MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT BETTER HOLDCO, INC.'S MOTION TO DISMISS THE COMPLAINT

Roberta A. Kaplan
Timothy S. Martin
Kate L. Doniger
Kaplan Hecker & Fink LLP
350 Fifth Avenue, 63rd Floor
New York, NY 10118
212.763.0883
rkaplan@kaplanhecker.com
tmartin@kaplanhecker.com
kdoniger@kaplanhecker.com

September 16, 2022

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

STATEMENT OF FACTS .................................................................................................... 2

    A.    Plaintiff's History at Better ....................................................................... 2

    B.    The Allegations of the Complaint .............................................................. 3

    C.    The Instant Case ......................................................................................... 7

ARGUMENT .................................................................................................................... 10

I.      THE RECENT AMENDMENTS TO § 740 DO NOT APPLY ...................................... 11

II.    PLAINTIFF FAILS TO STATE A CLAIM UNDER THE AMENDED
      VERSION OF § 740 ................................................................................................. 14

    A.    Plaintiff Has Not Alleged that She Engaged in Whistleblowing .......................... 15

    B.    Plaintiff Has Not Plausibly Alleged Retaliation ................................................. 20

          1.    Plaintiff Fails to Allege Any Retaliation Occurred "Because of" Her
               Alleged Whistleblowing ................................................................. 21

          2.    Plaintiff 's Organic Traffic and Profitability Allegations Cannot
               Supply the Requisite Causal Connection ................................................ 26

CONCLUSION ..................................................................................................................... 28

APPENDIX A ...................................................................................................................... 29

# TABLE OF AUTHORITIES

**Cases**                                                                                          **Page(s)**

*Ahmad v. Morgan Stanley & Co., Inc.,*
  2 F. Supp. 3d 491 (S.D.N.Y 2014)...........................................................................12

*Alexander v. Bd. of Educ. of City of N.Y.,*
  648 F. App'x 118 (2d Cir. 2016)..............................................................................25

*Aponte v. Bellevue Hosp. Center,*
  183 A.D.2d 594 (1st Dep't 1992).............................................................................11

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) ...........................................................................................10, 25

*B.B. v. The New Sch.,*
  No. 17 Civ. 8347, 2018 WL 2316342 (S.D.N.Y. Apr. 30, 2018) ..........................19

*Bailey v. N.Y. Law Sch.,*
  No. 16 Civ. 4283, 2017 WL 6611582 (S.D.N.Y. Dec. 27, 2017)...........................19

*Baldwin v. Goddard Riverside Comm. Ctr.,*
  53 F.Supp.3d 655 (S.D.N.Y. 2014).....................................................................25, 26

*Beers v. Kaiser Permanente Ne. Div.,*
  No. 98 Civ. 1121, 1999 WL 1269419 (N.D.N.Y. Dec. 16, 1999) ....................20, 21

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007)................................................................................................10

*Board Managers of Trump Tower at City Center Condominium by Neidith v. Palazzo,*
  346 F. Supp. 3d 432 (S.D.N.Y. 2018)....................................................................10

*Byrne v. Telesector Res. Grp., Inc.,*
  339 F. App'x 13 (2d Cir. 2009)..........................................................................26, 27

*Chardon v. Fernandez,*
  454 U.S. 6 (1981) ..................................................................................................13

*Clark Cnty. Sch. Dist. v. Breeden,*
  532 U.S. 268 (2001) ..............................................................................................26

*Cordone v. Wilens & Baker, P.C.,*
  286 A.D.2d 597 (1st Dep't 2001)...........................................................................13

*Delaware State College v. Ricks,*
  449 U.S. 250 (1980) ...............................................................................................13

*Deutsch v. Catherwood,*
   31 N.Y.2d 487 (1973) ............................................................................................ 12

*Diaz v. Transatlantic Reinsurance Co.,*
   No. 16 Civ. 1355, 2016 WL 3568071 (S.D.N.Y. June 22, 2016) ............................................. 17

*Dougherty v. Mem'l Sloan-Kettering Cancer Ctr.,*
   No. 00 Civ. 4083, 2002 WL 1610916 (S.D.N.Y. July 22, 2002) ............................... 20, 21, 24

*Duarte v. St. Barnabas Hosp.,*
   265 F. Supp. 3d 325 (S.D.N.Y. 2017) ........................................................................ 26, 27

*Dykstra v. Wyeth Pharmaceuticals, Inc.,*
   454 F. App'x 20 (2d Cir. 2012) ................................................................................ 13

*E.E.O.C. v. Abercrombie & Fitch Stores,*
   575 U.S. 768 (2015) .............................................................................................. 20

*Garcia v. Kings Cty. Hosp. Ctr.,*
   No. 16 Civ. 3151, 2018 WL 389212 (S.D.N.Y. Jan. 11, 2018) ................................................ 10

*Grayson v. Ressler & Ressler,*
   271 F. Supp. 3d 501 (S.D.N.Y. 2017) ............................................................................. 2

*Gross v. FBL Fin. Servs.,*
   557 U.S. 167 (2009) .............................................................................................. 20

*HC2, Inc. v. Delaney,*
   510 F. Supp. 3d 86 (S.D.N.Y. 2020) .............................................................................. 15

*Heaney v. GBS Properties LLC,*
   No. 2004-SOX-00072, 2004 WL 5840286 (U.S. Dep't of Labor SAROX Dec. 2, 2004) ....... 27

*Hogan v. Kelly,*
   86 A.D.3d 590 (2d Dep't 2011) ................................................................................. 12

*Jones v. New York City Bd. of Educ.,*
   No. 09 Civ. 4815, 2012 WL 1116906 (S.D.N.Y. Apr. 2, 2012) .............................................. 23

*Joshi v. Tr. of Columbia Univ.,*
   515 F. Supp. 3d 200 (S.D.N.Y. 2021) ........................................................................... 23

*Klein v. Brookhaven Health Care Facility,*
   No. 17 Civ. 4841, 2019 WL 1459258 (E.D.N.Y. Mar. 11, 2019) .............................. 15, 17, 26

*Kramer v. Time Warner, Inc.,*
   937 F.2d 767 (2d Cir. 1991) ................................................................................... 16

*March v. Metro-North Railroad Co.*,
    369 F. Supp. 3d 525 (S.D.N.Y. 2019).................................................................. 15

*Matter of Gleason*,
    96 N.Y.2d 117 (2001) .................................................................................... 12

*McGrane v. Reader's Dig. Ass'n, Inc.*,
    822 F. Supp. 1044 (S.D.N.Y. 1993)................................................................... 11

*Mendez v. New York City Transit Auth.*,
    186 A.D.2d 383 (1st Dep't 1992) ...................................................................... 11

*New York ex rel. Khurana v. Spherion Corp.*,
    511 F. Supp. 3d 455 (S.D.N.Y. 2021)........................................................... 18, 19

*Nolley v. Swiss Reisnurance Am. Corp.*,
    857 F. Supp. 2d 441 (S.D.N.Y. 2012)................................................................ 24

*People v. Utsey*,
    7 N.Y.3d 398 (2006) ...................................................................................... 12

*Piligian v. Icahn Sch. of Med. at Mount Sinai*,
    490 F. Supp. 3d 707 (S.D.N.Y. 2020)............................................................... 12

*Portes v. Wyeth Pharms., Inc.*,
    No. 06 Civ. 2689, 2007 WL 2363356 (S.D.N.Y. Aug. 20, 2007) ........................... 20

*Rapoport v. Asia Elecs. Holding Co.*,
    88 F. Supp. 2d 179 (S.D.N.Y. 2000).................................................................. 23

*Remba v. Fed'n Emp. & Guidance Serv.*,
    76 N.Y.2d 801 (1990) .................................................................................... 11

*Richardson v. Bronx Lebanon Hosp.*,
    No. 11 Civ. 9095, 2014 WL 4386731 (S.D.N.Y. Sept. 5, 2014) ............................ 27

*Schultz v. N. Am. Ins. Grp.*,
    34 F. Supp. 2d 866 (W.D.N.Y. 1999) ................................................................ 11

*Sharkey v. J.P. Morgan Chase & Co.*,
    No. 10 Civ. 3824, 2011 WL 135026 (S.D.N.Y. Jan. 14, 2011) ............................. 17

*Sherman v. Cnty. of Suffolk*,
    71 F. Supp. 3d 332 (E.D.N.Y. 2014).................................................................. 20

*Shultz v. Congregation Shearith Israel of City of New York*,
    867 F.3d 298 (2d Cir. 2017)............................................................................. 13

*Thompson v. Jamaica Hosp. Med. Ctr.*,
    13 Civ. 1896, 2016 WL 4556905 (S.D.N.Y. Aug. 30, 2016) ................................... 14

*Tompkins v. Metro-N. Commuter R.R.*,
    No. 16 Civ. 9920, 2018 WL 4573008 (S.D.N.Y. Sept. 24, 2018) ............................ 24

*Tonra v. Kadmon Holdings, Inc.*,
    405 F. Supp. 3d 576 (S.D.N.Y. 2019) ............................................................. 15, 16

*Triano v. Town of Harrison*,
    895 F. Supp. 2d 526 (S.D.N.Y. 2012) ..................................................................... 10

*Turnbull v. J.P. Morgan Chase & Co*,
    No. 21 Civ. 3217, 2022 WL 608708 (S.D.N.Y. Feb. 24, 2022) ................... 4, 25, 27

*Williams v. N.Y. City Dep't of Educ.*,
    No. 19 Civ. 01353, 2021 WL 1178118 (S.D.N.Y. Mar. 29, 2021) ......................... 27

*Zuro v. Town of Darien*,
    432 F. Supp. 3d 116 (D. Conn. 2020) ..................................................................... 25

**Statutes**

29 U.S.C. § 2101 ............................................................................................................... 8

Cal. Labor Code § 1400 ................................................................................................... 8

New York Labor Law ("NYLL") § 740 .................................................................. *passim*

**Rules**

Fed. R. Civ. P. 12(b)(6) ........................................................................................ 1, 2, 4, 10

**Other Authorities**

S. 4394-A, 2021-22 S., Reg. Sess. (N.Y.2021) ............................................................... 12

Defendant Better Holdco, Inc. ("Better" or the "Company") submits this memorandum of law in support of its motion to dismiss the Complaint ("Compl.") of Plaintiff Sarah Pierce, pursuant to Fed. R. Civ. P. 12(b)(6).

<u>**PRELIMINARY STATEMENT**</u>

This case is a former executive's attempt to transform her own voluntary resignation into a lucrative whistleblower claim and, in so doing, tarnish her former employer. Plaintiff joined Better as a recent college graduate and was given extraordinary opportunities for professional growth and development. Indeed, several months *after* her alleged "whistleblowing," the Company more than doubled her salary and paid her a bonus of $1 million. But unfortunately, the Company's faith turns out to have been misplaced. On December 17, 2021, apparently upset by a demand from Better's Board of Directors that the Company hire more seasoned leaders in light of its decreasing performance, she resigned. Although she now claims she was terminated, in a document her Complaint relies upon but only selectively quotes, Plaintiff announced using plain language that she would "like to begin transitioning out of my role and Better." Only when the Company rejected her extraordinary severance demands did Plaintiff begin to characterize herself as a whistleblower and manufacture a tale of "retaliation" based on acts the Company took *after* her own resignation—and *before* the statute she bases her claims on had even come into effect.

As set forth below, Plaintiff's claims are not only factually baseless, but her first and only cause of action against the Company, for the purported violation of New York Labor Law ("NYLL") § 740, fails for two independent reasons. First, it relies on a version of § 740 that was not in effect at the time of the alleged retaliatory conduct she challenges. As a result, § 740 is wholly inapplicable to her claims as a matter of law and the Court need not engage in any further analysis to dismiss that claim.

1

But even if that were not the case, Plaintiff has failed to plausibly allege that she engaged in any whistleblower activity protected by § 740, let alone plead the requisite causal connection between any alleged whistleblowing and any allegedly adverse employment action. Her vague and confusing allegations amount to, at most, descriptions of routine disagreements between colleagues about operational and management issues, not protected whistleblowing. And the actions she casts as "retaliation" are actions taken *after* her voluntary resignation, when the Company attempted to negotiate and process the resignation she had voluntarily submitted.

Two of the four instances of whistleblowing that Plaintiff alleges occurred months *before* the Company paid her a $1 million discretionary bonus—the exact opposite of retaliatory conduct. And each of the four instances is nothing more than Plaintiff criticizing her colleagues for having differing views. Moreover, but for her voluntary resignation from the Company in December 2021, none of the purported retaliation she describes in the Complaint would have occurred. At its core, this case is about a scheme by Plaintiff to get paid millions of dollars for quitting a job that backfired, causing her to burden the Company—and now this Court—with implausible whistleblower and retaliation claims that should be dismissed.

## STATEMENT OF FACTS[1]

### A. Plaintiff's History at Better

Better, founded in 2014, is a digital mortgage lender and provider of other mortgage-related services. Compl. ¶¶ 23, 28. Plaintiff Sarah Pierce, a 2014 graduate of Barnard College, joined the new company in August 2016 as an entry-level salesperson. *Id.* ¶ 29.

---

[1] For purposes of this motion, Better treats the Complaint's allegations as true, as required by Fed. R. Civ. P. 12(b)(6), even though it vehemently denies the vast majority as false. *See, e.g.*, *Grayson v. Ressler & Ressler*, 271 F. Supp. 3d 501, 513 (S.D.N.Y. 2017).

Over the course of the next four years, Better grew exponentially. *Id*. ¶ 28. As the Company grew, it invested heavily in Plaintiff, mentoring and giving her multiple and significant opportunities for professional growth and development. *Id*. ¶ 30. More specifically, during her tenure at the Company, she received numerous promotions, large salary increases, and significant annual bonus payments, not to mention equity grants and stock options, all worth millions of dollars. *Id*. ¶¶ 29, 31.

## B. The Allegations of the Complaint

Plaintiff's Complaint focuses on alleged events taking place between March 2021 and February 2022, during which period she alleges that she engaged in whistleblowing and was retaliated against as a result. A timeline reflecting Plaintiff's alleged protected activity and actions taken by the Company, including those she alleges the Company took in response to her purported whistleblowing, is attached hereto as Appendix A.

### 1. <u>Spring — Fall 2021: The SPAC Transaction and Company Headwinds</u>

In the spring of 2021, Better announced a plan to go public through a Special Purpose Acquisition Company ("SPAC") transaction. *Id*. ¶ 33. In March and May 2021, in what she now claims were acts of protected whistleblowing, Plaintiff alleges that she "raised [] concerns" internally about the Company's estimate of the amount of its revenue attributable to organic internet traffic. *Id*. ¶ 39. She alleges that she believed the correct estimate was 12%, while CEO Garg believed it to be 30%. *Id.*

As it sought to close the SPAC transaction, the Company was "faced with a challenging higher interest rate environment and worsening financial performance." *Id*. ¶ 36. The transaction, which was initially expected to close in the fourth quarter of 2021, was delayed. *Id.* ¶ 34. At some point around the fourth quarter of 2021, Plaintiff alleges that she "express[ed] concern" to CEO

Garg about his alleged view that the Company could achieve profitability by the end of the first quarter of 2022, which differed from her alleged view that the Company could not achieve profitability until the third quarter of 2022. *Id.* ¶¶ 40-42.

In October 2021, after these purported acts of whistleblowing, the Company awarded her a discretionary bonus of $1 million. *Id.* ¶ 31.

Throughout this challenging period for the Company, in addition to its generous financial investments in her, Better continued to trust and rely on Plaintiff, assigning her ever-increasing levels of responsibility and giving her every opportunity to advance professionally, ultimately promoting her to Head of Sales, Operations and Customer Experience and increasing her annual salary to $1 million. *Id.* ¶ 30.

### 2.    November — December 2021: The RIF and Plaintiff's Resignation

By the end of 2021, in light of ongoing financial and operational headwinds, the Company was forced to make difficult decisions about the size of its workforce, ultimately concluding that a reduction in force ("RIF") was necessary. *Id.* ¶ 49. As has been widely publicly reported, the RIF was conducted by CEO Garg over Zoom in December 2021, and the resulting video went viral, bringing negative attention to the Company. *Id.* ¶¶ 5-6.

In the wake of the RIF event, Better's Board of Directors determined that the Company should form a search committee to hire several "experienced and seasoned executives," including a Chief Operating Officer and President. *See* Declaration of Kate L. Doniger (the "Doniger Declaration"), dated Sept. 16, 2022, Ex. A.[2] Plaintiff held neither of these positions. On December

---

[2] On a Rule 12(b)(6) motion, the Court may consider "documents that are referenced in the complaint." *Turnbull v. J.P. Morgan Chase & Co*, No. 21 Civ. 3217, 2022 WL 608708, at *4 (S.D.N.Y. Feb. 24, 2022) (citation omitted). Here, Plaintiff relies heavily on (and quotes from) CEO Garg's December 8 email throughout her Complaint as both an act of purported whistleblowing and an instance of retaliation. Compl. ¶¶ 9, 43-44, 87-89. The Court may

8, 2021, CEO Garg circulated a draft email summarizing his meeting with the Board the previous day (the "December 8 email"), noting the Board's instruction to find, as Chief Operating Officer and President, "a seasoned operator who can help manage and drive performance across business functions and help . . . to build an inspirational leadership culture." Compl. ¶ 87. Garg's December 8 email further noted that the Board "feels the metrics of the company are a black box," recommending that Better form an Operations Review committee to ensure "an independent board reviewed set of metrics and operational rigor across the Company." *Id*. ¶ 88. Plaintiff alleges nothing to suggest that the Board discussed her or her job performance in its conversations with CEO Garg about these issues. She does allege that she "addressed this misstatement to the Board of Directors on December 9, 2021, advising it: 'The company's metrics are not a black box.'" *Id*. ¶ 44.

As her allegations make clear, Plaintiff—who at the time was communicating with colleagues remotely from Aspen, Colorado—was angered by the Board's directive to bring in new, experienced leaders, which she viewed as an effort to "replace" or "layer" her. *Id.* ¶ 148(a). A week after the December 8 email, Plaintiff resigned, sending the Company's CFO, Kevin Ryan, an email on December 17 stating that she would "like to begin transitioning out of my role and Better, and would like to work with the company toward a smooth transition."[3] Compl. ¶ 112; s*ee* Doniger Decl., Ex. B. She asked that Mr. Ryan forward her resignation to the Board of Directors.

therefore consider that email, which is attached to as Exhibit A to Doniger Declaration, that is being submitted herewith.

[3] Plaintiff also references and relies on her December 17 email to Better CEO Kevin Ryan, which she characterizes as a "transition proposal" throughout her Complaint. Compl. ¶¶ 112-114, 148(a); Doniger Decl. Ex. B. For the same reasons it may consider the December 8 email, *see* fn. 2, *supra*, the Court may consider this email as well, which is attached as Exhibit B to the Doniger Declaration.

Although she now describes her resignation e-mail as a "transition proposal" (a distinction without a difference), the plain language of the email served as a clear announcement that she planned to leave the Company and wished to negotiate the terms of her departure. She even went so far as to propose detailed severance terms, including the repurchase of her equity at a price of $27 a share and an agreement that, following her departure, Better would hire her as a part-time "non-employee" consultant at a rate of $2 million per year. Doniger Decl., Ex. B.

Significantly, Plaintiff also cryptically threatened at that time that she would "not affirmatively take action against the company with the information in my possession" *if* her efforts to extract this unearned compensation from the Company were successful. *Id.* Better's General Counsel promptly asked Plaintiff for an interview in order to understand what "information" she was referencing, and Plaintiff told the General Counsel that "all the information in her possession was already known by [the General Counsel] and the executive team." *Id.* ¶ 117.[4]

3.    December — January 2021:  Severance Negotiations and
      Plaintiff's Departure

In total, Plaintiff demanded a severance package worth as much as $54 million. Doniger Decl., Ex. B. Not surprisingly, the Company, which was experiencing a market downturn and had just been forced to lay off 900 employees, did not accept Plaintiff's proposed terms. *Id.* ¶ 36. As Plaintiff negotiated the terms of her departure with the Company, she was placed on administrative leave, which began on January 6, 2022. *Id.* ¶ 139. On January 15, 2022, the Company's outside counsel advised Plaintiff's counsel that the Company would process Plaintiff's resignation effective January 18, 2022, a date the Company "then unilaterally extended" to February 4, 2022,

---

[4] When Plaintiff finally agreed to an interview nearly a month later, she allegedly told the Company's General Counsel about her disagreement with CEO Garg about the profitability projections (described below) and otherwise stated that she "could not provide details" on other issues, but recommended that the General Counsel speak to the CFO if she wanted more information. Compl. ¶ 145.

in order to give Plaintiff more time to consider its counteroffer to her severance proposal. *Id.* ¶ 148. Plaintiff's employment with Better formally ended on February 4, 2022. *Id.*

## C. The Instant Case

On June 7, 2022, Plaintiff filed this lawsuit, now asserting that the Company's actions taken after her resignation—its decision to accept her voluntary resignation, place her on administrative leave while it attempted to negotiate a severance package with her counsel, and ultimately terminate her employment—were motivated not by her own decision to resign, but instead by the Company's desire to retaliate against her for supposed acts of whistleblowing. As discussed below, at the very most, all of Plaintiff's purported "whistleblowing" consists of routine, differing views among colleagues about various strategic and operational issues within the Company, not actionable, protected activity under New York law.

Cutting through the Complaint's pages of implausible and unsubstantiated claims, Plaintiff alleges that she reported three purported violations of law.[5] *First*, she alleges that she disagreed with Company's calculation of the amount of "direct-to-consumer funded loans that were generated from organic internet traffic," rather than through "paid customer acquisitions" (the "Organic Traffic allegations"). Compl. ¶¶ 38-39. More specifically, Plaintiff claims that in March and May 2021—*before* the Company gave her a substantial pay raise by increasing her yearly salary to $1 million *and before* the Company awarded her a $1 million discretionary bonus on top

---

[5] In addition to her allegations concerning the Company's organic traffic revenue calculations, profitability projections, and the RIF, Plaintiff appears to also allege that, after CEO Garg allegedly told the Board that the Company's metrics were a "black box," she engaged in protected whistleblower activity when she "addressed this misstatement" the next day by telling the Board of Directors that "the company's metrics are not a black box" (the "Black Box allegations"). Compl. ¶ 44. As an initial matter, and as discussed below, the *Board,* and not CEO Garg, made this statement; in any event, it is impossible to discern from the Complaint what "violation of law, rule, or regulation" could possibly have been implicated by the Board's characterization of the company's metrics (even if that characterization were somehow inaccurate).

of that—she "raised her concerns" to Garg and Defendant Nicholas Calamari (Better's General Counsel) about the Company's estimate that approximately 30% of its loans were attributable to organic traffic, since she believed the correct number to be 12%. *Id*. ¶ 39. The Complaint provides no explanation for why Plaintiff believed the Company's estimate was incorrect, let alone how its description of its own estimate could possibly violate any law.

*Second*, Plaintiff claims that at some point in time—she provides no date—she concluded that the Company would not achieve profitability until, "at the earliest, the third quarter of 2022," but that CEO Garg, at some other unspecified point in time, represented to the Board and investors that Better "would achieve profitability by the end of the first quarter 2022" (the "Projection allegations"). *Id*. ¶ 41. While Plaintiff alleges that she "expres[sed] concern" to Garg about his more optimistic timeline, Plaintiff fails to allege any facts sufficient to plausibly suggest that these alleged discussions—the specific contents and substance of which Plaintiff nowhere pleads—represented whistleblowing about violations of law, rather than good-faith disagreements between senior executives about projected financial performance. *See* Compl. ¶¶ 41-42. Indeed, Plaintiff's allegations that the Company retaliated against her nine months and $2 million later for allegedly blowing the whistle on either the Organic Traffic or the Projection allegations are wholly implausible given that the Company not only raised her salary but paid her a $1 million discretionary bonus *after* these discussions supposedly took place. *Id*. ¶ 90.

*Third*, Plaintiff alleges protected activity relating to the December 2021 RIF event and her purported view, shared widely within Better (*see* Compl. ¶¶ 51-53), that the RIF could violate the California's Worker Adjustment and Retraining Notification ("WARN") Act, Cal. Labor Code § 1400, et seq., and possibly the federal analogue, 29 U.S.C. § 2101, *et seq.*, which, among other things, impose certain notice and payment obligations on employers in connection with certain

types of mass layoffs. The Complaint's 40-plus paragraphs concerning the RIF event (the "RIF allegations") indicate that the execution of the RIF event was the subject of extensive debate and analysis within Better even before it occurred, including from the Company's human resources and legal professionals, and that CEO Garg's actions in connection with the RIF event was the focus of significant discussion afterwards, including at meetings with the executive team, the senior leadership team, and the Board. Compl. ¶¶ 46-85. More specifically, Plaintiff alleges that she, like many others at the Company, expressed her disapproval of CEO Garg's handling of the RIF event and that she "did not endorse or enable" the "false narrative" she claims he tried to develop afterwards. *Id*. ¶ 90. While Plaintiff alleges that the RIF event implicated either or both of the WARN Acts, she concedes that "HR and legal"—not Plaintiff—advised CEO Garg that a RIF of this size would trigger either WARN Acts' requirements and she does not allege that the WARN Acts' requirements were not followed. *Id*. ¶ 51. She does not allege any statements she made or steps she took that amount to whistleblowing for purposes of § 740; rather, she, like many others, was unhappy about the handling of the RIF event.

In response to these purported acts of whistleblowing, Plaintiff alleges that the Company took the following retaliatory employment actions against her: (1) the December 8 email reflecting the Board's decision to form a search committee for new leadership in certain senior management roles (not Plaintiff's), including a President/COO, Compl. ¶ 148(a); (2) her placement on administrative leave on January 6, 2022, after voluntarily tendering her resignation and while the parties' counsel were attempting to negotiate severance terms, *Id.* ¶ 148(b); (3) the Company's decision, on January 15, 2022, that it would "process her resignation," *Id.* ¶ 148(c); and (4) the formal end of her relationship with Better on February 4, 2022, *Id.* ¶ 148(d). Notably, three out of

four of these alleged retaliatory actions took place *after* Plaintiff had already voluntarily resigned from the Company on December 17.  Compl.  ¶ 112; Doniger Decl. Ex. B.

## ARGUMENT

In order to survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a complaint must contain "sufficient factual matter . . . to state a claim that is plausible on its face." *Triano v. Town of Harrison*, 895 F. Supp. 2d 526, 536 (S.D.N.Y. 2012) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  "A claim is facially plausible 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Garcia* v. *Kings Cnty. Hosp. Ctr.*, No. 16 Civ. 3151, 2018 WL 389212, at *3 (S.D.N.Y. Jan. 11, 2018) (citing *Iqbal*, 556 U.S. at 678).  Because a complaint must contain more than "naked assertions devoid of further factual enhancement," a court need not credit allegations which are no more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Board Managers of Trump Tower at City Center Condominium by Neidith v. Palazzo*, 346 F. Supp. 3d 432, 452 (S.D.N.Y. 2018) (*quoting Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  If a plaintiff has not "nudged [his] claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Id*. (alterations in original) (quoting *Twombly*, 550 U.S. at 555; *Iqbal*, 556 U.S. at 680).

Plaintiff's § 740 claim against Better fails as a matter of law because (1) her claim relies, as it must, on a version of § 740 that was not in effect at the time of her alleged whistleblowing; and (2) she fails to plausibly allege either that she engaged in the type of whistleblowing protected by § 740 or that there was any causal connection between her supposed whistleblowing and any purportedly retaliatory actions taken by the Company.

## I. THE RECENT AMENDMENTS TO § 740 DO NOT APPLY

As the very first sentence of the Complaint acknowledges, Plaintiff's claims against Better depend entirely on "New York Labor Law § 740, *as amended*." Compl. ¶ 1 (emphasis added). This reliance upon the amended New York statute is absolutely necessary for Plaintiff's claims because the prior version of § 740—which governs here since the relevant events alleged in the Complaint all took place before the amended statute's effective date—is wholly inapplicable. Effective January 26, 2022, § 740 was amended to prohibit retaliation against employees who report an activity, policy, or practice "that the employee reasonably believes is in violation of law, rule or regulation . . . ." § 740(2)(A). Prior to that time, however, § 740 only prohibited retaliation against employees who reported a legal violation that created "a substantial and specific danger to *public health and safety*." *See, e.g., Remba v. Fed'n Emp. & Guidance Serv.*, 76 N.Y.2d 801, 802 (1990) (emphasis added). It is beyond dispute that Plaintiff cannot bring a claim under the prior version of § 740 since none of her claims about Better's mortgage business (i.e., the Organic Traffic allegations, Projection allegations, RIF event and the Black Box allegations) implicate "public health or safety" within the meaning of the prior version of the statute. *See McGrane v. Reader's Dig. Ass'n, In*c., 822 F. Supp. 1044, 1051 (S.D.N.Y. 1993) ("Financial improprieties within a corporation do not constitute threats to public health or safety under Labor Law § 740"); *Schultz v. N. Am. Ins. Grp.*, 34 F. Supp. 2d 866, 869 (W.D.N.Y. 1999) ("[C]laims alleging fraudulent economic practices do not constitute a danger to public health or safety.").

It is black letter law that a plaintiff's claim must be "governed by the . . . statute in effect when his or her claim accrued." *Aponte v. Bellevue Hosp. Center*, 183 A.D.2d 594, 595 (1st Dep't 1992); *see also, e.g., Mendez v. New York City Transit Auth.*, 186 A.D.2d 383, 383-4 (1st Dep't

1992); *Hogan v. Kelly*, 86 A.D.3d 590, 592 (2d Dep't 2011).[6]  As a result, Better cannot be liable for acts of purported retaliation committed before § 740's effective date of January 26, 2022, which includes every retaliatory act alleged in the Complaint other than Plaintiff's last day as an employee on February 4, 2022, which, as shown below, obviously cannot constitute an independent act of retaliation in any event.  In *Ahmad v. Morgan Stanley & Co., Inc.*, the court concluded that, because the analogous whistleblower provision of the Dodd-Frank Act was not retroactive, the defendant could be liable "only for acts of retaliation committed on or after Dodd-Frank's effective date."  2 F. Supp. 3d 491, 499 (S.D.N.Y 2014).  Here, three of the four acts of retaliation alleged by Plaintiff occurred *before* January 26, 2022: (1) CEO Garg's December 8, 2021 email reflecting his conversations with the Board; (2) Plaintiff's January 6, 2022 placement on administrative leave after her voluntary resignation on December 17 and while the parties' counsel were attempting to negotiate a severance package; and (3) notice to Plaintiff, on January 15, 2022, that her resignation would be processed and her employment would be formally terminated effective January 18, 2022.[7]  None of these alleged retaliatory actions can possibly be actionable under the version of § 740 that could apply—the version amended to be effective as of January 26, 2022.

---

[6] Under New York law, "[a]mendments are presumed to have prospective application unless the Legislature's preference for retroactivity is explicitly stated or clearly indicated." *Piligian v. Icahn Sch. of Med. at Mount Sinai*, 490 F. Supp. 3d 707, 724 (S.D.N.Y. 2020) (quoting *Matter of Gleason*, 96 N.Y.2d 117, 122 (2001)). Section 740 contains no express statement of retroactivity, and the New York legislature postponed the effective date of the amendment by 90 days, which further demonstrates that there is no implied retroactivity. S. 4394-A, 2021-22 S., Reg. Sess. (N.Y. 2021); *see People v. Utsey*, 7 N.Y.3d 398, 403-04 (2006); *Deutsch v. Catherwood*, 31 N.Y.2d 487, 489 (1973).

[7] As noted above, this was subsequently extended to permit Plaintiff to consider the Company's severance proposal. Compl. ¶ 148(c).

That leaves Plaintiff's fourth (and only other) alleged act of retaliation: that "the Company terminated Ms. Pierce's employment" on February 4, 2022. Compl. ¶ 148(d). In order to invoke the new § 740, as amended, Plaintiff attempts to split her alleged retaliatory termination into two separate dates: the date she was notified of her "termination" (January 15, 2022) and the date that her "termination" formally went into effect (February 4, 2022). Compl. ¶ 148. But Plaintiff is not the first person to have used this tactic: the Supreme Court, as well as lower courts including in the Second Circuit, have repeatedly considered similar efforts and have consistently concluded that an employee's claim accrues when a termination decision is made and communicated to the employee, not when it ultimately goes into effect. *See Delaware State College v. Ricks*, 449 U.S. 250, 258 (1980) (under Title VII, the "only alleged discrimination occurred . . . at the time the tenure decision was made and communicated to Ricks. That is so even though one of the *effects* of the denial of tenure—the eventual loss of a teaching position—did not occur until later"); *Chardon v. Fernandez*, 454 U.S. 6, 8 (1981) (employment discrimination claim accrued when "the operative decision was made—and notice given—in advance of a designated date on which employment terminated."); *Shultz v. Congregation Shearith Israel of City of New York*, 867 F.3d 298, 305 (2d Cir. 2017) (employee's claim is actionable on the date "when the employer notifies the employee he is fired, not on the last day of his employment") (citation omitted); *Cordone v. Wilens & Baker, P.C.*, 286 A.D.2d 597, 598 (1st Dep't 2001) (same).

With respect to the specific context of § 740, courts have routinely applied this exact principle. In *Dykstra v. Wyeth Pharmaceuticals, Inc.*, for example, the Second Circuit held that where an employee's ultimate termination "flows as an inevitable consequence" from an earlier notice of suspension, the two are "properly viewed as one personnel action" occurring on the earlier date. 454 F. App'x 20, 22-23 (2d Cir. 2012). And in *Thompson v. Jamaica Hosp. Med.*

*Ctr.*, the court held that plaintiff's claim arose when he was given notice that he would be terminated, not on the termination's effective date. No. 13 Civ. 1896, 2016 WL 4556905, at *3 (S.D.N.Y. Aug. 30, 2016).

Here, Plaintiff's own allegations make clear that the latest alleged retaliatory act she challenges took place on January 15, 2022, when the Company's outside counsel informed Plaintiff that the Company would "process her resignation," Compl. ¶ 146. On that same day, pursuant to her own allegations, Plaintiff emailed the Company's General Counsel and stated that "[m]y attorney was informed [by the Company's outside counsel] that *I have been terminated effective this Wednesday . . .*" Compl. ¶ 15 (emphasis added). That happened 11 days *before* the amendment to § 740 went into effect. The fact that the Company later, in Plaintiff's words, "extended this date to allow Ms. Pierce time to consider" the Company's latest counterproposal, Compl. ¶ 148(c), does not change the rule that, for purposes of § 740 and analogous statutes, the latest purportedly retaliatory act occurred on January 15, 2022. *See, e.g., Thompson*, 2016 WL 4556905, at *3 (plaintiff's § 740 claim "beg[an] to accrue when [he was] given a notice of termination for retaliatory reasons and not [on] the actual termination date."). Accordingly, Plaintiff's claims should be dismissed because they are not actionable under the amended version of § 740 that governs here and this Court need not engage in any further analysis.

## II. PLAINTIFF FAILS TO STATE A CLAIM UNDER THE AMENDED VERSION OF § 740

Even if the Court were to hold that the amended version of § 740 applied to one or more of her allegations of retaliation, Plaintiff still has failed to state a claim because she has not pleaded facts sufficient to plausibly show that: (1) she engaged in the kind of whistleblowing protected by the New York statute; and (2) the Company subsequently took "retaliatory action" against her because of that whistleblowing. NYLL § 740(2).

### A. Plaintiff Has Not Alleged that She Engaged in Whistleblowing

Section 740, as amended, prohibits an employer from retaliating against an employee who has "disclos[ed]," "threaten[ed] to disclose," "object[ed] to or refus[ed] to participate in" an activity that the employee "reasonably" believed to be in violation of law, rule or regulation. NYLL § 740(2). While no court has yet defined the "reasonable belief" required by the statute, courts in these circumstances have routinely looked to analogous federal law to determine how the new law should be applied. *See, e.g., HC2, Inc. v. Delaney*, 510 F. Supp. 3d 86, 97-98 (S.D.N.Y. 2020). And the courts that have interpreted nearly identical language in federal whistleblower statutes have held that the statutory phrase "reasonable belief" means that an employee must have "both a subjective belief and an objectively reasonable belief that the conduct they complained of constituted a violation of relevant law." *See Tonra v. Kadmon Holdings, Inc*., 405 F. Supp. 3d 576, 591 (S.D.N.Y. 2019) (citation omitted); *March v. Metro-North Railroad Co.*, 369 F. Supp. 3d 525, 534 (S.D.N.Y. 2019). In addition, in order to satisfy their pleading standard, a plaintiff must "identify the particular activities, policies or practices in which the employer allegedly engaged, so that the complaint provides the employer with notice of the complained-of conduct." *Klein v. Brookhaven Health Care Facility*, No. 17 Civ. 4841, 2019 WL 1459258, at *10 (E.D.N.Y. Mar. 11, 2019), *report and recommendation adopted*, No. 17 Civ. 4841 (E.D.N.Y. Mar. 31, 2019) (citation omitted). As explained below, Plaintiff fails to satisfy these requirements here.

***The Organic Traffic Allegations.*** As noted above, Plaintiff contends that she engaged in protected whistleblowing in March and May 2021 when she "raised her concerns" to Better's CEO and General Counsel about a statement in "the Company's May 2021 S-4 filing" concerning organic website traffic. Compl. ¶¶ 38-39. Plaintiff alleges that this statement, which reads, in relevant part, "we believe approximately 30% of our [direct-to-consumer] funded loans were generated from organic internet traffic" was contrary to Plaintiff's own view that "[n]o more than

"12%" of such loans were generated from organic traffic.  *Id.*  Plaintiff, however, provides no description of how she "raised her concerns," what she said about them, the basis for her estimate that the relevant number was 12%, or why the Company's disclosure of its estimate was inaccurate, let alone unlawful.  *Id.*  In other words, Plaintiff's allegations fail to give this Court a sufficient basis to conclude that she has plausibly alleged a reasonable belief that the Company's disclosure violated the law.

As an initial matter, Plaintiff's allegations are directly contradicted by Better's S-4.[8]  *See, e.g., Kramer v. Time Warner Inc.,* 937 F.2d 767, 773 (2d Cir. 1991).  The language Plaintiff quotes comes not from a filing made by Better in May 2021, but from one made by Aurora Acquisition Corp. four months later in August 2021.[9]  While Plaintiff attributes this mistake to a "typographical error" (see Pl.'s Pre-Mtn. Ltr., ECF No. 23 at 1, fn. 1), that misses the point. Plaintiff's allegations that she "raised concerns" in March and May about a statement that would not be made for another 4-6 months fails the plausibility test.  Nor is it plausible that Plaintiff, the self-described "functional equivalent of [Better's] Chief Operating Officer," (Compl. ¶ 2) reasonably believed that the Company intended to make a material misrepresentation sufficient to violate federal securities laws, but took no steps whatsoever to correct that misstatement after it was made.  At most, Plaintiff has alleged a disagreement with her colleagues about the appropriate calculation of the Company's organic traffic revenue.  But that is not enough to state a claim here. *Tonra* at 589-91 (dismissing SOX whistleblower claim on the ground that plaintiff insufficiently alleged that "it

---

[8] As noted above, the Court may consider documents incorporated by reference in the Complaint, and this S-4 is referenced at ¶ 38.  *See Kramer v. Time Warner, Inc.*, 937 F.2d 767, 777 (2d Cir. 1991) (considering documents filed with SEC on a motion to dismiss).

[9] *See* Form S-4 Registration Statement, Aurora Acquisition Corp. (Aug. 3, 2021), https://www.sec.gov/Archives/edgar/data/0001835856/000119312521235147/d154116ds4.htm. In May 2021, Better announced a plan to become a publicly traded company through a merger with Aurora Acquisition Corp, a SPAC.  *See* Compl.  ¶ 33.  That merger has yet to occur.

would be reasonable to believe that the failure to disclose [certain information] in investor materials violated the securities laws").

      ***The Profitability Allegations.*** Plaintiff next alleges that CEO Garg "represented to the Board of Directors and investors—without any basis—that the Company would achieve profitability by the end of the first quarter 2022." Compl. ¶ 41. According to Plaintiff, she disagreed with this prediction as being one or two quarters too early and she "confronted" CEO Garg about it. *Id.* ¶ 42. But, once again, Plaintiff's allegations do not identify, or even attempt to approximate, a specific instance where CEO Garg actually made this alleged representation, to which board members or "investors" he supposedly made it, or even what he supposedly said, thereby making it impossible for the Company or this Court to identify the conduct she now alleges violated the law. *See Klein*, 2019 WL 1459258, at *10 (dismissing § 740 claim because the plaintiff "failed to identify the particular activities, policies or practices in which the employer allegedly engaged sufficient to put [the employer] on notice of the complained-of conduct."). And, because Plaintiff does not describe the content or context of CEO Garg's purported statements, she cannot plausibly allege that she possessed a reasonable belief that those statements violated the law. At most, Plaintiff has described a conversation with her boss in which she disagreed with him about predicting the timing of a future event. That is not protected whistleblower activity under § 740. *See Diaz v. Transatlantic Reinsurance Co.*, No. 16 Civ. 1355, 2016 WL 3568071, at *5 (S.D.N.Y. June 22, 2016) ("Plaintiff's bald assertions that she 'expressed concern about . . . [internal issues]' are precisely the type of conclusory statements that cannot sustain a [federal whistleblower retaliation] claim."); *Sharkey v. J.P. Morgan Chase & Co.*, No. 10 Civ. 3824, 2011 WL 135026, at *6-*8 (S.D.N.Y. Jan. 14, 2011).

***The RIF Allegations.*** Plaintiff claims she engaged in whistleblowing when she complained about CEO Garg's handling of the RIF event. Virtually all of the complaints she describes, however, concern the way that CEO Garg handled the RIF event as an employee and public relations matter, not as a legal matter, Compl. ¶¶ 46-85, and therefore are not protected by § 740. *See New York ex rel. Khurana v. Spherion Corp.*, 511 F. Supp. 3d 455, 476 (S.D.N.Y. 2021).

Plaintiff's suggestion that the RIF event implicated the federal or California WARN Act also falls short of plausibly alleging that she engaged in protected activity under § 740. Compl. ¶¶ 51-52. Importantly, Plaintiff's Complaint lacks any allegation that the Company at any point intended to, or actually did, violate the WARN Acts.[10] Instead, she merely alleges that, in one of many internal meetings before the RIF event took place, and in the midst of ongoing "disagreement" with senior leaders about the Company's obligations, CEO Garg "gave [a] clear directive" to pay less severance to terminated employees than the California WARN Act supposedly requires. *Id.* ¶ 52. There is no allegation that the Company's HR or legal professionals followed through on that "directive," that CEO Garg himself subsequently did so, or that Plaintiff reasonably believed that Better would do so.

More fundamentally, even if Plaintiff had reasonably believed that the RIF event violated either WARN Act, Plaintiff does not allege that *she*, as opposed to others at the Company (any of the Company's lawyers, for example, whom Plaintiff acknowledges participated in the discussions concerning the RIF event), was the person who raised concerns about the WARN Acts. Instead, she repeatedly concedes that Better's internal legal professionals and outside counsel "explained

---

[10] In fact, as Plaintiff is well-aware, the Company did compensate employees terminated pursuant to the RIF event consistent with the requirements of the WARN Acts.

very clearly that the RIF would . . . trigger, at least, the California WARN Act," and that she and others agreed. Compl. ¶ 51; *see also id.* ¶¶ 52, 83. Merely raising "generalized concerns . . . widely shared and voiced by others," as Plaintiff alleges she did, "is not itself conduct that rises to the level of protected activity" under § 740. *Khurana*, 511 F. Supp. 3d at 476.

***The Black Box Allegations.*** Finally, in a set of allegations as confusing as they are misleading, Plaintiff claims that CEO Garg's December 8 email somehow constituted a potential violation of law on which she blew the whistle. More specifically, Plaintiff alleges that CEO Garg told the Board of Directors that the Company's metrics were "a black box" and that Plaintiff engaged in protected activity when she told the Board on December 9, 2022 that the Company's (financial and performance) metrics were *not* a black box, Compl. ¶¶ 43-44. One problem with that theory is that it completely misrepresents the December 8 email, which makes it clear that it was the *Board*, not CEO Garg, who thought that the Company's metrics were a black box. Doniger. Decl., Ex B. This Court "is not obliged to reconcile plaintiff's own pleadings that are contradicted by other matters . . . incorporated by reference by a plaintiff in drafting the complaint." *B.B. v. The New Sch.*, No. 17 Civ. 8347, 2018 WL 2316342, at *6 (S.D.N.Y. Apr. 30, 2018). Where a plaintiff does not "cast doubt on the authenticity or veracity" of such materials and cannot explain a "conflict between his allegations and the exhibits," the "contradicted allegations are implausible" and "will not defeat a motion to dismiss." *Id.*; *see also Bailey v. N.Y. Law Sch.*, No. 16 Civ. 4283, 2017 WL 6611582, at *7 (S.D.N.Y. Dec. 27, 2017).

Indeed, the fact that it was the Board and not the CEO who made these comments renders Plaintiff's claims nonsensical. Plaintiff does not and cannot explain how she engaged in protected whistleblowing when she "addressed this misstatement" with the Board on December 9 and disputed a statement that the Board itself had made. Plaintiff likewise cannot explain how or why

she could have reasonably believed that the ambiguous assertion by the Board that the Company's [financial and performance] metrics were a "black box" somehow violated any law.  As a result, these allegations do not constitute whistleblowing for purposes of § 740.  *See, e.g., Portes v. Wyeth Pharms., Inc.*, No. 06 Civ. 2689, 2007 WL 2363356, at *4 (S.D.N.Y. Aug. 20, 2007).

## B. Plaintiff Has Not Plausibly Alleged Retaliation

Even if any of the allegations described above sufficiently established that Plaintiff engaged in some form of protected whistleblowing under § 740—and none of them do—Plaintiff has also failed to plausibly allege that she faced any retaliation as a result.  NYLL § 740(2).

Section 740 prohibits an employer from taking retaliatory action against an employee "*because*" the employee engages in activity protected by the statute. § 740(2)(emphasis added). The word "because" does real work here—§ 740 provides employers a complete defense if "the retaliatory action was predicated upon grounds other than the employee's exercise of any rights protected by this section." § 740(4)(c).  Thus, a plaintiff making § 740 claims must plead facts to meet this "high causation" threshold, *Beers v. Kaiser Permanente Ne. Div.*, No. 98 Civ. 1121, 1999 WL 1269419, at *4 (N.D.N.Y. Dec. 16, 1999)—facts sufficient to "warrant the inference that . . . the adverse employment action *would not have been taken* absent the employee's protected [activity]." *Dougherty v. Mem'l Sloan-Kettering Cancer Ctr.*, No. 00 Civ. 4083, 2002 WL 1610916, at *6 (S.D.N.Y. July 22, 2002) (emphasis added). *See also, e.g., E.E.O.C. v. Abercrombie & Fitch Stores*, 575 U.S. 768, 772-73 (2015) (statutory use of the term "because" "typically imports, at a minimum, the traditional standard of but-for causation"); *Sherman v. Cnty. of Suffolk*, 71 F. Supp. 3d 332, 348 (E.D.N.Y. 2014) (interpreting use of "because" in the ADEA to require showing that discrimination was "but for cause of employer's adverse action") (quoting *Gross v. FBL Fin. Servs.*, 557 U.S. 167, 177-78 (2009)).

As noted above, Plaintiff identifies four adverse employment actions that allegedly resulted from her purported whistleblowing: (1) CEO Garg's December 8 email, which she claims "scapegoat[ed]" her for a "mishandled" RIF; (2) her January 6, 2022 placement on paid administrative leave during negotiations over the terms of her December 17, 2021 resignation; (3) outside counsel's January 15, 2022 statement that it would "process her resignation" and that her final date would be January 18, 2022; and (4) her ultimate February 4, 2022 termination. Compl. ¶ 148. But, as discussed below, Plaintiff has failed to meet the "high threshold" of alleging that any of these actions "would not have been taken" absent her alleged whistleblowing. *Beers*, 1999 WL 1269419 at *4; *Dougherty*, 2002 WL 1610916, at *6.

1. Plaintiff Fails to Allege Any Retaliation Occurred "Because of" Her Alleged Whistleblowing

On December 17, 2021, Plaintiff voluntarily resigned, informing CFO Ryan that she would "like to begin transitioning out of my role and Better," and proposing outrageous severance terms: $54 million in share buy-backs and unearned compensation and a post-employment consulting contract with the Company, on top of the millions she already had been paid during her five years at the Company. Compl. ¶ 112; Doniger Decl., Ex. B. Only one of the retaliatory employment actions alleged in the Complaint pre-dates that December 17 resignation—the Board's decision on December 8, 2021 to begin searching for certain senior management candidates to fill roles other than Plaintiff's. With respect to that decision, Plaintiff has failed to allege any plausibly retaliatory intent by the Board because, according to her own allegations, the Board was not even aware of her alleged whistleblowing. Compl. ¶ 44.

The other three retaliatory employment actions challenged by Plaintiff—namely, her placement on administrative leave during negotiations between Company lawyers and her outside counsel over her severance; the Company's processing of her resignation; and the effective date

of her termination—all took place *after* she had already submitted her resignation (or what she now terms her "transition proposal"). Compl. ¶ 112. Regardless of the language she now uses to describe it, Plaintiff made clear on December 17, 2021 that she no longer wished to remain employed at Better. Compl. ¶¶ 112-13; Doniger Decl., Ex. B. As a result, any alleged actions that subsequently took place could not possibly have been "but for" her alleged whistleblowing.

a) Plaintiff Fails to Plausibly Allege a Retaliatory Act Before December 17

Plaintiff alleges only one retaliatory act before her December 17 email, claiming that CEO Garg's December 8 email was retaliatory because it "indicat[ed] that she was incompetent," that Plaintiff "had not, and could not, measure the Company's financial performance," and recommended that a search committee be formed to replace her. Compl. ¶ 148(a). This is a blatant mischaracterization of the actual email, which is incorporated by reference in the Complaint. *See supra at* p. 22. In fact, the email nowhere mentions Plaintiff, her competence, whether she knew how to measure the Company's financial performance, or any intention on the part of the Board or anyone else to replace her; those words simply cannot be found in the December 8 email. *See* Doniger Decl., Ex A. As discussed above, it merely reflects that the Board told CEO Garg that the Company's financial and performance metrics were a "black box" and that the Board wanted him to initiate a search for several senior executives, including a COO/President, a position that Plaintiff did not hold.[11] This Court need not accept as true Plaintiff's allegations

---

[11] Although Plaintiff repeatedly claims that the Company planned to "replace" her, her own allegations suggest the Company had no intention of terminating her employment. Rather, her allegation that CFO Ryan "acknowledged" that Plaintiff was "getting layered," Compl. ¶ 148, reflects Ryan's understanding that Pierce would maintain her position but a new COO would sit above her in the corporate hierarchy. *See* Monica Torres, "Is Getting 'Layered' At Work an Automatic Demotion?" *Huffpost* (Nov. 8, 2019), https://www.huffpost.com/entry/layered-at-work-explainer_1_5dc19ee0e4b03d0aad00f1a5. Indeed, Plaintiff's assertion that she was being

when they are plainly contracted by documents incorporated by reference in the Complaint. *See Rapoport v. Asia Elecs. Holding Co.*, 88 F. Supp. 2d 179, 184 (S.D.N.Y. 2000).

At most, the December 8 email reflects that *the Board* viewed the Company's metrics as a "black box" and that *the Board* wanted the Company to hire a "seasoned" COO and President (and to fill other senior-level positions). Plaintiff cannot plausibly allege that the Board gave those instructions to retaliate against her since, among other things, Plaintiff does not allege that the Board was even aware of any of her purported whistleblowing. The Complaint alleges that the Board was aware of a single instance of her purported whistleblowing, which occurred on December 9—the day *after* the relevant Board meeting, when she allegedly went to the Board to push back on the concern that the company's financial and performance metrics were a "black box." Compl. ¶ 44. Plaintiff does not and cannot explain how the Board could possibly have retaliated against her on December 8 for future whistleblowing that occurred on December 9. Indeed, courts have found that "[a]lleged adverse employment action cannot be retaliatory if it occurred before the protected conduct." *Joshi v. Tr. of Columbia Univ.*, 515 F. Supp. 3d 200, 218 (S.D.N.Y. 2021), *aff'd*, No. 21-418, 2022 WL 3205883 (2d Cir. Aug. 9, 2022).

b) Plaintiff Fails to Plausibly Allege Retaliatory Acts After December 17

Plaintiff's Complaint and the December 17 email to CFO Ryan make it clear that Plaintiff communicated her intent to resign as of December 17, 2021. Compl. ¶ 112; s*ee* Doniger Decl., Ex. B. The Complaint alleges that she submitted a "transition proposal" that included an offer to return 1,100,000 stock options in exchange for $29,700,000 and to "use the information in my possession to be an advocate of the company and not an adversary." Compl. ¶ 113. She even

---

"layered" does not plead an adverse employment action at all. *See Jones v. New York City Bd. of Educ.*, No. 09 Civ. 4815, 2012 WL 1116906, at *10 (S.D.N.Y. Apr. 2, 2012).

alleges that the original draft of her December 17 email stated that it was not a resignation, but that she decided to remove that language from the version she ultimately sent. *Id.* ¶ 114. But the fact that she omitted this language from the version she sent, if anything, lends further weight to the plain language of the email, which expresses a clear and unreserved intent to depart from the Company. Indeed, she neglects to mention in her Complaint that she also wrote in that email that she would "like to begin transitioning out of [my] role and Better" and offered "to assist in a smooth transition" as a paid "*non-employee* independent contractor" and consultant to the Company. Doniger Decl., Ex. B (emphasis added). There is only one way to read the plain meaning of these words: Plaintiff no longer wanted to be a Better employee and wrote to put the Company on notice that she was quitting.

This correspondence, and the severance negotiations that ensued thereafter, Compl. ¶ 119-22, 145-46, further establish that Plaintiff has not pleaded facts sufficient to suggest that any alleged adverse employment action "*would not have been taken* absent" Plaintiff's alleged whistleblowing. *Dougherty*, 2002 WL 1610916, at *6 (emphasis added). The caselaw is clear that an "intervening event between the protected activity and the adverse employment action"—especially an employee's own actions—"may defeat the inference of causation." *Tompkins v. Metro-N. Commuter R.R.*, No. 16 Civ. 9920, 2018 WL 4573008, at *7 (S.D.N.Y. Sept. 24, 2018) (employee's refusal to work in weather conditions broke chain of causation between protected activity and adverse employment action), *aff'd*, 983 F.3d 74 (2d Cir. 2020); *see also Nolley v. Swiss Reisnurance Am. Corp.*, 857 F. Supp. 2d 441, 461-62 (S.D.N.Y. 2012) (any inference of causation in Title VII retaliation claim was broken by negative feedback about plaintiff's interpersonal style from partner firms), *aff'd*, 523 F. App'x 53 (2d Cir. 2013). Here, Plaintiff's voluntary resignation was an "intervening event" that clearly breaks any inference of a causal link

between her alleged protected activity and the employment actions at issue, much in the same way that an employee's whistleblowing cannot, as a matter of law, supersede an employer's prior intention to terminate them. *See Baldwin v. Goddard Riverside Comm. Ctr.*, 53 F.Supp.3d 655, 674 (S.D.N.Y. 2014).

When deciding a motion to dismiss, "the Court is not obligated to suspend its common sense." *Turnbull v. JPMorgan Chase & Co.*, No. 21 Civ. 3217, 2022 WL 608708, at *5 (S.D.N.Y. Feb. 24, 2022) (concluding that Plaintiff's proffered explanation for his termination—retaliation by his employer—was implausible, particularly in light of alternative, more plausible explanations); s*ee also, e.g., Alexander v. Bd. of Educ. of City of N.Y.*, 648 F. App'x 118, 120-21 (2d Cir. 2016) (considering an alternative explanation for plaintiff's termination in determining that claims of retaliatory intent were implausible). Here, the only plausible inference is that because of Plaintiff's voluntary resignation on December 17, the Company put Plaintiff on administrative leave on January 6, 2022 (20 days into severance negotiations between the parties' counsel, Compl. ¶ 139), decided to process her resignation on January 15, and terminated her employment effective February 4, 2022.[12] Plaintiff has pointed to no facts that nudge her theory of retaliation "across the line from conceivable to plausible" and, accordingly, her § 740 claims should be dismissed. *Iqbal*, 556 U.S. at 680; *see also, e.g.*, *Zuro v. Town of Darien,* 432 F. Supp. 3d 116, 127 (D. Conn. 2020) (dismissing ADA retaliation claim where "the premise of plaintiff's retaliation argument . . . is facially implausible").

---

[12] Notably, as discussed above, the February 4, 2022 effective date of Plaintiff's termination is the only alleged event that post-dates the effective date of the amended § 740. For the reasons discussed at Part I, *supra*, the amended statute still does not apply to her claims. But even if it did, Plaintiff certainly has not plausibly alleged that the Company allowed her termination to go into effect on February 4, 2022 "because" of her protected activity rather than because of an administrative process initiated at the time the Company said it would "process her resignation" before the statute went into effect. Compl. ¶ 146.

2.    Plaintiff 's Organic Traffic and Profitability Allegations Cannot
      Supply the Requisite Causal Connection

As explained above, the December 17 voluntary resignation email and subsequent severance negotiations dispose entirely of Plaintiff's claim that she was retaliated against. But Plaintiff's alleged whistleblowing regarding the Organic Traffic and Projection allegations cannot supply the requisite causal connection for the additional reason that the causal link is broken, as a matter of law and logic, by (1) intervening positive, non-retaliatory employment actions, *see Byrne v. Telesector Res. Grp., Inc.*, 339 F. App'x 13, 17-18 (2d Cir. 2009), and (2) the passage of time, *see Duarte v. St. Barnabas Hosp.*, 265 F. Supp. 3d 325, 353 (S.D.N.Y. 2017)*.

Specifically, Plaintiff alleges that she engaged in whistleblowing about the Organic Traffic and the Projection allegations in March and May 2021 and at some unspecified time in the fourth quarter of 2021.[13]  Compl. ¶¶ 38-40.  According to her own allegations, several months *after* these purported acts of whistleblowing occurred, the Company *awarded her a $1 million discretionary bonus* in October 2021.  *See* Compl. ¶ 31.  This fact renders implausible any inference that she was retaliated against for the Organic Traffic and Projection allegations, which pre-date, by

---

[13] Plaintiff's claims concerning the timing of her alleged whistleblowing about the profitability projections are extremely unclear.  The section of her Complaint labelled "Misrepresentation Regarding Time Horizon to Achieve Profitability" generally places the allegations in the fourth quarter of 2021, but provides no date for any of the alleged events, including her "confront[ation]" with CEO Garg.  Compl. ¶¶ 40-42.  This alone makes it impossible for the Court to assess whether Plaintiff has plausibly alleged a protected activity or retaliation. *See Klein*, 2019 WL 145928, at *10. In Paragraph 145 of her Complaint, Plaintiff also alleges that during her January 12, 2022 interview with Better's General Counsel, she raised her concerns about CEO Garg's profitability projections. *Id.* ¶ 145. However, this interview occurred *after* Plaintiff submitted her resignation on December 17, 2021, and was placed on administrative leave on January 6, 2022, so, for all the reasons discussed at Part B(1)(b), *infra*, it cannot support an inference of "but for" causation.  An employer "need not suspend previously planned actions upon discovering that a protected activity occurred, and their proceeding along lines previously contemplated, though not yet definitely determined, is no evidence whatever of causality." *Baldwin*, 53 F.Supp.3d at 674(alterations omitted) (quoting *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 272 (2001)).  Here, the wheels of Plaintiff's departure were well in motion by the time of the January 12, 2022 interview.

months, her $1 million bonus payment. *See Byrne*, 339 F. App'x at 17—18 (affirming dismissal of Title VII retaliation claim where the plaintiff's "promotion effectively negated [her] otherwise unsupported claim that" the defendant's conduct "was motivated by a retaliatory intent"); *Williams v. N.Y. City Dep't of Educ.*, No. 19 Civ. 01353, 2021 WL 1178118, at *9—10 (S.D.N.Y. Mar. 29, 2021) (holding in Title VII retaliation claim that the fact that the plaintiff "was promoted to Principal" was an "intervening positive employment action [that] breaks any alleged causal link"); *Richardson v. Bronx Lebanon Hosp.*, No. 11 Civ. 9095, 2014 WL 4386731, at *13 (S.D.N.Y. Sept. 5, 2014) (holding in Title VII case that receipt of a promotion and $10,000 raise "further underscores the absence of any causal connection"); *see also Heaney v. GBS Properties LLC*, No. 2004-SOX-00072, 2004 WL 5840286, at *3 (U.S. Dep't of Labor SAROX Dec. 2, 2004) (in SOX whistleblower action, holding employee failed to demonstrate retaliation where his employment "continued . . . uninterrupted" after he allegedly engaged in protected conduct and noting that he "even receiv[ed] awards").

But even if Plaintiff had not received a significant bonus after her alleged whistleblowing, the nine-month temporal gap between her alleged whistleblowing, which began in March 2021, and the alleged adverse employment actions, which began in December 2021, is too long to support a plausible inference of "but for" causation in any event. *Turnbull*, 2022 WL 608708, at *5 (noting that the Second Circuit uses "as a starting point the initiation of the protected conduct" and dismissing claim where employee was terminated eight months after the alleged protected activity began because eight months "is too long a delay to permit an inference of retaliation"); *see also Duarte*, 265 F. Supp. 3d at 353 ("[D]istrict courts within the Second Circuit have consistently held that the passage of two to three months between the protected activity and the adverse employment action does not allow for an inference of causation.").

## **CONCLUSION**

For the reasons set forth above, Plaintiff's sole cause of action against Better should be

dismissed.

Dated: September 16, 2022
New York, New York

_____

Roberta A. Kaplan
KAPLAN HECKER & FINK LLP
350 Fifth Avenue, 63rd Floor
New York, New York 10118
Telephone: (212) 763-0883
rkaplan@kaplanhecker.com

*Counsel for Better Hold Co.*

# APPENDIX A



**October 2021**: Company pays plaintiff $1,000,000 bonus (¶ 31).

**January 6, 2022, Alleged Employment Retaliation**: Plaintiff placed on administrative leave (¶ 12).

**February 4, 2022, Alleged Employment Retaliation**: Plaintiff's final date (¶ 17).

**December 8, 2021, Alleged Employment Retaliation:** "Black Box" email describing Board of Directors' conversation with CEO (¶ 87-88) (Ex. A).

**January 15, 2022, Alleged Employment Retaliation**: Plaintiff advised resignation will be processed, final date to be Jan 18, 2022 (¶ 148c).

2021

2022

2022

**Q4 2021, Alleged Protected Activity**: Projection allegations (¶¶ 40-41).

**Beginning First Week December 2021, Alleged Protected Activity**: RIF allegation (¶¶ 75-78).

**December 17, 2021**: Plaintiff sends resignation email (Ex. B).

**March-May 2021, Alleged Protected Activity:** Organic Traffic allegations (¶ 39).

**December 9, 2021, Alleged Protected Activity**: "Black Box" email complaint (¶ 44).

**January 26, 2022**: NYLL § 740 Amended

30