**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
---------------------------------------------------------------X
SARAH J. PIERCE,

              Plaintiff,

-against-                            No. 1:22-cv-04748 (AT)(OTW)

BETTER HOLDCO, INC., VISHAL GARG,
and NICHOLAS CALAMARI,

                    Defendants.
---------------------------------------------------------------X


**CONSOLIDATED MEMORANDUM OF LAW IN**
**OPPOSITION TO SEPARATE MOTIONS TO DISMISS BY**
**DEFENDANT BETTER AND DEFENDANTS GARG AND CALAMARI AND IN**
**SUPPORT OF PLAINTIFF'S CROSS-MOTION FOR LEAVE TO AMEND HER**
**COMPLAINT**


The Law Offices of Neal Brickman, P.C.
Neal Brickman
Ethan Leonard
420 Lexington Avenue – Suite 2811
New York, New York 10170
212-986-6840
neal@brickmanlaw.com
ethan@brickmanlaw.com
Attorneys for Plaintiff Sarah J. Pierce

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ………………………………………………………. iii-vii

PRELIMINARY STATEMENT ……………………………………………………  1

LIMITED STATEMENT OF FACTS ……………………………………………...  6

ARGUMENT ……………………………………………………………………....  13

    I.      GENERAL LEGAL STANDARD FOR CONSIDERING A PRE-ANSWER
           MOTION TO DISMISS ………………………………………………….  13

    II.     STANDARDS FOR AMENDMENT …………………………………….  15

    III.    PLAINTIFF HAS SET FORTH VALID CLAIMS UNDER NYLL §740 …  16

    IV.    PLAINTIFF HAS STATED A VALID DERIVATIVE CLAIM FOR
           BREACH OF FIDUCIARY DUTY AGAINST GARG AND THE BOARD
           OF BETTER ……………………………………………………………  25

    V.     PLAINTIFF HAS SET FORTH VALID CLAIMS FOR DEFAMATION…  27

    VI.    PLAINTIFF HAS SET FORTH A VALID CLAIM FOR INTENTIONAL
           INFLICTION OF EMOTIONAL DISTRESS ……………………………  33

    VII.   PLAINTIFF HAS SET FORTH A VALID CLAIM FOR TORTIOUS
           INTERFERENCE WITH A CONTRACT …………………………………  34

    VIII.  PLAINTIFF HAS SET FORTH A VALID CLAIM FOR BREACH OF
           CONTRACT ……………………………………………………………..  36

CONCLUSION …………………………………………………………………  37

# TABLE OF AUTHORITIES

**Cases**

*Aetna Cas. & Sur. Co. v. Aniero Concrete Co.,*
    404 F.3d 566 (2d Cir. 2005)     …………………………     15

*Alloy Advisory, LLC v. 503 West 33rd St. Associates, Inc*.,   …………………………    36
    195 A.D.3d 436 (1st Dept 2021)

*American Protein Corp. v. AB Volvo,*
    844 F.2d 56 (2nd Cir), *cert. denied,*
    488 U.S. 852, 109 S.Ct. 136, 102 L.Ed.2d
    109 (1988)     …………………………     35

*Armstrong v Simon & Schuster*,
    85 N.Y.2d 373 (1995)     …………………………     28

*Ashcroft v. Hammond,*
    197 N.Y. 488 (1910)     …………………………     32

*Ashcroft v. Iqbal,*
    129 S. Ct. 1937 (2009)     …………………………     13,14

*Baldwin v. Goddard Riverside Comm. Ctr.,*
    53 F.Supp.3d 655 (SDNY 2014)     …………………………     24

*Bank of New York v. Berisford Int'l*,
    190 A.D.2d 622 (1st Dept 1993)     …………………………     35

*Beers v. Kaiser Permanente Ne. Div*., No.
    98 Civ. 1121, 1999 WL 126419 (NDNY 1999)   …………………………     23

*Bell Atl. Corp. v. Twombly,*
    544 F. Supp. 2d 199 (SDNY  2008)     …………………………     13,14

*BIB Constr. Co. Inc. v. City of Poughkeepsie*,
    612 N.Y.S.2d 283 (3rd Dept 1994)     …………………………     35

*Biro v. Conde Nast*,
    883 F.Supp.2d 441 (S.D.N.Y. 2012)     …………………………     28,31

*Brehm v. Eisner*,
    746 A.2d 244 (Del. 2000)     …………………………     26

*Chambers v. Time Warner, Inc.*,
    282 F. 3d 147 (2nd Cir. 2002) ………………………… 13

*Chardon v. Fernandez*,
    454 U.S. 6 (1981) ………………………… 20

*Christopher Lisa Matthew Policano, Inc. v. North American Precis Syndicate, Inc.*,
    129 A.D.2d 488 (1st Dept 1987) ………………………… 27

*Cohen v. Davis*,
    926 F.Supp. 399 (SDNY 1996) ………………………… 34-5

*Constantin Assoc. v. Kapetas*,
    851 N.Y.S.2d 68 (S.Ct.  NY County 2007) ………………………… 27

*Continental Collieries, Inc. v. Shober*,
    130 F.2d  631 (3rd Cir. 1942) ………………………… 14

*Cooper v. Parsky*,
    140 F. 3d 433 (2nd Cir. 1998) ………………………… 14

*Delaware State College v. Ricks*,
    449 U.S. 250 (1980) ………………………… 20

*Diaz v. Transatlantic Reinsurance Co.*,
    No. 16 Civ. 1355, 2016 WL 3568071 (SDNY 2016) ………………………… 23

*DiFolco v. MSNBC Cable L.L.C.*,
    2010 WL 3911330 (2nd Cir. 2010) ………………………… 14

*Dougherty v. Memorial Sloan Kettering*,
    No. 00 Civ. 4083, 2002 WL 1610916 (SDNY 2022) ………………………… 23

*Dunson v. Tri-Maintenance & Contractors, Inc.*,
    171 F.Supp.2d 103 (EDNY 2001) ………………………… 32

*Dykstra v. Wyeth Pharmaceuticals*,
    454 F. App'x 20 (2nd Cir. 2012) ………………………… 20

*EEOC v. Ambercrombie & Fitch*,
    575 U.S. 768 (2015) ………………………….... 23

*Flamm v. Van Nierop*,
    56 Misc.2d 1059 (Westchester Cty. S.Ct.1968)      ……………………………      34

*Flatley v. Hartmann*,
    138 A.D.2d 345 (2nd Dept 1988)      ……………………………      34

*Foman v. Davis*,
    371 U.S. 178 (1962)      ……………………………      15

*Frank v. National Broadcasting Co., Inc.*,
    119 A.D.2d 252 (2nd Dept 1986)      ……………………………      28

*Fraser v. Fiduciary Trust Co. Int'l*,
    417 F. Supp. 2d 310 (SDNY 2006)      ……………………………      23

*Gantler v. Stephens*,
    965 A.2d 695 (Del. 2009)      ……………………………      25

*G.D. Searle & Co. v. Medicore Communications, Inc.*,
    843 F.Supp. 895 (S.D.N.Y.1994)      ……………………………      35

*Gross v. FBL Fin. Svs.*,
    557 U.S. 167 (2009)      ……………………………      23

*Guard-Life Corp. v. S. Parker Hardware
Manufacturing Corp.*,
    50 N.Y.2d 183 (1980)      ……………………………      35

*Guttman v. Huang*,
    823 A.2d 492 (Del. Ch. 2003)      ……………………………      26

*Halio v. Lurie*,
    15 A.D.2d 62 (2nd Dept 1961)      ……………………………      34

*Harris v. Seward Park Hous. Corp.*,
    79 A.D.3d 425 (1st Dept. 2010)      ……………………………      36

*Hoeppner v. Dunkirk Print. Co.*,
    254 N.Y. 95 (1930)      ……………………………      32

*Howell v. New York Post Co.*,
    81 N.Y.2d 115 (1993)      ……………………………      33

*In re Orchard Enterprises, Inc. Stockholder Litig.*,
    88 A.3d 1 (Del. Ch. 2014)      ……………………………      25

*In re Walt Disney Co. Derivative Litig.*,
    906 A.2d 27 (Del. 2006)    …………………………    25,26

*In re Wonderwork, Inc.*,
    611 B.R. 169 (US Bankr. Ct, SDNY 2020)    …………………………    25

*Kasachkoff v. City of New York*,
    485 N.Y.S.2d 992 (1st Dept 1996)    …………………………    32

*KForce, Inc. v. Alden Personnel, Inc.*,
    288 F. Supp. 2d 513 (S.D.N.Y. 2003),    …………………………    13

*Khurana v. Spherion Corp.*,
    511 F.Supp.3d 455 (SDNY 2021)    …………………………    23

*Klein v. Brookhaven Health Care Facility*,
    2019 WL 1459258 (EDNY Mar. 11, 2019)    …………………………    22

*John Langenbacher Co. v. Tolksdorf*,
    199 A.D.2d 64 (1st Dept 1993)    …………………………    28

*Langenkamp v. New York University*,
    2012 WL 12540277 (SDNY March 15, 2012)    …………………………    28,31,32

*Leshinsky v. Televent GIT, S.A.*,
    942 F.Supp.2d 432 (SDNY 2013)    …………………………    23

*Levine v. Gurney*,
    149 A.D.2d 473 (2nd Dept 1989)    …………………………    34

*Liberman v. Gelstein*,
    80 N.Y.2d 429 (1992)    …………………………    32

*Mahony v. Keyspan Corp.*,
    2007 WL 805813 (EDNY Mar 12, 2007)    …………………………    23

*Matchett v. Stark*,
    2016 N.Y. Misc. LEXIS 2584 (SCt., NY Cty, 2016)    …………………………    28,31

*McManus v. Tetra Tech Construction, Inc.*,
    260 F.Supp.3d 197 (NDNY 2017)    …………………………    15

*Nolley v. Swiss Reinsurance Am. Corp.*,
    857 F.Supp.2d 441 (SDNY 2012)    …………………………    24

*November v. Time Inc.*,
    13 N.Y.2d 175 (1963)    …………………………    28,31

*Orenstein v. Figel*,
    677 F.Supp.2d 706 (SDNY 2009) ............................ 32

*Richardson Greenshields Securities, Inc. v. Lau*,
    825 F.2d 647 (2nd Cir. 1987) ............................ 15

*Riddell Sports Inc. v. Brooks*,
    872 F.Supp. 73 (SDNY 1995) ............................ 35

*Scheuer v. Rhodes*,
    416 U.S. 232 (1974) ............................ 14

*Schultz v. Congregation Shearith Israel of New York*,
    867 F.3d 298 (2nd Cir. 2017) ............................ 20

*Seymour v. New York Elec. & Gasoline Corp.*,
    627 N.Y.S.2d 466 (3rd Dept 1995) ............................ 32

*Sharkey v. J.P. Morgan Chase & Co.*,
    No. 10 Civ. 3824, 2011 WL 135026 (SDNY 2011) ............................ 23

*Sherman v. County of Suffolk*,
    71 F.Supp3d 322 (EDNY 2014) ............................ 23

*Sherry Bender v. City of New York, et al.*,
    78 F.3d 787 (2nd Cir. 1996) ............................ 34

*Stepanov v. Dow Jones & Co., Inc.*,
    120 A.D.3d 28 (1st Dept 2014) ............................ 28

*Stillman v. Ford*,
    22 N.Y.2d 48 (1968) ............................ 32

*Stone v. Ritter*,
    911 A.2d 362 (Del. 2006) ............................ 25-6

*Sweet v. Sheahan*,
    235 F. 3d 80 (2nd Cir. 2000) ............................ 13

*Tompkins v. Metro-North Commuter RR*,
    2018 WL 4573008 (SDNY 2018) ............................ 24

*United Food and Commercial Workers Union and
Participating Food Industry Employers Tri-State Pension
Fund v. Zuckerberg Eyeglasses*,
    262 A.3d 1034 (2021) ............................ 27

*Uniloeb Holdings LLC v. Shamus*,
    76 Misc.3d 1206(A) (SCt NY Cty August 25, 2022) ............................ 27

*3P-733, LLC v. Davis*,
     187 A.D.3d 626 (1st Dept 2020)      ………………………     28

**STATUTES:**

18 U.S.C. § 1514A ………………………………………………………     2

§78U-6(h)(1)(A)(i)-(iii) ………………………………………………     2

FRCP § 8(a)(2) ………………………………………………………...     13

FRCP § 8(e) …………………………………………………………....     14

FRCP § 12(b)(6) ……………………………………………………....     13

FRCP § 15(a) …………………………………………………………...     15

NYLL §740 ……………………………………………………………..     14-18,22,25

Worker Adjustment and Restraining Notification (WARN) Act  …………..1,2,7,11,17,22,23,26

72 N.Y.Jur.2d: Interference § 42      ……………………………………..     35

2 N.Y. PJI 236–37 (Supp.1996)      ……………………………………..     35

Plaintiff Sarah Pierce ("Pierce"), by and through her undersigned attorneys, The Law Offices of Neal Brickman, P.C., respectfully submits this consolidated Memorandum of Law in Opposition to the pending Motion to Dismiss of Better Holdco, Inc. ("Better") and the joint Motion to Dismiss filed on behalf of Vishal Garg ("Garg") and Nicholas Calamari ("Calamari"), and in Support of her Cross-Motion for Leave to Amend her initial Complaint.  Plaintiff should be permitted to amend her initial Complaint where, as here, there was no delay or prejudice. Moreover, there is no basis for dismissal of any of the remaining claims in the initial Complaint. Defendants' instant motions should be denied in their entirety.

<u>Preliminary Statement</u>

The allegations in both the Complaint and the proposed Amended Complaint are clear, complete, and more than sufficient properly to set forth each of the causes of actions alleged therein.  Defendants' attempt to create an entirely new narrative and to substitute that narrative for the well-pleaded allegations of the Complaint and the proposed Amended Complaint – as well as through mischaracterizing the existing allegations and clear language of the applicable law.  Their attempts run afoul of clear and long-standing case law and jurisprudence for determining pre-answer motions to dismiss in this jurisdiction.

In summary, Plaintiff was highly successful at, and a material contributor to the success of, Better.  She was the *de facto* COO and highly compensated for her contributions. The CEO Garg considered, and touted, her as the Number 2 Executive at the Company, until after December 1, 2021, when she first made complaint about Garg's illegal defamation of former employees, intended violation of the WARN Act, and misrepresentations concerning the

finances of the Company[1]; took steps to protect other employees from his retaliatory acts; and made complaint of the retaliatory acts taken against her.

Contrary to the mischaracterizations of the Defendants, the facts and the timeline are clear. On December 1, 2021, despite being warned against taking such action, Garg terminated 900 employees on a then publicly disseminated zoom meeting. In so doing and in the direct aftermath of such action, Garg publicly, knowingly, and purposefully defamed those employees; directed that Better not comply with its obligations under the WARN Act; and began to make false statements as to the bases for the terminations to the public. When Pierce questioned and complained about these activities, Garg excluded her from meetings and then – as corroborated by Better's CFO, Kevin Ryan ("Ryan") – used Pierce as a scape-goat for his actions to the Board. Garg improperly maligned Pierce to the Board, Senior Management, and thirty other executives (including those who reported to Pierce). Specifically, he called for the hiring of a "seasoned" executive who could "help manage and drive performance across business functions" and "build an inspirational leadership culture" as COO instead of, and in place of, Pierce. He further denigrated Pierce's actions as COO by asserting to the Board, and then improperly represented that the Board believed, that "the metrics of the Company are a black box." In

---

[1] Contrary to the explicit allegations of the Complaint (¶7) wherein Pierce notes that it was only after December 1, 2021 that Garg "began to state" knowing of its falsity that profitability would be obtained by Better in Q12022, Defendants now repeatedly claim that Pierce never alleges any time frame for these statements by Garg. While Pierce had previously made complaints about misrepresentations concerning the percentage of loans being generated from organic internet traffic and the functionality and capabilities of the Company's electronic mortgage origination platform ("Tinman"), the same are not directly applicable to the claims presented in this action. These allegations are more relevant to those made in the ongoing OSHA proceeding. At the beginning of June, 2022, Ms. Pierce filed a notice of claim with the Occupational Safety and Health Administration ("OSHA") against Better for retaliation in violation of the Sarbanes-Oxley Act of 2002 ("SOX") (as amended by Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank"), 18 U.S.C. § 1514A; §78U-6(h)(1)(A)(i)-(iii). On or about November 28, 2022, Ms. Pierce will be permitted to, and intends to, transfer that matter to the Federal District Court in the form of a new action that may or may not be then consolidated with the instant matter.

reality, Pierce had been completely transparent about Better's metrics.  It was Garg who had

ignored the metrics and repeatedly misrepresented them to the Board, shareholders, and the

public, including potential investors.  When Pierce corrected Garg and demonstrated that she

would not promulgate or perpetuate his knowing lies and wrote to the Board on December 9,

2022, Garg decided to take further steps to "get rid of" Pierce.  Contrary to the current

allegations of Defendants, the pleadings are clear that Garg's desires to get rid of Pierce did not,

at that time, equal a determination by Better, but rather were the self-serving desires of Garg

personally.

On December 10, 2021, Garg began to take some time off, and Ryan assumed his duties.

Ryan told Pierce to create a proposal to deal with her potential demotion.  In the context of that

request, Pierce made it clear to Ryan that she was NOT resigning, and that she had no intention

to resign.  Pierce informed Ryan that she wanted to remain at Better, but also complied with his

directive as the acting CEO.  True to her word, Pierce continued to fulfill all of her duties as

acting COO through the end of 2021 and through January 6, 2022.  On or about January 3, 2022,

Pierce met with Garg who had unilaterally decided that he had taken enough time off.  At that

juncture, the Board still wanted to know if Pierce wanted to stay or leave. Then Calamari took

over the negotiations concerning Pierce's ongoing role with Better in light of the presumptive

decision to demote her and Garg's pronouncement to get rid of her (*i.e.* "get her out").  On

January 6, 2022, Pierce was put on administrative leave because, according to Ryan, she was

claiming that she was "being retaliated against."  No wrongdoing on the part of Pierce was

alleged at that, or any other, time.  On January 12, 2022, Pierce sat for an employee interview in

which she reiterated many of her claims against Garg, as well as Calamari and Better, as

identified above (i.e. that Garg had knowingly violated a number of laws and disregarded the

advice of the subject matter experts and the unequivocal facts upon which they based their determinations).

Within days, Better's outside counsel asserted that they were going to accept Pierce's non-existent "resignation."  It was directly reiterated that Pierce had never resigned.  When Pierce maintained this position – based on her understanding and the clear reality of the situation – Calamari and Better made the decision on or about February 4, 2022 to summarily terminate Pierce.  No additional reasons were ever provided for her termination.  Garg had finally, after over two (2) months, coerced Better into terminating Pierce without basis or bona fide reason, but rather to satisfy his own personal vendetta and attempt to besmirch Pierce so that he could continue to attempt to cover-up his own bad acts and illegal activities.  During this period, December 17, 2021 through February 4, 2022, Garg also repeatedly and publicly asserted, with knowledge of the falsity of the allegations, that Pierce was the leader of a "coup," that she had "resigned," that she "abandoned" Better and her team; that she attempted to "extort" money that she was not entitled to from Better; that she had done nothing for Better; that she had contributed no managerial services of any value; and that her title should have been "Cheerleader in Chief."

The retaliation and defamation continued against Pierce after her termination in ongoing violation of §740 and common law.[2]  Specifically, subsequent to her termination, Garg repeatedly knowingly and purposefully lied to Ryan, members of the senior leadership team, and the Board of Directors in asserting that Pierce had been "fudging the numbers" at Better and that she had told him that Better was incurring a "labor cost of only $900.00 per loan."  Garg was

---

[2] Better has also steadfastly refused to correct Pierce's 2021 W-2 to reflect her permanent address in New Hampshire.  Again, this is a routine matter that is normally pro forma.  It is only because of Pierce's complaints and ongoing attempts to protect her rights that Better has retaliated against her by not providing a corrected tax form.

specifically and personally aware that Pierce had never fudged the numbers and had routinely iterated that labor costs per loan were over $2,000.  These ongoing and repeated knowing fabrications constituted actionable defamation *per se*.   Such statements will inevitability effect Pierce's future employment opportunities.

Better has also further retaliated against Pierce for her complaints while at Better, as well as her filing of the OSHA Complaint and the instant action, by improperly "calling" her loan agreements and by treating her differently, and less favorably, than other terminated employees with the same type of loan agreements. Specifically, initially Better claimed that the Notes were due and sought payment for the same some sixty-five days early.  This attempt greatly troubled Pierce.  However, in making the early demand in breach of the terms of the agreements, Better agreed on March 30, 2022 to repurchase the unvested shares vis a cancellation of the loan balance and repurchase those which are vested in order to "settle the loan." After due consideration, Pierce accepted the offer.  However, after the OSHA Complaint and the instant action were filed, in direct and clear retaliation for the same, Better reneged and demanded cash repayment of the entire loan amounts in direct contravention of not only the terms of the loan agreements, but the agreement offered by Better and previously accepted by Pierce.  Even after Pierce agreed to execute a completely new repurchase agreement for her unvested shares (that Better still holds) that was not required of any other similarly situated employees, and which resulted in the expenditure of unnecessary material time and expense to Pierce, Better has now actually commenced an action against Pierce personally seeking the full amount of the loans in direct contravention of the terms of the loan agreements, in direct contravention of the fact that portions of the loans by their explicit terms are non-recourse, in violation of Better's earlier accepted offer, and in transparent retaliation for her complaints under §740, and pursuit of the

OSHA and the instant complaints.   The instant motions to dismiss should be denied in their entirety, and Pierce's motion to amend should be granted along with any such other or further relief to Pierce as is just and proper.[3]

<u>Limited Statement of Facts[4]</u>

Contrary to Better's attempts to rewrite history, Pierce's contributions to Better and its phenomenal growth during the time in which she oversaw its sales and operations more than warranted the compensation that she received from Better. (Complaint ¶2; hereinafter "C¶#"). It is undisputed that during her 5.5 years at Better, she received four (4) promotions, outstanding performance reviews, large merit-based salary increases, significant discretionary annual bonuses, as well as stock option and equity grant awards.   It is also undisputed that from at least 2020 she served as Better's functional COO and the number 2 executive at the Company (as described by CEO Vishal Garg ("Garg") in writing on October 25, 2021), who oversaw approximately 85% of Better's 10,000+ person workforce. (C¶¶2,27-29).   Due to these successes, Better made plans to go public through a Special Purpose Acquisition Company ("SPAC") transaction through a merger with Aurora Acquisition Corp. ("Aurora"), a public shell. (C¶¶31-2).

In his zeal to close the SPAC Transaction and faced with a challenging higher interest rate environment and worsening financial performance, CEO Garg, on behalf of Better, has (a) publicly misstated and exaggerated the Company's "organic traffic revenue" (C¶¶36-7); (b) ignored internal projections and publicly accelerated, without justification, the Company's anticipated time horizon to achieve profitability (C¶¶38-39); (c) publicly lied about the Company's "metrics" being

---

[3] While the Amended Complaint clarifies a few issues and sets forth the additional retaliatory acts by Defendants in greater detail, the initial complaint is not properly subject to dismissal – especially at the pre-Answer stage.
[4] Plaintiff respectfully refers to her Complaint and proposed Amended Complaint for a more particularized statement of facts.

a "black box" and, thus, misstated internal financial projections (C¶¶41); and (d) terminated 900 employees via a zoom call, in violation of relevant WARN acts and, during which, he knowingly falsely accused the terminated employees of having "stolen" from the Company in violation of relevant laws and Company policy and procedure. (C¶34,44-53).

Pierce reasonably believed that each of these actions constituted a violation of law, including federal securities laws designed to protect shareholders and investors and applicable WARN Act paid notice requirements. In each instance, as detailed below, Pierce made internal complaints regarding her concerns that these actions were illegal. Better retaliated against her for making complaints.  (C¶¶35,37,40,42,143(summarizing)).

For several months prior to December 1, 2021, Garg directed Pierce and other company executives to hire hundreds of additional sales personnel. This decision by Garg was directly contrary to the advice of Pierce and other executives.  In direct contravention of Pierce's advice and warnings, Garg demanded that his plan be followed. (C¶¶44-6). By November 2021, it became clear that Pierce and others had been right, and Garg reversed course then demanding a large-scale reduction in force ("RIF") and specifically decried the need for a disparate impact analysis, the need to follow legal's advice, or the need to adhere to the relevant WARN acts. (C¶¶47-52).  Again, in contravention of Pierce's and others' advice, Garg determined to effectuate the RIF between Thanksgiving and Christmas while still refusing to allow for due compensation under the relevant WARN acts asserting, "who cares, these people will never sue us." (C¶¶49-50).

On December 1, 2021, Garg conducted the 900 Employee Termination Call in which he completely ignored the agreed upon script and then conducted a company-wide zoom meeting in which he asserted – with direct knowledge of the falsity of the assertion – that the 900 terminated employees had been fired because they "stole from the Company."  (C¶¶52-3).  The backlash to

Garg for the 900 Employee Termination Call was swift, public, and world-wide.  (C¶¶54,59,60).  Faced with both external and internal complaints, Garg continued to defame the terminated employees to the press and the public. (C¶55,57,67).  In reaction to the good faith attempts by Pierce to mitigate and correct the situation, Garg began his scheme to make her the scape-goat for his problematic and illegal actions, including lying about what knowledge he had or did not have prior to the 900 Employee Termination Call.  (C¶¶55-6,61-70).  Pierce responded to these attacks and the perpetuation, and escalation, of Garg's lies, by continuing to press for the truth to be told, but Garg and Better resisted. (C¶¶73-83).

On Wednesday evening, December 8th, CEO Garg met with the Board in a closed session.  The morning after, Pierce received a forwarded email from CFO Ryan. The original email was a communication from CEO Garg to the Board recapping their conversation in the form of a draft communication to be sent out to 30+ senior leaders. (C¶84).  In this correspondence, Garg stated (i) that he and the Board decided to hire (among others): "B. COO and President – a seasoned operator who can help manage and drive performance across business functions and help me and all of you learn how to build an inspirational leadership culture. Kevin and I know someone who might fit this bill. And there may be others" (C¶85); that "2. The board currently feels the metrics of the company are a black box and need to be managed much more carefully as we are in a loss making state and recent operational challenges have been difficult and we need to pivot from blitzscale mode to sustainable growth mode while the market environment remains volatile" (C¶86); that "as such, we plan to form an Operations Review committee, with Steve and Dinesh acting as leads. Rebecca Li from GAC all help and work with our Bizops leaders to make sure we have an independent board reviewed set of metrics and operational rigor across the company. The board has selected Kevin CFO Ryan, with support from Bizops and Vikram Jaipuria to lead this

effort on the Better teams side" (C¶87).  Prior to the backlash of the layoffs and Pierce's clear statements that she did not endorse or enable CEO Garg's false narrative, Pierce was - as stated by CEO Garg - his number 2. In 5.5 years, Pierce never received below a 4 on a performance review and had received four promotions. Pierce had direct management over all of the Company's business lines and her core job function was very clearly to do exactly what CEO Garg was proposing the new "COO/President" would do: "manage and drive performance across business functions." (C¶88).  For CEO Garg to state that the Company's metrics are a black box and that the solution is to set up an Operations Committee – led by CFO Ryan,  and Vikram Jaipuria, the head of partnerships - neither of whom were even in the core business functions and not, Pierce, the effective Chief Operating Officer, is a sudden and stark change in CEO Garg's description of Pierce's performance and is a clear move of scapegoating and retaliation on behalf of CEO Garg in response to Pierce's protected activity of speaking out against him. (C¶89). In each of these instances, Garg substituted his intentions for that of the Board.  It was all part of his scheme to scape goat and discredit Pierce by knowingly lying about her character, her abilities, and her performance in front of the Board for his own nefarious purposes and in direct contravention of the truth and Better's best interests: a scheme which is detailed throughout the Complaint. (C¶¶142-3,105)

In the days that followed, Ryan repeatedly recognized that Garg had clearly "thrown her under the bus" and that the search was, indeed, for her replacement. Pierce was distraught and upset by how CEO Garg had cast blame for his decisions on her and the false narrative that a replacement was needed to perform her job. (C¶104-5).  Ryan ultimately recommended on December 16, 2021 that Pierce provide a written proposal (the "Transition Proposal") for her transition if and when a new hire was made. Pierce duly complied with this request. (C¶¶106-111)

In her discussions with Ryan, both before and after the Transition Proposal, she made clear that she was not resigning and that she had no intention of resigning.  Ryan acknowledged this point. (C¶¶108,110).  Thereafter, the Board decided to have outside counsel handle any actions related to Garg's decision to layer Pierce and have the COO duties, that Pierce had been fulfilling, performed by a new hire, as well as the Transition Proposal. (C¶116-7). Pierce continued to fulfill all of her duties, including those associated with the COO role. (C¶120).

On January 3, 2022, outside counsel first referenced the Transition Proposal as a resignation. Pierce immediately corrected her and reiterated that she had not resigned and did not intend to resign. (C¶123).  No one at Better, including the Board, had yet made any determination as to Pierce or her future relationship with Better; no replacement had yet even been found, much less hired. (C¶129).  Pierce continued to fulfill all of her duties, including those associated with the COO role. (C¶¶132,135).  Coinciding with Calamari's taking over the internal aspects of transitioning Pierce and Pierce's conversation with Garg in which she reiterated her concerns about his actions, Pierce's counsel told Better's counsel that Pierce believed she was being retaliated against due to her repeatedly speaking up about Garg.  (C¶134).

At 5:30pm Eastern Time on January 6, 2022, Pierce called CFO Ryan for a regularly scheduled check in. On the call, he told her that "they" had decided to put her on administrative leave. Incredibly confused, Pierce asked why. CFO Ryan clearly stated, "because you are claiming you're being retaliated against." Pierce asked for details about how her leave would be handled, including communicating with her direct reports, rescheduling meetings and reassigning work as well as when the leave would commence. CFO Ryan said he "did not have further details but that both parties' counsel should work out the details and you can continue to speak with your direct reports." (C¶136).  Immediately following the phone call with CFO Ryan, Pierce went back to her

computer to finish work for the day, but she was already locked out of her computer, email and slack, making it look like she had been terminated on slack – all at the specific direction of Garg and Calamari as part of their scheme to discredit and impugn Pierce (as later confirmed by Ryan). (C¶137-8).

Despite the ongoing abuse and harassment by Garg and Calamari, on January 12, 2022 Pierce participated in an employee interview with General Counsel Tuffin. In the interview, Pierce stated that "[t]his is consistent with Vishal stewardship of the company in ignoring guidance from subject matter experts and making misleading statements regarding the company's position and data. For example, in December of 2021, business operations and finance presented a proposed business model for 2022 that projected the company could break even or achieve slight profitability for Q3-Q4 of 2022. These groups are subject matter experts in both our finance and business strategy. Despite their guidance that achieving profitability before Q3 would be near impossible, Vishal told investors and board members we would be profitable in in Q1 2022.There are additional examples of Vishal providing misleading statements regarding the company's financial situation but I do not have access to my email or slack so I cannot provide details. However, I do recall that on many occasions and specifically in email Vishal referred to GAAP accounting as "generally accepted asshole principles." I'd recommend you interview Kevin if you would like more information in that realm. In addition to the previously mentioned example where he ignored the guidance of HR and legal and directed the company to violate WARN, he ignored the guidance of operations, strategy and finance about the oncoming contracting refinance market." (C¶140).

Within days of this interview, Pierce received communication from Better's counsel that the company would "process her resignation" -- a resignation that she had repeatedly

communicated that she had not tendered. (C¶141).  When Pierce's counsel reiterated this fact, a paltry offer was made to see if Pierce would change her mind and resign.  Only thereafter, did Garg succeed with his scheme to "get her out," when on February 4, 2002 Better decided to terminate Pierce. (C¶143).  Through this period, Garg also consistently and repeatedly defamed Pierce to other executives in the Company, including Pierce's direct reports and, particularly Megan Bellingham, Armando LaRocca, Stephen Rosen, and Daniel Wood, and CFO Ryan, General Counsel Calamari, General Counsel Tuffin, the Board of Directors, and the Head of HR, by stating the following with specific knowledge that each such statement was false at the time that he made it:

a.      That Pierce was the leader of "a coup, that attempted to get rid of CEO Garg" so that she could replace him as CEO.  Garg repeated this comment throughout Q1 2022;

b.      That in her December 17, 2021 transition proposal, Pierce had "resigned from the Company," "abandoned" it in its time of need, and that she sought to "extort" money to which she was not entitled from the Company. These statements were made repeatedly during the period December 18, 2021 through Pierce's retaliatory termination, on February 4, 2022; and

c.      That, because Pierce supposedly did no work for the Company and contributed no managerial services of any value, her title should have been "Cheerleader in Chief." (C¶159-61).

Subsequent to her unlawful termination, from February 4, 2022 and continuing incessantly to date, CEO Garg continued to defame Pierce to Better's senior leadership, Megan Bellingham, CFO Ryan, and the Board of Directors and anyone else who would listen by asserting with complete knowledge of the falsity of his assertions at the time that he made them that Pierce had been "fudging the numbers" and had incorrectly reported to him and finance that Better was incurring "labor cost of only $900.00 per loan." (C¶162-5).

<u>Argument</u>

I.      <u>GENERAL LEGAL STANDARD IN CONSIDERING A PRE-ANSWER
        MOTION TO DISMISS</u>

Contrary to the contentions of Plaintiff herein, it is clear that the Federal Rules of Civil

Procedure require only that a claim for relief contain "a short and  plain statement of the claim

showing that the pleader is entitled to relief."  FRCP 8(a)(2).  A complaint may be dismissed to

the extent that it "fail[s] to state a claim upon which relief can be granted."  FRCP 12(b)(6).

"In considering a motion to dismiss pursuant to Rule 12(b)(6), the court should construe

the complaint liberally, 'accepting all factual allegations in the complaint as true, and drawing all

reasonable inferences in the plaintiff's favor.'"  *KForce, Inc. v. Alden Personnel, Inc.,* 288 F.

Supp. 2d 513, 515 (S.D.N.Y. 2003), *quoting Chambers v. Time Warner, Inc*., 282 F. 3d 147, 152

(2nd Cir. 2002). "Dismissal is only appropriate when 'it appears **beyond doubt** that the plaintiff

can prove no set of facts which would entitle him or her to relief.'"  *Id*., quoting *Sweet v.

Sheahan,* 235 F. 3d 80, 83 (2nd Cir. 2000) (emphasis added).

To survive a motion to dismiss, a complaint must contain sufficient factual matter,

accepted as true, to "state a claim to relief that is plausible on its face." A claim has facial

plausibility when, as here, the pleaded factual content allows the court to draw the reasonable

inference that the defendant is liable for the misconduct alleged.  *Ashcroft v. Iqbal,* 129 S. Ct.

1937, 1949 (2009) (*quoting Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S. Ct. 1955, 167

L.Ed.2d 929 (2007)). In other words, a complaint is not required to have "detailed factual

allegations, but it demands more than an unadorned, the defendant-unlawfully-harmed-me

accusation." *Id*. In its formulation of the Twombly/Iqbal requirements for a statement of claim,

the Supreme Court has established the following protocol to be followed in determining whether or not the pleading is adequate: "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *DiFolco v. MSNBC Cable L.L.C.,* 2010 WL 3911330 (2nd Cir. 2010) (emphasis supplied). "It is only where well-pleaded facts do not permit the court to infer more than mere "possibility of misconduct" that "a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth."" *Iqbal*, *supra* at 1949.

In ruling on a motion pursuant to Fed.R.Civ.P. 12(b)(6), the duty of a court "is merely to assess the legal feasibility of the complaint, not to assess the weight of the evidence which might be offered in support thereof." *Cooper v. Parsky*, 140 F. 3d 433, 440 (2nd Cir. 1998) (internal citation and quotation marks omitted). "No matter how likely it may seem that the pleader will be unable to prove his case, he is entitled, upon averring a claim, to an opportunity to try to prove it." *Bell Atlantic v. Twombly, supra, quoting Continental Collieries, Inc. v. Shober*, 130 F.2d 631, 635 (3rd Cir. 1942). See, also, *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S. Ct. 1683, 40 L.Ed. 2d 90 (1974): a district court weighing a motion to dismiss asks "not whether a plaintiff will ultimately prevail, but whether the claimant is entitled to offer evidence to support the claims."

Finally, pleadings must be construed so as to do justice.  FRCP 8(e).  Here, it is not even a close call.  Plaintiff has clearly met the legal standards to set forth valid claims for relief under New York Labor Law §740 (as against Better); Breach of Fiduciary Duty (as a Derivative Claim plead in the proposed Amended Complaint against CEO Garg and the Board); Defamation (as against Garg and Better); Breach of Contract as against Better); Intentional Infliction of

14

Emotional Distress (as against Garg); and Tortious Interference with a Contract (in the alternative, as against Garg and Calamari)[5].

II.    STANDARDS FOR AMENDMENT

Courts "should freely give leave when justice so requires." FRCP 15(a).  As a general rule, absent "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should, as the rules require, be 'freely given.' " *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962);  *Aetna Cas. & Sur. Co. v. Aniero Concrete Co.,* 404 F.3d 566, 603–04 (2d Cir. 2005) (quoting *Richardson Greenshields Securities, Inc. v. Lau*, 825 F.2d 647, 653 n.6 (2nd Cir. 1987)) (Rule 15(a) leave should be given absent "undue delay, bad faith, futility of the amendment, and perhaps most important, the resulting prejudice to the opposing party"); *McManus v. Tetra Tech Construction, Inc.,* 260 F.Supp.3d 197, 209-11 (NDNY 2017).

In the instant case, Plaintiff's cross-motion to amend has been made within the time set forth in the agreed upon and so order Case Management Plan.  There have been no prior amendments.  There has been no undue delay, bad faith, or dilatory acts on the part of Plaintiff or her agents.  No discovery has yet been conducted and the lawsuit is still in the Pre-Answer stage. Moreover, no prejudice would befall Defendants from allowing the amendments.  The proposed Amended Complaint clarifies certain existing causes of action and reformulates others, and adds additional elements to Plaintiff's claim for unlawful retaliation under NYLL §740, and only adds

---

[5] The initial Complaint properly set forth causes of action sounding under New York Labor Law §740, Defamation, and Intentional Infliction of Emotional Distress.  The proposed Amended Complaint has supplemented those claims, modified the Breach of Fiduciary Duty Claim, and added claims for Breach of Contract and Tortious Interference with a Contract. The Amended Complaint also withdraws the individual breach of fiduciary claim, asserting, instead, those claims as derivative claims.

additional causes of action based on facts present in the existing pleadings and otherwise well

know to Defendants.  There is no reason to deny the instant cross-motion to amend, and a myriad

of reasons to grant the instant application.[6]

III.     PLAINTIFF HAS SET FORTH VALID CLAIMS UNDER NYLL §740

New York Labor Law §740, as recently amended, provides, in pertinent part, as follows:

1.      Definitions.  For the purposes of this section, unless the context specifically indicates otherwise:
e.      a "Retaliatory action" means an adverse action taken by an employer or his or her agent to discharge, threaten, penalize, or in any other manner discriminate against any employee or former employee exercising his or her rights under this section, including (i) adverse employment actions or threats to take such adverse employment actions against an employee in the terms of conditions of employment including but not limited to discharge, suspension, or demotion; (ii) actions or threats to take such actions that would adversely impact a former employee's current or future employment…"

2.      Prohibitions: An employer shall not take any retaliatory action against an employee whether or not within the scope of employee's job duties, because such employee …
(a)     Discloses or threatens to disclose to a supervisor … an activity, policy, or practice of the employer that the employee reasonably believes is in violation of law, rule, or regulation…

4.      Violation; remedy.
(a) An employee who has been the subject of a retaliatory action in violation of this section may institute a civil action in a court of competent jurisdiction for relief as set forth in subdivision 5 of this section within two years after the alleged retaliatory action was taken.

5. Relief. In any action brought pursuant to subdivision 4 of this section, the court may order relief as follows:
a.      an injunction to restrain continued violation of this section;
b.      the reinstatement of the employee to the same position held before the retaliatory action … or front pay on lieu thereof;
c.      the reinstatement of full fringe benefits and seniority rights;

---

[6] The Court should ask Defendants to re-formulate their motions to address the Amended Complaint, as that Amended Complaint addresses – particularly as it relates to the breach of fiduciary duty claim – certain of the deficiencies alleged in Defendants' respective motions.  The Amended Complaint also asserts three (3) new claims that are not addressed in the initial Complaint: a derivative breach of fiduciary duty claim; a breach of contract claims; and a tortious interference with a contract claim.  In addition, the Amended Complaint adds to Pierce's NYLL §740 claim by adding additional acts of retaliation on the part of Defendants Better and Garg, including those occurring since the initial filing.

    d.      the compensation for lost wages and other remuneration;

    e.      the payment by the employer of reasonable costs, disbursements, and attorneys' fees;

    f.      a civil penalty of an amount not to exceed ten thousand dollars; and/or,

    g.      the payment by the employer of punitive damages, if the violation was willful, malicious, or wanton.

In the instant matter, Pierce was terminated on February 4, 2022, some nine (9) days after the effective date of the amended NYLL §740.  Both the Complaint and the proposed Amended Complaint clearly reflect that Pierce made clear complaints about, *inter alia*, violations of the WARN Act and defamation of some 900 employees. Pierce also made complaint of actions and statements by Garg that constituted securities law violations and knowing misrepresentations to shareholders and the investing public concerning, *inter alia*, the projected profitability of Better. Within days of her complaints, Garg began a self-serving concerted campaign to defame, denigrate, diminish, and orchestrate first the demotion and then, ultimately, the termination of Plaintiff.  While Garg manipulated others around him, it was not until February 4, 2022 that he, with the assistance of Calamari, ultimately succeeded in persuading Better to terminate Pierce. In a less successful part of his scheme, Garg and Calamari promoted the knowingly false narrative that Pierce had resigned.  While this characterization led to additional complaints by Pierce of additional abuse and retaliation, in addition to that suffered due to her prior complaints of, *inter alia*, SEC violations, it led to her January 6, 2022 suspension which was premised solely on her complaints of retaliation.  However, it was not until February, after Defendants recognized that Pierce, as she had repeatedly asserted, had not resigned and did not intend to resign, that Better under ongoing pressure from Garg and Calamari actually decided to terminate Pierce.

In addition to her improper termination, Pierce also suffered further retaliation at the hands of Better in direct contravention of NYLL §740.  Specifically, Garg continued to retaliate

against Pierce by publicly defaming her to the Board, members of senior management, CFO

Ryan, and other individuals by knowingly and falsely impugning her business acumen, her

business abilities, and her integrity, by repeatedly asserting – with personal knowledge that his

statements were false -- that (i) she "cooked the books" at Better and (ii) repeatedly

misrepresented to him that processing costs of loans to Better were $900 when they were over

$2,000.  In addition, Better itself continued its retaliation against Pierce first by prematurely

calling her loans, then by reneging on an agreement to extinguish Pierce's loan balances

(recourse and non-recourse), and then by violating the terms of its loan agreements (this

additional retaliation is addressed in the proposed Amended Complaint).  Better's recent

demands for cash payments to satisfy the entirety of the loans – even the non-recourse portions –

as well as its more recently publicly filed suit against Pierce for the same relief despite the

explicit terms of the loan agreements and her prior acceptance of Better's offer for resolution of

those same agreements, smacks of bad faith; is clearly retaliatory; and represents manifest

disparate treatment as no other similarly situated employees have been so harassed, publicly

humiliated, or sued.

These facts are well more than sufficient to set forth a cause of action under NYLL §740

sufficient to survive a pre-answer motion to dismiss and none of Better's arguments or cited case

law warrant a different determination.

As an initial, and dispositive, matter, Better – just as the individual Defendants attempt to

do – improperly attempts to create its own narrative that completely ignores material allegations

in the Complaint in a desperate attempt to avoid liability for its actions.

Better's first argument[7] is that Pierce resigned on December 17, 2021.  As discussed above, this fabrication completely ignores the undisputed, and well pleaded, facts that CFO Ryan, then acting CEO, directed Pierce to provide a proposal for her transition assuming that a replacement was hired to fulfill the duties of COO that she had been handling.  Notably, no such hire had been made during Pierce's employ.  It is equally undisputed that Pierce continued to fulfill all of the duties of COO until she was placed on suspension for her complaints of retaliation on January 6, 2022. Better's contention concerning the "resignation" is also belied by the undisputed facts that Pierce both directly prior to, and at all times after, her good faith provision of the required transition proposal stated that she was not resigning and had no intention of resigning.  When Better first raised this contention, on or about January 3, 2022, Pierce denied it and has continued to do so since then. C¶126.  Better's position is also belied by its own abandonment of its theory after its outside counsel proclaimed that Better would accept Pierce's resignation within two days of her January 12, 2022 employee interview and Pierce's denial, again, that she had ever resigned. C¶¶132,146.  It was only after Garg understood that Pierce was not going to resign that he convinced Better -- which determined that it no longer wanted Pierce even in a demoted position or a position outside of New York -- to then terminate her on February 4, 2022, the date she was terminated, not the date when some non-existent resignation was accepted. C¶148. This is at best for Better a highly contested issue of fact sufficient to survive summary judgment, much less a pre-answer motion to dismiss.  At this stage of the proceeding, the allegations of the Complaint must be accepted as true.  The Complaint specifically asserts that Pierce told Ryan, and Ryan acknowledged, that she was NOT resigning

---

[7] Better makes numerous statements which seek solely to paint Pierce negatively and bias the reader against her.  As same are irrelevant to the issues actually before the Court, we trust that same will be properly ignored and only the most pertinent misrepresentations will be individually addressed herein.

and that she did not intend to resign. Better's argument flies directly in the face of these allegations. By ignoring them, the well pleaded allegations of the Complaint do not go away.

Better's second and related argument is that the decision to terminate Pierce had been made well before February 4, 2022. Again, this argument ignores – rather than accept as true – the well-pleaded allegations of the Complaint. In making this argument, Better conflates a disputed defense that it might later assert, with the recognized standards for reviewing a pre-answer motion to dismiss. Pierce does not dispute that Garg might have wanted here gone before then, but Better did not make the decision to terminate her or notify her of any termination before February 4, 2022. This is not the instance in which an employee is notified of their termination on a specific date and that the termination will then be effective at some later date, as in each of the cases cited by Better. See, *e.g., Delaware State College v. Ricks*, 449 U.S. 250, 258 (1980); *Chardon v. Fernandez,* 454 U.S. 6, 8 (1981); *Schultz v. Congregation Shearith Israel of New York*, 867 F.3d 298, 305 (2nd Cir. 2017). Even in *Dykstra v. Wyeth Pharmaceuticals*, 454 F. App'x 20, 22-3 (2nd Cir. 2012), which Better asserts stands for the principal that when a suspension is part of the termination process, where the termination "flows as an inevitable consequence" from an earlier suspension, Court's look to the earlier date to determine the accrual of the action. The earlier date in question in that case was the one on which Dykstra was given "notice of suspension pending discharge for falsifying GMP documents." *Id.* at 21. These cases are simply non-dispositive as their fact patterns are materially different than the instant matter. First, Pierce was never given a notice of termination prior to February 4, 2022. At most, she was told that Better would be accepting her non-existent resignation on or about January 15, 2022. However, Better then reversed that position, when it was relayed that Pierce continued to maintain that there had been no resignation. Perhaps, Better was too

complacent.  Perhaps, it still had not decided to terminate her as Garg had been pushing it to do. What we do know now is that (i) Pierce never resigned; (ii) any purported acceptance of a resignation in January was moot and, in addition, was withdrawn; and that notice of her termination was made on February 4, 2022, after the effective date of the revised statute.  We also know that, in all cases, Defendants' post-termination acts of retaliation are still actionable.

Better then argues that Pierce supposedly never engaged in any whistleblowing activities. The Court need not even delve into the question of whether numerous SEC rules and regulations were violated, including those concerning fraud on shareholders and prospective investors (they were) or even determine whether the misrepresentations constituted violations of rules and regulations or misunderstandings between colleagues.[8]  Better's arguments in this regard constitute quintessential red herrings.  The specific complaints made by Pierce are detailed in several places in the Complaint. By way of example only: C¶¶4,13 setting forth the specific complaints made during her January 12, 2022 on the record employee interview with co-General Counsel Tuffin; C¶8 concerning complaints made to Tuffin and Garg about Garg's material misrepresentations as to profitability, available data, and the terminated 900; C¶36-7 reiterating complaints as to Garg's actions; C¶42 concerning complaints to Garg concerning his misrepresentations as to projected profitability; C¶44 concerning Pierce's complaint to the Board as to Garg's false statements concerning Better metrics and Pierce's performance; C¶¶49-52 concerning warnings and complaint by Pierce that Garg's actions would violate statutes,

---

[8] If the Court decides to make such a determination, it must rely solely on the allegations in the Complaint, and potentially the proposed Amended Complaint, which both make it clear that as the individual responsible for maintaining Better's records and metrics, Pierce was the person in the position to know the percentage of loans generated by organic traffic and the potential for profitability.  Notably, Pierce's determinations in these regards were corroborated and shared by CFO Ryan and others.  It should also be noted that contrary to Better's assertions, the Complaint specifically relates that it was only after December 1, 2021 that Garg began to falsely project profitability in Q1 2022.

including, but potentially not limited to, California's WARN Act; C¶¶75-85 concerning Pierce's complaints to Better's General Counsels, Head of Communications, and Senior Leadership, as well as Garg directly, as to the need for corrective action concerning misrepresentations to shareholders and to the SEC, WARN Act violations, defamation of employees, additional falsehoods of Garg; C¶¶98-100 concerning complaints made by Pierce to the Executive Team concerning Garg's improper acts; C¶148 summarizing complaints; C¶¶149-53 summarizing cause of actions against Better.

According to Better, Pierce's complaints to, *inter alia*, the Board, Garg, CFO Ryan (who served as the acting CEO), and Better's General Counsel that she reasonably believed these actions were violative of law and statute did not sufficiently constitute whistleblowing under NYLL §740.  Similarly, ineffectually, Better contends that because there was no proof submitted that Better ultimately violated the WARN Act, no cause of action can be maintained.  That contention is simply wrong and belied by the plain language of the statute as set forth above. Pierce need only show that she reasonably believed that Better was in violation of law, rule, or regulation.  It is undisputable that at the time Pierce raised her concerns, the directives that Garg was making would have resulted in a violation of the WARN Act.  Even if Better later corrected its actions (which cannot be considered on the instant motion to dismiss), but still retaliated against Pierce (as it did retaliate against her) it would still be liable, and the cause of action would survive.  In any event,  Better never even addresses Pierce's complaints concerning defamation.

Just as above, the cases cited by Better are simply not on point.  *Klein v. Brookhaven Health Care Facility,* 2019 WL 1459258, at *10 (EDNY Mar. 11, 2019) was decided under §740's predecessor with dismissal warranted as the complaint was based solely on vague

allegations of "health and safety issues."  Unlike the clear allegations set forth in the initial and Amended Complaint, no specific allegations of legal or statutory violations were provided by Klein in that case.  Similarly, *Diaz v. Transatlantic Reinsurance Co*., No. 16 Civ. 1355, 2016 WL 3568071 (SDNY 2016) (Complaints solely as to nepotism and conflicts of interest within internal policy violations did not state viable SOX claim), *Sharkey v. J.P. Morgan Chase & Co.,* No. 10 Civ. 3824, 2011 WL 135026 (SDNY 2011), and *Khurana v. Spherion Corp.,* 511 F.Supp.3d 455, 476 (SDNY 2021) (concerns over the best use of funds did not constitute protected conduct under the New York False Claims Act) all stand for the generic principal that a Plaintiff need only set forth what violations were being complained of.  While recitation of specific statutes is not required even for SOX violations (*Leshinsky v. Televant GIT, S.A*., 942 F.Supp.2d 432, 440-1 (SDNY 2013); *Mahony v. Keyspan Corp.*, 2007 WL 805813, at *5 (EDNY Mar 12, 2007); *Fraser v. Fiduciary Trust Co. Int'l*, 417 F. Supp. 2d 310, 322 (SDNY 2006)), Pierce clearly met even that threshold herein in referencing the WARN Act, the clear and repeated defamation as to the terminated employees, and the false and misleading information provided by Garg to shareholders and the investing public.  Better's arguments on this point are not compelling, much less dispositive.  Its motion should be denied.

Finally, Better contends that Plaintiff has not plausibly alleged retaliation.  Despite devoting numerous pages to this element, Better ultimately relies on a large number of cases decided on summary judgment[9] and the now disproved trope that Pierce resigned.  Just as

---

[9] *Beers v. Kaiser Permanente Ne. Div*., No. 98 Civ. 1121, 1999 WL 126419 *4 (NDNY 1999) (no allegations of pretext yet only determined on summary judgment); *Dougherty v. Memorial Sloan Kettering*, No. 00 Civ. 4083, 2002 WL 1610916 86 (SDNY 2022) (No FDA violation, no pretext alleged, and legitimate reason for termination, yet only determined on summary judgment); *EEOC v. Ambercrombie & Fitch*, 575 U.S. 768, 772-3 (2015) (summary judgment denied where need for a religious accommodation found to be one motivating factor in hiring decision); *Sherman v. County of Suffolk*, 71 F.Supp3d 322, 348 (EDNY 2014) (Title VII retaliation claims governed by a but for standard on summary judgment); *Gross v. FBL Fin. Svs.,* 557 U.S. 167, 177-8 (2009) (post-judgment jury verdict).

Pierce's "resignation" was shown to be a fiction above, it also cannot constitute an intervening act as it never happened. As such, the remainder of Better's summary judgment cases also fail to lend any assistance to its current motion. See *e.g., Tompkins v. Metro-North Commuter RR*, No. 16 Civ. 9920, 2018 WL 4573008, at *7 (SDNY 2018) (specific bases for termination identified, yet only decided on summary judgment); *Nolley v. Swiss Reinsurance Am. Corp.*, 857 F.Supp.2d 441, 461-2 (SDNY 2012) (under Title VII protected act need not be sole cause of adverse action as determined on summary judgment); *Baldwin v. Goddard Riverside Comm. Ctr.*, 53 F.Supp.3d 655, 674 (SDNY 2014) (short time between protected active and adverse action insufficient on its own to survive summary judgment if there is no question that termination proceedings began prior to protected activity).

As set forth above, in the current matter, Plaintiff has alleged that Garg immediately upon hearing of her protected complaints started to retaliate against her. He excluded her from meetings, he defamed her, he knowingly and falsely attempted improperly to foist blame on her to distract from his own bad acts, and he determined that he would orchestrate her denigration and silence. Then, upon his return from leave and with the assistance of Calamari, Garg attempted to further isolate and silence Pierce. Pierce was specifically informed by CFO Ryan that her suspension was because she had complained of retaliation. (He, of course, knew that Pierce had not resigned as a result of his numerous discussions with her on that very point). No explanation was ever provided to Pierce for her termination. This temporal proximity, combined with the intervening acts of clear retaliation, and the abject failure to even attempting to create a non-pretextual reason for her termination, are more than sufficient to demonstrate a causal connection between her protected complaints between December 2001 and January 2022 and her ultimate termination in February 2022. Most tellingly, the Complaint and the Amended

Complaint allege that, after Pierce engaged in protected activity, Garg instructed his minions to "get her out." Defendants do not even attempt to address this admission of retaliatory animus. Better's Motion to Dismiss should be denied in its entirety.

In addition the proposed Amended Complaint alleges additional retaliation and disparate treatment following Pierce's improper termination, her ongoing complaints, and her filing of the instant action, as well as her OSHA filing, which only further demonstrate why dismissal is wholly unwarranted. The subsequent acts of retaliation – related to Pierce's loan balances and the additional acts of defamation and character assassination -- clearly fall squarely within the protections of NYLL §740.

IV.    <u>PLAINTIFF HAS STATED A VALID DERIVATIVE CLAIM FOR BREACH OF FIDUCIARY DUTY AGAINST GARG AND THE BOARD OF BETTER</u>

In their motion to dismiss the instant Complaint, Garg and Calamari perforce focused on the direct claim that was alleged in the initial Complaint. The proposed Amended Complaint has removed any direct claim for breach of fiduciary duty (as well as the claim for aiding and abetting the same as against Calamari) and set forth a derivative claim on behalf of Better and its shareholders. With regard to that claim, there is no question that both Garg, as CEO, and the Board owed Better and its Shareholders a fiduciary duty and a duty of care. See *e.g., In re Wonderwork, Inc*., 611 B.R. 169, 194 (US Bankr. Ct, SDNY 2020); *Gantler v. Stephens*, 965 A.2d 695, 709 (Del. 2009). It is equally clear that a violation occurs when a "fiduciary intentionally acts with a purpose other than that of advancing the best interests of the corporation." *In re Walt Disney Co. Derivative Litig.,* 906 A.2d 27, 67 (Del. 2006); see also, *In re Orchard Enterprises, Inc. Stockholder Litig.,* 88 A.3d 1, 33 (Del. Ch. 2014). Officers and Board members are required to act in "good faith" (see *e.g., Stone v. Ritter*, 911 A.2d 362, 370 (Del. 2006)) which is an element of the requisite duty of loyalty which similarly requires that

fiduciaries acts with a good faith belief that their actions are in the corporation's (not any individual's) best interests. *Id.;* see also, *Guttman v. Huang*, 823 A.2d 492, 506 n.34 (Del. Ch. 2003)); *In re Walt Disney Co. Derivative Litig.*, 907 A.2d 693, 749 (Del. Ch. 2005), *aff'd*, 906 A.2d 27 (Del. 2006); *Brehm v. Eisner*, 746 A.2d 244, 259 (Del. 2000) (Board must consider all facts reasonably available to them in executing their duties).  The allegations in the Amended Complaint more than satisfy these requirements, in that they specifically address the failure to exercise appropriate attention, the failure to exercise reasonable oversight, the failure to take any acts to prevent or in any way mitigate the bad acts and disastrous decisions of Garg, which in violating various basic legal standards and SEC rules and regulations have materially diminished the value of Better.

In their current brief, Defendants assert that any derivative action would be fruitless as no pre-suit demand was made to the Board.  While the allegations in the initial Complaint do not address this contention (as the claim was then set forth as a direct claim), the Amended Complaint does address this standard and clearly sufficiently alleges improprieties by the Board sufficient to specifically identify the factual predicates to legally demonstrate the futility of any pre-suit demand.  By way of example only, the behavior of the Board (i) in participating in and condoning the suppression of Pierce's concerns about CEO Garg's WARN Act violations and mass defamation of the terminated 900; (ii) in shirking its duty to review such charges; in taking no action to quash, or even address, much less mitigate the damages arising from, Garg's scheme to scape-goat Pierce for his own acknowledged errors; (iii) in condoning the false and misleading financial information that was being disseminated to shareholders and the investing public, by disregarding explicit warnings as to the falsity of that information (and their own knowledge of the same); (iv) in condoning and joining, the actions of CEO Garg, did not act to advance the

best interests of the corporation, failed to act in the face of a known duty to act (as in herein where public misstatements were being made to investors and shareholders), and demonstrated a conscious disregard for their duties; (v) in routinely rubber-stamping any action – including any personnel action – that Garg suggested without undertaking any meaningful or reasonable oversight and thereby demonstrating their clear lack of independence from Garg; and (vi) in acting as one clearly faces liability for neglecting their duties to address any of the claims (including this breach of fiduciary claim) against CEO Garg that would have been the subject of any pre-suit litigation demand, demonstrates that as a matter of law, the demand requirement should be excused as futile.  See *e.g., United Food and Commercial Workers Union and Participating Food Industry Employers Tri-State Pension Fund v. Zuckerberg Eyeglasses*, 262 A.3d 1034, 1059-60 (2021) (identifying new, current, standards for determining futility, including, but not limited to, when the Board lacks independence from an individual with personal gain or liability concerning the matters in question or when the Board would be forced to sue itself or had any likelihood of liability on the claims asserted (both instances present herein)); see also, *Uniloeb Holdings LLC v. Shamus*, 76 Misc.3d 1206(A), 173 N.Y.S.3d 47 * 3 (SCt NY Cty August 25, 2022) (Finding pre-suit notice futile under the *United Food* standard).

As such, it is clear that the Amended Complaint has set forth more than sufficient allegations to survive a pre-Answer motion to dismiss.

V.     PLAINTIFF HAS SET FORTH VALID CAIMS FOR DEFAMATION

To make out a claim for defamation, a plaintiff need only set forth a false statement concerning plaintiff by defendant, (2) publication by the defendant of such statement to a third party, and (3) injury. See, *e.g., Constantin Assoc. v. Kapetas*, 17 Misc. 3d 1137(A), 851 N.Y.S.2d 68 (S.Ct.  NY County 2007); *Christopher Lisa Matthew Policano, Inc. v. North*

*American Precis Syndicate, Inc.,* 129 A.D.2d 488 (1st Dept 1987); *3P-733, LLC v. Davis*, 187

A.D.3d 626 (1st Dept 2020) (reversing lower court's granting of dismissal and reinstating claim

for defamation).  As the Appellate Division First Department noted in *Stepanov v. Dow Jones &*

*Co., Inc.,* 120 A.D.3d 28, 34 (1st Dept 2014), "[o]n a motion to dismiss a defamation claim, the

court must decide whether the statements, considered in the context of the entire publication, are

reasonably susceptible of a defamatory connotation;" see also, *Armstrong v Simon & Schuster*,

85 N.Y.2d 373, 379 (1995) (if any view of allegations could support defamation, complaint

survives motion to dismiss); *Frank v. National Broadcasting Co., Inc.,* 119 A.D.2d 252, 256 (2nd

Dept 1986) (Denial of motion to dismiss warranted unless the court determines that the contested

statements are incapable of any defamatory meaning as a matter of law); *Matchett v. Stark*, 2016

N.Y. Misc. LEXIS 2584, 6-8, 2016 NY Slip Op. 31302 (U) (SCt., NY Cty, 2016) (rejecting a

motion to dismiss defamation claims and recognizing role of the jury in determining

defamation); *Biro v. Conde Nast*, 883 F.Supp.2d 441 (S.D.N.Y. 2012) ("challenged statements

are not to be read in isolation, but must be perused as the average reader would against the

'whole apparent scope and intent'"" of the statement which must not be interpreted in "their

mildest and most inoffensive form so as to hold them nonlibelous." (quoting, *November v. Time*

*Inc.,* 13 N.Y.2d 175 (1963)); *Langenkamp v. New York University*, 2012 WL 12540277 *3

(SDNY March 15, 2012).  Notably, where the defamatory statement could cause harm to a

plaintiff's trade or profession, the plaintiff need not plead or prove special damages. See *e.g.,*

*John Langenbacher Co. v. Tolksdorf*, 199 A.D.2d 64 (1st Dept 1993).  It is undisputed that the

statements attributed to Garg are defamatory *per se*, and that Pierce has set forth several valid

defamation claims – including ones occurring after Pierce's unlawful termination -- more than

sufficient to survive a motion to dismiss.

The Complaint specifically alleges how Garg, in response to Pierce's complaints concerning his improper acts during and related to the 900 employee termination zoom, commenced a pattern of harassment and abuse to minimize and silence Pierce and set her up as the scape-goat for his own bad acts.  His first step in that regard was to defame Pierce to the Board by impugning her business capabilities and belittling her prior successes.  Specifically, Garg called for the hiring of a replacement for Pierce who, unlike Pierce, would be a "seasoned" executive who could "help manage and drive performance across business functions" and "build an inspirational leadership culture" as COO.  He further denigrated Pierce's actions as COO by asserted to the Board, and then improperly represented that the Board believed, that "the metrics of the Company are a black box."  In reality, Pierce had been completely transparent about Better's metrics. Indeed, those metrics and the result of operations were reviewed with, and signed off by, Garg on a weekly basis. Pierce was not to blame for Company's reversal of fortunes. Instead, it was Garg who single handedly caused the "loss making state" of the Company, repeatedly ignoring, and overriding, Pierce's operational directives.  (C¶¶143,156-8).

Garg also consistently and repeatedly defamed Pierce to other executives in the Company, including Pierce's direct reports and, particularly Megan Bellingham, Armando LaRocca, Stephen Rosen, and Ryan, General Counsel Calamari, General Counsel Tuffin, the Board of Directors, and the Head of HR, by asserting, with specific knowledge of the falsity of each statement, that Pierce had irresponsibly lead a coup against him; that Pierce had abandoned Better, them, and her duties; that Pierce was an extortionist; and that given her lack of actual contributions she should be known as the "Cheerleader in Chief." (C¶¶159-161).

In addition, subsequent to Pierce's termination, Garg repeatedly knowingly and purposefully lied to Ryan, other members of the senior leadership team, and the Board of

Directors in asserting that Pierce had been "fudging the numbers" at Better and that she had told him that Better was incurring a "labor cost of only $900.00 per loan."  Garg was specifically and personally aware that Pierce had never "fudged the numbers" and had routinely iterated that labor costs per loan were over $2,000.  These ongoing and repeated knowing fabrications also constituted actionable defamation *per se*. (C¶¶162-5).  Such statements will inevitability effect Pierce's future employment opportunities just as they were designed to do.  The Complaint alleges (and the Amended Complaint further clarifies) that these knowingly false statements by Garg -- impugning Pierce's honesty, integrity, and competence -- were made for the purpose of harming Pierce so as to scapegoat her for his own bad acts.   The concept of "cooking the books" or "fudging the numbers" could, in certain circumstances, constitute a crime.

Garg makes several arguments in support of his request for dismissal of the defamation claims. None have any merit.  First Garg asserts that none of the alleged statements were defamatory.  In so concluding, Garg only addresses certain of the alleged defamatory statements. He first contends that the "black box" comments were not defamatory as they were made by the Board and not false statements.  This characterization ignores the fact that the Complaint alleges that not only was this one of Garg's characterizations, but that Garg specifically knew of its falsity based on weekly meetings and that he pushed this false statement on the Board so as to impugn Pierce for his own nefarious purposes.  Just because Garg again attempts to ignore the specific allegations in the Complaint and proposes an alternative reality in his motion papers, does not make it so.  Nor is such an alternative version properly relied upon to support a motion to dismiss.  Moreover, in addressing the black box comments as well as the denigrations of Pierce's professional abilities, Garg improperly fails to consider either the context of the comments or to read them in their entirety.  Both failures are fatal to his argument.  See e.g.,

*Matchett*, 2016 N.Y. Misc. LEXIS at 6-8; *Biro*, 883 F.Supp.2d at 441; *November*, 13 N.Y.2d 175; *Langenkamp*, 2012 WL 12540277 *3.

Garg's arguments concerning his post-termination asserting that Pierce had been "fudging the numbers" at Better are internally inconsistent and completely misstate the applicable law.  In back-to-back sentences, Garg writes that:

"She also claims that Mr. Garg <u>knowingly made a false statement</u> that she had been "fudging the numbers" related to the Company's labor costs." (emphasis added) and

In the Complaint, Plaintiff simply asserts that these statements *were* false, but is silent on whether Mr. Garg *knew them to be false*." (emphasis in the original).

As the Complaint makes clear (even as referenced by Garg and Calamari), Pierce has repeatedly alleged that Garg knew that his statements about Pierce (including those pertaining to "fudging the numbers") were false when he made them.  Garg's instant argument is abjectly baseless.  Garg's secondary argument that the cause of action must fail as the Complaint fails to assert "why Garg was wrong to believe her reports were incorrect."  First, such proofs are well beyond any pleading requirement for defamation, much less the federal notice pleading standard. The argument must fail on this basis alone.  Second, the Complaint never asserts that Garg believed that Pierce's reports were incorrect.  To the contrary, the Complaint relates – as it is true – that Garg knew that Pierce's reports were wholly correct, but intentionally chose to lie about them.  Pierce does not assert that Garg was confused, but that he purposefully told knowing lies about her so as to impugn her character, her abilities in her field, and to otherwise harm her.

Garg's final argument is that even if his knowingly false statements about Pierce were defamatory (which they indubitably were), they were purportedly subject to a qualified privilege.

As an initial, and dispositive matter, the post-termination statements attributed to Garg do not fall

under any of the asserted bases for a qualified privilege.  As such, these statements are

unequivocally actionable and the cause of action is not subject to dismissal.

Second, and also dispositive, even if the statements are considered to be subject to a

qualified privilege,[10] any one of several exceptions noted in the *Kasachkoff* case cited by Garg

and Calamari would apply so as to avoid any form of summary dismissal. *Id.* ((a) "actual

malice",  see *e.g., Stillman v. Ford*, 22 N.Y.2d 48, 53 (1968); (b) "ill-will," see *e.g., Ashcroft v.*

*Hammond,* 197 N.Y. 488, 495) (1910); or (c) "personal spite…or culpable recklessness or

negligence," see *e.g., Hoeppner v. Dunkirk Print. Co.,* 254 N.Y. 95, 106 (1930)). Each of the

cases cited by Garg and Calamari acknowledge these and similar exceptions that void any

qualified privilege. See *e.g., Orenstein v. Figel*, 677 F.Supp.2d 706,711 (SDNY 2009); *Dunson*

*v. Tri-Maintenance & Contractors, Inc.,* 171 F.Supp.2d 103, 117 (EDNY 2001) (recognizing

malice as fatal to qualified privilege); *Langenkamp*, 2012 WL 12540277 *3[11].  In fact, there are

two types of malice that overcome any qualified privilege: malice can mean being made (i) with

"spite or ill will;" or (ii) with "knowledge that the statement was false or reckless disregard of

whether it was false or not." *Id.,* quoting, *Liberman v. Gelstein*, 80 N.Y.2d 429, 437-8 (1992).  In

the instant case, and despite Garg's continued attempts to ignore the plain language of the

allegations of the Complaint, each of the statements attributed to Garg was plead to have been

---

[10] None of the case cited on behalf of Garg and Calamari concern circumstances wherein the complained of statements were considered subject to a qualified privilege where, as herein, they were disseminated to 30 people – in various parts of a Company and amongst whom were direct and secondary reports of the subject of the defamatory statements. (¶¶86-92).  See  *e.g., Kasachkoff v. City of New York*, 485 N.Y.S.2d 992 (1st Dept 1996).

[11] In addition, as Garg "may be said to have made the allegedly false statements within the scope of his employment, [Better] may be liable under respondeat superior and cannot be dismissed at this stage." *Langenkamp*, 2012 WL 12540277 *3; see also, *Seymour v. New York Elec. & Gasoline Corp.*, 627 N.Y.S.2d 466, 468 (3rd Dept 1995).

made by Garg with his specific knowledge of their falsity.  Moreover, although not required, and

certainly unnecessary to survive a motion to dismiss, in many instances the specific bases for

Garg's knowledge of the falsity of his lies concerning Pierce was noted in the Complaint.

Moreover, as each of the complained of statement were part of Garg's scheme to discredit,

impugn, and harm Pierce, each complained of statement meets both standards for malice.  Thus,

even if the qualified privilege was held to be applicable, Pierce has clearly overcome any

qualified privilege.  As a matter of law, this cause of action should proceed.

VI.   PLAINTIFF HAS SET FORTH A VALID CLAIM FOR INTENTIONAL
      INFLICTION OF EMOTIONAL DISTRESS

In order to set forth a claim for intentional infliction of emotional distress, a plaintiff must

allege (1) extreme and outrageous conduct, (2) intent to cause severe emotional distress, (3) a

causal connection between the conduct and the injury, and (4) severe emotional distress.  See

*e.g., Howell v. New York Post Co*., 81 N.Y.2d 115, 121 (1993).  In the instant case, Pierce has

alleged that Garg and Calamari took actions to knowingly and falsely blame Pierce for Garg's

improper defamation and termination of 900 employees over a zoom call – an incident that

garnered national and international news coverage and condemnation.  In addition, Garg and

Calamari purposefully placed Pierce on administrative leave in specific fashion so as to make it

appear to the entire workforce and the 8,500 employees for whom Pierce was responsible that

Pierce had been terminated abruptly and in a fashion that suggested near criminal wrongdoing.

In attempting to make Pierce the scapegoat for their own illegal, improper, and universally

condemned actions, Garg and Calamari sought to ruin Pierce's reputation in the field and across

the globe.  Similarly, Garg's and Calamari's plan – including their characterization of Better's

requested proposal as a "resignation" – to induce Pierce to resign was purely to cause her

additional emotional distress.  Moreover, their ultimate effectuation of a knowingly improper and

retaliatory termination of Pierce and attempted enforcement of economic sanctions against her in pure retaliation for her legitimate and good faith complaints was extreme and outrageous and designed solely to impugn Pierce and cause her severe emotional distress. Courts have upheld claims for intentional infliction of emotional distress based on far less malevolent facts.  See *e.g., Sherry Bender v. City of New York, et al.,* 78 F.3d 787 (2nd Cir. 1996); *Flatley v. Hartmann*, 138 A.D.2d 345, 346 (2nd Dept 1988) ("hang-up" telephone calls);  *Halio v. Lurie*, 15 A.D.2d 62, 67 (2nd Dept 1961) (taunting letter from former boyfriend, boasting of marriage);  *Flamm v. Van Nierop*, 56 Misc.2d 1059, 1061 (Westchester Cty. S.Ct.1968) (harassing plaintiff by driving too closely and making threatening looks); *Levine v. Gurney*, 149 A.D.2d 473, 473 (2nd Dept 1989). Given the highly improper motivation and the nearly year-long pattern of abuse and harassment that resulted not only in Pierce's ostracization at work, her ongoing public humiliation (as alleged with more detail in the Amended Complaint), her unwarranted termination, and Garg's campaign to impugn, discredit, and minimize her, dismissal of this claim is also unwarranted.

VII.   <u>PLAINTIFF HAS SET FORTH A VALID CLAIM FOR TORTIOUS INTERFERENCE WITH A CONTRACT</u>[12]

Plaintiff has specifically and clearly alleged in the Amended Complaint that Garg, as well as Calamari who was integral in assisting Garg, used wrongful means to effect the termination of her employment.  In order to state a claim for tortious interference with a contract an at-will employee, such as Pierce, needs to allege that the defendant "used wrongful means to effect the termination such as fraud, misrepresentation, or threats, that the means used violated a duty owed by defendant to the plaintiff, or that the defendant acted with malice." *Cohen v. Davis*, 926 F.Supp. 399, 403 (SDNY 1996) (Denying motion to dismiss as to tortious interference claim

---

[12] Plaintiff acknowledges that this claim does not appear in the Complaint and is not subject to Garg's instant motion to dismiss.  Plaintiff includes only a bare recitation of applicable law to demonstrate the good faith basis for the amendment.

against co-workers of at-will employee at Mount Sinai hospital based on defendants filing of false and misleading reports about her performance); *Guard-Life Corp. v. S. Parker Hardware Manufacturing Corp.,* 50 N.Y.2d 183, 194 (1980).  Similarly, co-workers can be held liable for tortious interference with a contract when, as here, it is alleged that they were not acting in good faith when they caused the termination of co-worker plaintiff.  See *e.g., Cohen*, 926 F.Supp. at 405; see also, *BIB Constr. Co. Inc. v. City of Poughkeepsie*, 204 A.D.2d 947, 612 N.Y.S.2d 283, 285 (3rd Dept 1994) (employer's agent liable for tortious interference if "agent does not act in good faith and commits independent acts directed at another for personal pecuniary gain"); *Bank of New York v. Berisford Int'l*, 190 A.D.2d 622, 594 N.Y.S.2d 152 (1st Dept 1993) (motion to dismiss tortious interference with contract claim denied based on allegations that defendant "was not acting in good faith and committed wholly independent torts directed at plaintiff for personal pecuniary gain"); *Riddell Sports Inc. v. Brooks*, 872 F.Supp. 73, 78 (SDNY 1995) (Denying motion to dismiss as a "reasonable trier of fact could conclude that one or more officers and directors induced contractual breaches using improper means or motivated by malice towards the counterplaintiffs. If it is the case that one or more officers or directors, motivated by malice and acting outside of the scope of their corporate representative capacities, induced a breach, then a claim for tortious interference with contractual relations properly lies."); *American Protein Corp. v. AB Volvo,* 844 F.2d 56, 63 (2nd Cir), *cert. denied*, 488 U.S. 852, 109 S.Ct. 136, 102 L.Ed.2d 109 (1988); *G.D. Searle & Co. v. Medicore Communications, Inc.,* 843 F.Supp. 895, 910–11 (S.D.N.Y.1994); 72 N.Y.Jur.2d: Interference § 42 at 238 (employer agent can be held liable for tortious interference if acts with malice, without justification, or contrary to the interest of the corporation); 2 N.Y. PJI 236–37 (Supp.1996).

Just as the defendants in *Cohen*, Garg and Calamari made numerous false and misleading reports, statements, and characterizations concerning Pierce: all so as to result in her termination. This cause of action should be allowed, and the matter should proceed to discovery.

VIII.   <u>PLAINTIFF HAS SET FORTH A VALID CLAIM FOR BREACH OF CONTRACT</u>[13]

A claim for breach of contract in New York is made out with allegations of (1) the existence of a contract, (2) the plaintiff's performance, (3) the defendant's breach, and (4) resulting damages. See *e.g., Alloy Advisory, LLC v. 503 West 33rd Street Associates, Inc*., 195 A.D.3d 436 (1st Dept 2021);  *Harris v. Seward Park Hous. Corp.,* 79 A.D.3d 425, 426, 913 N.Y.S.2d 161 (1st Dept 2010).  In the instant case, Pierce had various contracts with Better concerning stock awards and related notes.  The note agreements had specific terms.  Pierce had performed all of her obligations under the agreements.  In contravention of the plain terms of the note agreement, Better breached the agreements when it attempt to collect on the notes before they came due.  It is equally axiomatic that an offer and acceptance constitute a binding agreement.  On March 30, 2022, Better made an offer to resolve the outstanding balances under the note agreements.  Pierce accepted that offer, making a binding contract.  Better then reneged on the offer and currently has compounded its breach by commencing a public suit against Pierce personally seeking the full amount of the loans in direct contravention of the terms of the loan agreements, in direct contravention of the fact that portions of the loans are non-recourse, in violation of Better's earlier accepted offer, and in abject retaliation for her complaints under §740, and pursuit of the OSHA and the instant complaints.

---

[13] Plaintiff acknowledges that this claim does not appear in the Complaint and is not subject to Garg's instant motion to dismiss.  Plaintiff includes only a bare recitation of applicable law to demonstrate the good faith basis for the amendment.

This cause of action should be allowed, and the matter should proceed to discovery.

<u>Conclusion</u>

WHEREFORE, for the all of the reasons set forth herein, it is respectfully requested that the Court (i) deny Defendants' respective Motions to Dismiss in their entirety; (ii) grant Plaintiff leave to file and serve her proposed Amended Complaint; and (iii) grant Plaintiff any such other and further relief as it deems just and proper.

Dated: New York, New York
       November 1, 2022

*Neal Brickman*
_____
The Law Offices of Neal Brickman, P.C.
Attorneys for Plaintiff Sarah J. Pierce
Neal Brickman (NB0874)
Ethan Leonard (EL2497)
420 Lexington Avenue – Suite 2811
New York, New York 10170
(212) 986-6840
neal@brickmanlaw.com