EXHIBIT "B"

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------X
SARAH J. PIERCE, Individually, and on behalf of
Better Holdco, Inc., and all Shareholders of Better
Holdco, Inc.,

            Plaintiff,

    -against-

BETTER HOLDCO, INC., VISHAL GARG,
and NICHOLAS CALAMARI,

            Defendants.
--------------------------------------------------------------X

Case No. 22-CV-04748 (AT)

**<u>AMENDED
COMPLAINT AND
JURY DEMAND</u>**

COMES NOW Plaintiff, Sarah J. Pierce ("Pierce"), individually and derivatively on behalf of Better Holdco, Inc., and all shareholders of Better Holdco, Inc., by and through her undersigned counsel, and as and for her amended complaint against Defendants Better Holdco, Inc. ("Better" or the "Company"), Vishal Garg, ("CEO Garg") and Nicholas Calamari ("General Counsel Calamari" and, together with Better and CEO Garg, the "Defendants") states and alleges as follows:

<u>Nature of the Action</u>

1.      At its core, this action is a whistleblower retaliation claim, pursuant to the New York Labor Law § 740, as amended. Pierce complained on multiple occasions, to the Founder and Chief Executive Officer ("CEO"), the Chief Financial Officer ("CFO"), the General Counsel, and the Board of Directors about her reasonable belief or suspicion that the Company, and its CEO, had violated securities laws aimed at protecting shareholders and investors as well as other laws. In response, the CEO and Company retaliated against her by scapegoating her for the company's deteriorating financial state and blaming it on her incompetence, by announcing that it was searching for her replacement, by placing her on unexplained administrative leave and shutting off

1

her access to her work computer and e-mail, by threatening to "process" a resignation, which she never tendered, and, ultimately, by terminating her employment.[1]

2.     Until her termination on February 4, 2022, Pierce was the functional equivalent of Chief Operating Officer for the Company, overseeing all of its businesses (mortgage, real estate and insurance) and 85% of its 10,000+ person workforce. Pierce built the sales and operations of the company from the ground up, growing her team from under 30 people to over 9,000. During her 5.5 years at the Company, she received four (4) promotions, consistently outstanding performance reviews, large merit-based salary increases, significant annual bonus payments, and stock options and equity grant awards.

3.     Pierce reported directly to CEO Garg from September 2020 though her termination on February 4, 2022.

4.      Pierce repeatedly spoke directly to CEO Garg (her supervisor), General Counsel Calamari, Chief Financial Officer Kevin Ryan ("CFO Ryan"), Paula Tuffin ("General Counsel Tuffin"), and the Board of Directors about misleading statements CEO Garg made regarding the company's financial prospects and performance, including in a January 12, 2022 on the record employee interview with General Counsel Tuffin in which she stated that CEO Garg had a history of providing misleading financial statements and information to investors and disregarding the notice requirements of, at least, the California WARN Act and of making knowingly actionable defamatory statements about employees.

5.     On December 1, 2021, CEO Garg terminated 900 employees via a Zoom call in which he disregarded company approved talking points that specifically categorized the event as a reduction in force ("RIF") and made the event about himself. On social media forums and in the press, CEO Garg publicly and knowingly defamed the 900 employees stating, *inter alia*, that they had "stolen from the company." The termination also violated the notice provision of, at least, the California Warn Act.

---

[1] On June 1, 2022, Ms. Pierce filed a notice of claim with the Occupational Safety and Health Administration ("OSHA") against Better for retaliation in violation of the Sarbanes-Oxley Act of 2002 ("SOX") (as amended by Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank"), 18 U.S.C. § 1514A; §78U-6(h)(1)(A)(i)-(iii). It is anticipated that the OSHA action will be transferred to Federal Court shortly after November 28, 2022, as permitted by law.

6.      The disastrous Zoom call was recorded and posted online. It immediately went viral and was covered by news outlets globally. CEO Garg received swift and intense backlash from the public and senior employees and the Company's business was significantly negatively impacted.

7.      In an attempt to deflect blame, CEO Garg continued to state that the terminated employees had stolen from the company to leadership, to the press, and on social media forums such as Blind. He also began to state to the Board of Directors and investors that the company would achieve profitability in Q1 2022, despite his knowledge to the contrary and in direct contradiction of Pierce and other senior leaders explicitly stating that this outcome was not possible.

8.      Pierce was concerned with both CEO Garg's defamation of these employees and his knowingly blatant fabrications about the RIF process and the Company's prospects on profitability. In the days following the Zoom call, Pierce directed her leadership to stick to truthful Company approved talking points and requested that the company issue a statement correcting CEO Garg's misinformation on the terminated employees. Pierce was told repeatedly by the Company's counsel, particularly General Counsel Tuffin, to not contradict CEO Garg. Pierce also spoke up directly to CEO Garg about his misstatements regarding the terminated employee's performance (*i.e.* that they, in fact, had not "stolen" from the company as he falsely asserted) and the company's financial prospects, making it clear she would not enable his false narrative.

9.      In CEO Garg's first instance of retaliation due to Pierce speaking up to him and to others about him, he scapegoated her in a private meeting to the Board. After this meeting, he sent an email to the Board with the text of an email that he was to send to his "leadership team of about 30 execs (some junior some senior in both experience and capability) who help manage different parts of the business and with whom we have been conversing about the events of the last week." These "30 execs" were those who had been the most vocal in their admonishment of his acts and included numerous individuals who reported to Pierce. In memorializing the content of the Board meeting he stated that the "metrics of the company are a black box" (his terminology that he foisted upon the Board so that he could denigrate Pierce's performance) and that the Company would seek to replace Pierce by hiring a "a seasoned operator who can help manage and drive performance across business functions," qualifications that Garg represented that Pierce did not have. CEO Garg not only scapegoated Pierce to the Board, but also planned to scapegoat her to these 30 senior

leaders in a continued effort to deflect blame from himself – all without even speaking to Pierce directly.

10.     Minutes after receiving this draft announcement, CFO Ryan forwarded the email to Pierce in a clear acknowledgment he knew she was being scapegoated.

11.     In reaction to CEO Garg's continuing to peddle his false narratives, Pierce then spoke up directly to the Board stating, *inter alia*, that "if you believe the company's metrics and financials are a black box that is because [CEO Garg] did not communicate them to you." In the aftermath of Pierce speaking up to the Board, CFO Ryan told Pierce that CEO Garg directed him to "get her out." Garg's desire to get rid of Pierce did not, at that time, equal a determination by Better, but rather was his self-serving need to quash anyone who was telling the truth about him and his actions. In reality, Pierce had been completely transparent about Better's metrics. It was Garg who had ignored the metrics and repeatedly misrepresented them to the Board, shareholders, and the public, including potential investors.

12.     In his second instance of retaliation, on January 6, 2022 CEO Garg, in concert with General Counsel Calamari, placed Pierce on an unexplained leave of absence, shutting off her access to company systems, including slack and email. General Counsel Calamari directed IT to shut off her access, making it appear as if she had been terminated. The only explanation Pierce received for her leave was from CFO Ryan who clearly stated on January 6 and then again, at least, two additional times to Pierce and others that her leave was because she "claimed retaliation." CEO Garg and General Counsel Calamari's scheme to put Pierce on a leave of absence, with no communication plan to her 8,500 employees, was an attempt to intimidate, silence, and discredit her.

13.     On January 12, 2022 at the request of General Counsel Tuffin, Pierce completed an employee interview. In the interview she engaged in clearly protected activity stating that "This [the RIF event] is consistent with Vishal's stewardship of the company in ignoring guidance from subject matter experts and making misleading statements regarding the company's financial position and data … There are additional examples of Vishal providing misleading statements regarding the company's financial situation … I'd recommend you interview Kevin if you would like more information in that realm." Pierce also gave several examples of CEO Garg's providing misleading financial information in this interview.

14. In their third instance of retaliation, 48 hours after this interview in which Pierce engaged in protected activity on the record, Pierce was informed through the Company's counsel that her "resignation", which she did not tender, would be "processed." In reality, the document that Defendants have repeatedly mischaracterized as a "resignation" was a document that CFO Ryan had directed Pierce to prepare should Better ultimately decide to replace her as Garg had recommended in retaliation for her complaints about him and his illegal acts. The required "transition" proposal was coupled with an explicit announcement, repeated several times thereafter, to CFO Ryan that Pierce was <u>not</u> resigning.

15. Pierce immediately emailed General Counsel Tuffin registering her shock and dismay and seeking the ability to talk to Human Resources about her next options.

16. Among the questions was how a document requested by the then acting CEO to address her potential layering (not termination) and provided to him as directed with the specific caveat that she was not resigning, and did not intend to resign, could be so blatantly and improperly be misinterpreted and misrepresented as a "resignation."

17. Upon learning that Pierce remained constant that she had not resigned, did not intend to resign, and maintained her objections to Better's improper assertions to the contrary, General Counsel Tuffin informed Pierce that her leave would be extended for an additional two weeks.

18. When it was clear that Pierce had no intention of resigning, rather than allow any layering, in their final act of retaliation, on February 4, 2022 CEO Garg finally effected his self-serving desire by convincing, Better, with the help of General Counsel Calamari, to terminate Pierce's employment without reason, severance or benefits. Pierce never resigned from Better, and she was never provided an explanation for her termination.

19. All four instances of retaliation by CEO Garg, General Counsel Calamari and the Company against Pierce for speaking up to CEO Garg and to the Board were acknowledged multiple times by CFO Ryan to Pierce and other employees. Her mistreatment and the strange circumstances of her departure were widely known and acknowledged by the entire senior leadership team, including General Counsel Tuffin and CFO Ryan as well members of the Board. On multiple occasions other senior leaders such as Megan Bellingham, Head of Operations, and Kenna Meyerhoff, Head of HR, spoke directly to CFO Ryan and General Counsel Tuffin about the inappropriate and shocking way Pierce was being treated. They conveyed the personal and

business impact it was having on the company and their concerns that she was clearly being retaliated against. They were ignored.

20.     In addition to these acts of retaliation, CEO Garg repeatedly defamed Pierce during the period, December 17, 2021 through February 4, 2022, by repeatedly and publicly questioning Pierce's aptitude, fitness, integrity, and ability to effectuate her job by asserting, with knowledge of the falsity of the allegations, that Pierce was the leader of a "coup," that she had "resigned," that she "abandoned" Better and her team; that she attempted to "extort" money that she was not entitled to from Better; that she had done nothing for Better; that she had contributed no managerial services of any value; and that her title should have been "Cheerleader in Chief."

21.     On her last day, Pierce was not permitted to address any of the 8,500 employees she had led, tirelessly for years. In a final email announcement to the company, her years of service were characterized as Pierce being "a good friend." In contrast to the way the CEO Garg attempted to minimize Pierce's years of service and dedication to the employees, a TechCrunch news article covering Pierce's departure quoted one employee who said "Sarah was one of the most, if not the most, beloved employee at Better over the last six years. She is single handedly responsible for most of our growth and success."

22.     In the months following Pierce's termination, CEO Garg has continued to defame her and acknowledge that he "got her out" in written and verbal communication to employees. Garg also further impugned Pierce's character, integrity, and ability to perform her job by repeatedly and knowingly falsely asserting that Pierce had been "fudging the numbers" and had repeatedly lied to him about the labor costs to Better of each loan.

23.     Better has also repeatedly retaliated against Pierce for her complaints while at Better, as well as her filing of the OSHA Complaint and the instant action, concerning its disparate treatment of her loan agreements.  Specifically, Better peremptorily breached the loan agreement by attempting to call them due some sixty-five days early.  However, in making the early demand in breach of the terms of the agreements, Better agreed on March 30, 2022 to repurchase the unvested shares vis a cancellation of the loan balance and repurchase those which are vested in order to "settle the loan." After due consideration, Pierce accepted the offer.  However, after the OSHA Complaint and the instant action were filed, in direct and clear retaliation for the same, Better reneged and demanded cash repayment of the entire loan amounts in direct contravention of not only the terms of the loan agreements, but the agreement offered by Better and previously

accepted by Pierce. Better has since compounded this breach by filing a retaliatory public lawsuit against Pierce personally seeking the full amount of the loans in direct contravention of the terms of the loan agreements, in direct contravention of the fact that portions of the loans are non-recourse, in violation of Better's earlier accepted offer, and in abject retaliation for her complaints under §740, and pursuit of the OSHA and the instant complaints.

24.    In addition to the New York Law § 740 claim related to her February 4, 2022 termination and the post-termination retaliatory acts by Defendants, this Amended Complaint asserts related claims for defamation (against CEO Garg and Better), breach of fiduciary duty (derivatively on behalf of Better and its shareholders as against Garg), intentional infliction of emotional distress (against CEO Garg and General Counsel Calamari), breach of contract (against Better), and, in the alternative, tortious interference with a contract (against Garg and Calamari). Pierce seeks compensatory damages, punitive damages, statutory penalties, interest and costs, including her reasonable attorneys' fees.

<u>Parties</u>

25.    Pierce is, and was at all times relevant hereto, an individual citizen of the United States, residing at 172 Rocky Shore Road, Bristol, New Hampshire. She was, until she was illegally terminated from Better on February 4, 2022, a level L13 employee, (a Chief level paygrade at the company), and directly oversaw Sales, Operations, and Customer Experience for all of Better's business lines. She was the functional equivalent of its Chief Operating Officer.

26.    Better is, and was at all times relevant hereto, a corporation organized and existing under and pursuant to the laws of the State of Delaware, with its principal offices located at 3 World Trade Center, 59th Floor, New York, New York 10007. Better is a digital mortgage company which operates an online platform for mortgage originations and related services, including the placement of real estate, title, and homeowner's insurance.

27.    CEO Garg is, and was at all times relevant hereto, an individual residing in New York, New York. CEO Garg is, and was at all times relevant hereto, the Founder, CEO, and a significant shareholder of Better.

28.    General Counsel Calamari is, and was at all times relevant hereto, an individual residing in New York, New York. General Counsel Calamari is, and was at times relevant hereto,

one of two General Counsels at Better. Garg and Calamari are the subject of a separate lawsuit in which the Plaintiff investors accuse them of fraud in soliciting and managing their money.

Jurisdiction and Venue

29.    This Court has jurisdiction over this action, pursuant to 28 U.S.C. §1332, because there is complete diversity of citizenship between the Plaintiff and the Defendants and the matter in controversy, exclusive of interest, costs, and attorneys' fees, exceeds $100,000.00.

30.    Venue is proper in this district because the Defendants all reside in this district and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this district.

Facts Common to All Counts

31.    Better was founded in 2014 and launched its first business – Better Mortgage – in 2016. During the period 2016 through 2020, coinciding with Pierce's ascendancy up its corporate leadership ranks, Better experienced explosive growth. In 2020 the Company generated $24.2 billion in mortgage originations, and placed $7.7 billion in title insurance and $14 billion in homeowners insurance, realizing an operating profit of approximately $172 million.

32.    Pierce commenced employment with Better in or about August 2016 as a salesperson. During her five and a half years at the Company she received four (4) promotions, consistently outstanding performance reviews by Garg, large merit-based salary increases, significant discretionary annual bonus payments, and stock options and equity grant awards.

33.    Because of her outstanding job performance, in August 2020, Pierce was promoted from Head of Sales to Head of Sales, Operations and Customer Experience, the functional equivalent of the Company's Chief Operating Officer, reporting directly to CEO Garg. In that role, Pierce oversaw a team of 9,000 employees across the Company's mortgage, insurance, and real estate business lines. During Pierce's tenure at the Company, the Company grew from fewer than 50 employees to over 9,000 employees and from less than $1 million in revenue to over $1 billion in revenue. By e-mail dated October 25, 2021 from CEO Garg to the Board of Directors, CEO Garg described Pierce as the "number 2" executive at the Company.

34.    At the time of her illegal termination (February 4, 2022), Pierce was earning a base salary of $1,000,000.00, had earned, just 3 months prior, in October 2021, an annual discretionary

bonus of $1,000,000.00, and had been awarded stock options and equity grants, resulting in her owning, at the time of her termination, over 1,900,500 shares of Better stock. CEO Garg had promised Pierce, prior to her illegal termination, an additional grant of another 1,000,000 shares of Better stock.

35.     In 2016 the Company launched Better Mortgage and secured $30 million in Series A funding. That same year, the Company was approved to be a Fannie Mae seller/servicer. In 2017 the Company raised Series B funding in the amount of $15 million with Kleiner Perkins, Goldman Sachs, and Pine Brook Partners. In 2018, The Company launched two additional subsidiaries: Better Real Estate and Better Settlement Services. A year later, the Company launched a fourth subsidiary, Better Cover, and raised $160 million in Series C funding led by Activant Capital. In 2020, the Company raised Series D funding of $200 million, led by L. Catterton. In April 2021, the Company raised an additional $500 million from Japanese investment conglomerate SoftBank, resulting in a $6 billion valuation of Better.

36.     In May 2021 Better announced that it planned to go public via a Special Purpose Acquisition Company ("SPAC") transaction, and, in furtherance of that plan, Better filed an initial S-4 with the Securities and Exchange Commission ("SEC"), describing that transaction (the "SPAC Transaction"). According to that filing, Better will go public by merging with Aurora Acquisition Corp. ("Aurora"), a blank check company public shell, sponsored by Novatar Capital. As a part of that deal – which is supported by a fully executed Agreement – a SoftBank Group subsidiary committed to make a $1.5 billion investment in the combined company. Novatar Capital also committed to invest $200 million into the merged company.

37.     The SPAC Transaction, which was expected to close in the fourth quarter of 2021, was delayed. On November 30, 2021 Better and Aurora entered into a new agreement, which included $750 million of bridge financing from SoftBank that Better was slated to receive immediately. The remaining $750 million of equity placement, to which SoftBank had committed, was replaced by a more structured convertible note. No new date was, or has, been set for the closing of this SPAC Transaction.

38.     Since the May 2021 SPAC Transaction announcement, CEO Garg has engaged in inappropriate, and potentially illegal, conduct (described below), intended to ensure that the SPAC Transaction closes and that the investors do not exercise their contractual right to withdraw from that transaction due to a material adverse change in Better's financial condition. His conduct, aided

by General Counsel Calamari was designed to benefit CEO Garg's personal interests, at the expense of the Company's, and its shareholders', interests.

<u>Better's Misrepresentations and Its Mishandling of its Reduction in Force</u>

39.     In his zeal to close the SPAC Transaction and faced with a challenging higher interest rate environment and worsening financial performance, CEO Garg on behalf of Better has (a) publicly misstated and exaggerated the Company's "organic traffic revenue"; (b) ignored internal projections and publicly accelerated, without justification, the Company's anticipated time horizon to achieve profitability; (c) lied about the Company's "metrics" being a "black box" and, thus, misstated internal financial projections; (d) terminated 900 employees via a Zoom call, in which he defamed those employees and knowingly violated laws and Company policy and procedure; and (e) misrepresented the capabilities and functionality of the Company's allegedly proprietary electronic mortgage origination platform.

40.     Pierce reasonably believed that each of these actions constituted a violation of law, including federal securities laws designed to protect shareholders and investors and applicable WARN Act paid notice requirements. In each instance, as detailed below, Pierce made internal complaints regarding her concerns that these actions were illegal. Better retaliated against her for making these complaints.

<u>Misrepresentation Regarding the Company's Organic Traffic</u>

41.     The relevant August 2021 S-4 filing contained the following information as supplied by Better:

*"Our technology platform and customer-first ethos are gaining in the market. In April 2021, we had an average of over one million visits to our website, including more than 400,000 visits from what we believe to be organic traffic (customers visiting our website directly, versus through a partner or affiliates' site). We believe such engagement represents a substantial opportunity to covert these potential customers through improved sales outreach, customer onboarding, and production expansion. In 2020, we believe approximately 30% of our D2C funded loans were generated from organic internet traffic, comprised of visitors that converted with us from a channel outside of paid customer acquisitions (e.g., from lead aggregators or paid internet advertisement.)*

*We define "funds from organic traffic" as funded loans to borrowers whose last touch point with us was coming to better.com directly or by clicking a non-paid marketing link through a search engine or content piece."*

42.     This convoluted statement is contrary to the empirical data that Ms. Pierce and her team provided to CEO Garg, CFO Ryan, and General Counsel Calamari. The representation regarding the amount of direct-to-consumer funded loans that were generated from organic internet traffic was inflated. No more than 12% of Better's direct to consumer funded loans, not the 30% represented in the filing, were generated from organic internet traffic. Pierce had repeatedly made these and other metrics, as well as all of the underlying relevant data, available to senior management, specifically including CEO Garg. Ms. Pierce expressly raised her concerns about these misrepresentations to CEO Garg and General Counsel Calamari. They ignored her concerns and proceeded to publish the false and misleading data in the S-4 and repeatedly to tout these misrepresentations to the Board of the Directors, potential investors, and the press. These misrepresentations were knowingly false and misleading.

<u>Mishandling of the Reduction in Force</u>

43.     For several months prior to December 1, 2021, CEO Garg directed Pierce and other company executives to hire hundreds of additional personnel. This decision by CEO Garg was directly contrary to the advice of Pierce and other executives. Pierce and other executives believed that the rising interest rate environment and other market conditions should, instead, cause the Company to take steps to reduce its work-force and cut costs, rather than ramp up hiring and increase overhead. Pierce and other executives voiced their concern to CEO Garg and specifically stated that they opposed his decision to hire hundreds of additional personnel.

44.     CEO Garg overruled Pierce, stating to Pierce and other executives that Company sales would increase because "President Biden will die of COVID," this will cause interest rates to fall, and save the Company from its worsening financial condition. CEO Garg's decision to ramp up hiring based on his belief that President Biden would die of COVID was repeated on several occasions over a period of several weeks to at least 50 other executives and senior employees of the Company and to the Board of Directors.

45.     In accordance with CEO Garg's instructions, Pierce [as the company's Chief Operating Officer, in charge of the sales and operations division] oversaw the hiring of hundreds of new sales and operations personnel. CEO Garg's strange prediction, that sales would increase because of President Biden's prospective illness and death, obviously did not come to pass. As Pierce warned and predicted, sales declined. As a result, by the beginning of the 4th Quarter, 2021, the Company was losing money and was in a dire, and worsening, financial condition.

46.     CEO Garg, who now realized the disastrous consequences of his decision to over-hire based on his strange prediction about President Biden, abruptly reversed course in early November 2021 and instructed Pierce to develop a plan to reduce the company's workforce. At the beginning of November 2021, CEO Garg approached CFO Ryan and Pierce about reducing cost through a large-scale reduction in force ("RIF") event. CEO Garg gave the directive that he wanted 20% (2,000 employees) of the Company's workforce cut. It was unclear what exactly this number was tied to. CEO Garg also stated that he wanted the event to happen on November 19, which gave Pierce and other executives a two-week time frame within which to plan and execute this RIF. Pierce stated to CEO Garg that a two-week timeline to conduct a RIF of this scale was irresponsible and would not give the Company sufficient time to complete critical steps required by law.

47.     CEO Garg responded that he did not care about legal compliance or "bureaucratic processes," like a required disparate impact analysis. He instructed Pierce to ignore the advice of in-house and outside attorneys regarding the legal requirements of a RIF of this size. One week into the process, it became clear that there was no way the RIF could be finalized by November 19. Pierce went to CEO Garg to speak to him about pushing out the timeline. Pierce asked to move the event to early January as it would be a public relations nightmare and was generally bad practice to conduct a RIF between Thanksgiving and Christmas. CEO Garg stated to Pierce, "I don't give a shit, I will fire them on Christmas if I have to." CEO Garg ordered Pierce to complete the process by November 30.

48.     From the beginning of the RIF process, HR and legal advised CEO Garg that a RIF of this size would trigger the WARN Act, which requires the Company to give 60 days' notice or provide 60 days of compensation in lieu of notice to terminated employees. Gabi Toledo, a Board member with deep experience in HR, advised on this as well and specifically noted that the Company needed to check the WARN Act and ensure that it complied with the notice provisions

of that Act. On multiple occasions CEO Garg stated and emailed that he "read the WARN law himself and we wouldn't trigger it," and he again reiterated to "never trust HR or the legal beagles." It was decided by HR and legal that the Company would pay the full 60 days pay mandated by the WARN Act. In the days leading up to the event, finance highlighted that the compensation pay out, pursuant to the WARN Act, would be $18M. This triggered an email exchange wherein CEO Garg explicitly stated that the Company would not be paying out 60 days and that he wanted to pay out 1 week instead. The next day, there was a 20-person meeting with CEO Garg, Better senior executives including Pierce, General Counsel Tuffin and CFO Ryan, and other members of the legal and HR teams. At that meeting, the legal team explained very clearly that the RIF would, in fact, trigger, at least, the California WARN Act.

49.     In response, CEO Garg made several disparaging comments about both Better's internal legal team and the counsel it used as an advisory. He continued to say he wanted to pay "1 week, 2 weeks max." After the legal team continued to hold firm that the Company would violate, at least, the California WARN Act, all parties (including CEO Garg) on the Zoom call agreed with this assessment. After at least 20 minutes of disagreement with several leaders, including Pierce and Kenna Meyerhoff, Head of HR, CEO Garg gave the clear directive to pay no more than $8M to the terminated employees, which would have been 3 weeks' pay, in violation of the California WARN Act. At this point, Pierce became deeply disturbed by CEO Garg's lack of decency in dealing with the impacted employees and his refusal to comply with the law. CEO Garg said, "who cares, these people will never sue us."

50.     In late November, the Company had a communications planning meeting to discuss the logistics for the RIF event. The General Counsels and Head of HR advised that managers should conduct each termination via an individual conversation. They stated that, in order to conduct individual conversations, the Company would need at least two more weeks to prepare and potentially bring in external HR consultants so that there would be enough HR representatives to be in each conversation. Pierce agreed that this would be the best path. CEO Garg said that it was unacceptable to delay the RIF and indicated that he would do the termination himself via a large Zoom call. The Company's communications team advised that they believed that this alternative could work, if, and only if, CEO Garg was highly scripted. CEO Garg agreed to read directly from a script.

51.     Two days before the event, CEO Garg reviewed and read his script in front of HR, communications and other executives. He agreed to read this script that was approved by communications, HR and the executive management team, including Pierce. The communications team also reviewed scripts for follow-on town halls. The scripts and company approved talking points were all very careful not to discuss performance in the decision making, as it was widely understood and openly acknowledged that the Company was not only firing bottom performers. This was specifically to be executed as a RIF event, not a performance review event.

52.     On December 1, 2021, in the middle of the holiday season, CEO Garg held a Zoom call with hundreds of employees in which he terminated over 900 employees (the "900-Employee Termination Call"). Instead of displaying any sympathy toward these employees who were being terminated weeks before Christmas, CEO Garg only referred to the impact of his decision on himself. He did not read the agreed script or anything close to it. Immediately following the 900-Employee Termination Call, CEO Garg began to speak publicly on social media forums and to the press where he conveyed baseless and defamatory information about the 900 terminated employees, claiming, without any evidence, that they "stole from the company." Apart from violating employment laws and regulations in multiple states, the timing, the words used by CEO Garg during the 900-Employee Termination Call, and particularly his self-obsession during a traumatic moment for 900 individuals terminated during the holiday season, made international press.

53.     The 900-Employee Termination Call was played and discussed repeatedly on major news networks globally and on social media. Multiple recordings were played on YouTube and received hundreds of thousands of views. Upon information and belief, a major television network in Italy bestowed upon CEO Garg the award of Asino del Grino ("Donkey of the Day"). CEO Garg and Better faced swift and intense backlash that had a material detrimental impact on the company's business and reputation. Thousands of customers filed complaints and a major partner, Progressive Insurance, withdrew from a pending lucrative arrangement with the Company. Sales fell dramatically and continue to fall to date. Upon information and belief, in a private meeting, the company's major investor called CEO Garg "an embarrassment."

54.     Thereafter, CEO Garg continued to make false statements about the terminated employees on social media and in the news [including in an interview with *Fortune* magazine, in which he repeated the false, baseless and defamatory statement that the 900 employees had stolen

from the company and cited false metrics that were not used in association with the RIF]. In the aftermath of the 900-Employee Termination Call, the international attention and devastating financial backlash, CEO Garg attempted to deflect blame from himself by blaming others, including Pierce, for the fiasco, and creating a false and misleading narrative of the steps leading up to the call and the disastrous nature of the call. The extent to which he deflected blame is highlighted by his statement to Pierce, Meyerhoff, and others on the communication team: "why didn't you turn off my camera when I went off script."

55.     Pierce, as described in more detail below, became a convenient scapegoat for CEO Garg and Better because she spoke up about CEO Garg's incompetence and his creation of a toxic work environment, refused to cooperate with the defendants' coverup and illegal acts (false and misleading financial reporting), and demanded that the Company correct the record on the defamatory statements CEO Garg made about 900 employees who were terminated weeks before Christmas and honor its financial obligations under the WARN Act.

56.     CEO Garg's two scheduled townhalls: one with the terminated employees and one with the rest of the company, caused further confusion and anger as he went completely off script. In his Zoom call terminating employees he referred to how he "cried for the first time" and then, even more egregiously, in the company-wide townhall, he stated "you can make a mistake once but not twice."

57.     His misstatements put Pierce's sales and operations leadership team in an incredibly confusing and uncomfortable position where the approved scripts for their subsequent townhalls directly contradicted what CEO Garg was sharing – as he lied and they were planning to tell the truth. Pierce had a townhall with all eight thousand production employees immediately following the company wide townhall and stuck to the approved script. She also gave the directive for her team to continue with their townhalls, sticking to their approved scripts that reflected the truth.

58.     By the end of the day a recording of CEO Garg's termination Zoom call had been posted on YouTube and began to go viral.

59.     The backlash from the public and internal employees was fast and specifically called out decisions CEO Garg made despite all advice to the contrary, including terminating people three weeks before Christmas, violating, at least, the California WARN Act, conducting the firing via a large Zoom call, and calling people lazy and saying that they stole from the company.

60.     In the immediate aftermath of this backlash, CEO Garg began to rewrite history and deflect blame for his decisions. Though, occasionally, he stated that he "was the only one to blame", when pushed on what he blamed himself for, he noted things such as "I should have reviewed the list because I didn't know we were firing middle performers." This is categorically false and CEO Garg, and some fifty managers at the Company, knew it was false when he said it.

61.     CEO Garg gave the directive to fire 20% of the company in order to save expenses, met with the legal, HR and planning teams 5+ times during the process, where it was specifically referred to as a RIF event, and not a performance review process, and was shown the methodology used to identify employees to be terminated. This methodology clearly showed that middle performers would be terminated. CEO Garg, undoubtedly, knew that he was terminating middle performers.

62.     In referring to the sales and operations teams, which represented 700 out of the 900 people terminated, CEO Garg began to lean into this narrative that he did not know it was more than bottom performers who were being terminated and stated clearly to Pierce and others, that he needed to do this in order to "keep the moral high ground." The employee population was turning against him fast and he wanted to redirect their ire.

63.     CEO Garg took specific actions to clearly state this narrative that "there may have been mistakes" due to the process rather than his decisions to conduct a large-scale RIF in an irresponsible manner. He began making incredibly misleading comments in public forums such as Blind and to reporters, blatantly spreading misinformation.

64.     On December 2, 2021, the day after the RIF, CEO Garg posted publicly on social media application, Blind, that he would "love if you all would game the following metrics" and then proceeded to list metrics that were not used in performance reviews and were not used in the RIF decisions. He also said, "if you have issues you can always email me directly." This immediately caused several impacted employees to believe they had been terminated for failing to meet metrics – metrics that were not used in the process. CEO Garg knew this statement was false and misleading when he made it.

65.     On Friday, December 3, 2021 CEO Garg reiterated this narrative to a Fortune magazine reporter, stating that the Company reviewed "individual employee productivity data, including missed telephone call rates, number of inbound and outbound calls, employees showing

up late to meetings with a customer, and other factors" and that "the data factored into who the company decided to lay off." This was a false and misleading statement. As quoted by the article, he also said, in an emailed statement prior to the interview with Fortune, that he went on Blind "to provide context regarding the planning and process that went behind the layoffs." He also said that he wanted "to acknowledge that we are not sure we did them right, and if people felt that they were affected but actually had great performance to reach out to us."

66. CEO Garg's public claims, that the Company had only fired "lazy people that stole from the company," contradicted the Company approved talking points and the reality of the situation, which caused mass confusion among both current and terminated employees. Terminated employees wrote into him, HR, other leaders and Pierce, saying they had not been underperformers.

67. Facing these employees, CEO Garg further tried to rewrite history, provide misinformation and dig into this narrative directly to terminated employees.

68. Despite Pierce's active and repeated requests that he not perpetuate this false narrative, CEO Garg began to reply to these inquiries, saying that the Company may have made a "mistake" and that it would re-hire anyone who was not an underperformer. Pierce specifically asked him to stop saying this because, she warned, he would cause more confusion and chaos. HR and legal advised that he could open the Company up to serious liability due to these statements.

69. Over the following weekend, the video and CEO Garg's comments became even more viral. In response, he tried different tactics and excuses to shift blame from himself. He oscillated between the terminated employees being lazy people and thieves, while, on the other hand, saying mistakes had been made and he wasn't aware of the process that he, in fact, dictated. He continued to repeat that he needed to "keep the moral high ground." He sent emails to Pierce and several other leaders, such as Megan Bellingham, Head of Operations and Armando La Rocca, Head of Business Operations, asking them to reconsider individuals who were terminated. CEO Garg continued to say things like "I should have reviewed the list and I didn't know we were firing mid performers," while also stating that the terminated employees were lazy and the reason the company was failing.

70. At this point, Pierce became very concerned with the contradictory and false narrative CEO Garg was stating, as well as his insistence that the Company would rehire

individuals who were terminated, who were not bottom performers. This was concerning to Pierce from a culture perspective, as it was already causing confusion. The event had been conducted as a RIF process and not a performance review process.

71.    Pierce's direct reports and other leaders in the organization came to her, concerned as their managers and employees were confused. They had employees and managers asking why people had been terminated who were working extremely hard and long productive hours. They were concerned about terminated employees believing that they had been defamed or wrongly terminated. They did not know what to do or say as the truth contradicted what CEO Garg was publicly stating.

72.    As an executive of the company and leader of 85% of the workforce, Pierce could not allow CEO Garg to put the company in this position and she began to clearly speak up against him, stating, on multiple occasions, that the Company could "not let him rewrite history." Pierce conveyed her deep concern about his recharacterization of the RIF event directly to the two General Counsels.

73.    In several communications meetings during the week of December 6, 2021 (the week following the event), Pierce stated clearly that she wanted the Company to issue a statement clarifying CEO Garg's comments and stating for the record the actual process that took place.

74.    Pierce then stated that she wanted to speak directly to the sales and operations teams and clarify the record. She was advised, on numerous occasions, against this and when she kept saying that it needed to be done, she was told by Liz Bowyer, Head of Communications, and General Counsel Tuffin that she was not "allowed" to have Townhalls with the sales and operations teams. Other members of the communications team as well as many other senior leaders including Kenna Meyerhoff, Head of HR, agreed with Pierce that the Company should correct the record.

75.    Pierce stated openly that she believed decisions were being made to protect CEO Garg and not the Company or its employees, as she reasonably believed that Garg had violated the law – both as to the WARN Act and in defaming the terminated employees. CEO Garg was in several of these meetings and heard, and was, therefore, aware of Pierce's concerns and position that she was not going to enable his self-serving false narrative.

76.     On Monday December 6, 2021, CEO Garg hosted another Townhall with senior leadership. Pierce was not able to attend as she was remote and CEO Garg did not allow for a remote Zoom call, as he was afraid it would be recorded. At 1:30pm, immediately following the townhall, CEO Garg was supposed to join a meeting with Pierce's direct reports including, Megan Bellingham, Head of Operations, Kenna Meyerhoff, Head of HR, Stephen Rosen, Head of Sales, Armando La Rocca, Head of Business Operations, and Daniel Wood, Pierce's Chief of Staff. Rather than joining the scheduled Zoom call, CEO Garg kept La Rocca, Bellingham, and Rosen in his office ("cornered" is the word they have used), and refused to join the Zoom call with Pierce, Meyerhoff and Wood. He asked them repeatedly if they "stood by" who they fired and if they had made mistakes in an attempt to further support his false narrative that he thought "only lazy people" were being fired and that anyone who was terminated and not an underperformer, was a mistake.

77.     For at least 20 minutes, Pierce waited on the Zoom call. Several individuals were sent into the room to ask CEO Garg to join. He refused to join. When Pierce finally was allowed to join, she asked what was going on and CEO Garg said, "he needed to hear it from them directly." Pierce's direct reports have each told Pierce, that they felt uncomfortable and intimidated in the conversation. Clearly CEO Garg was attempting to find a narrative that allowed him to shift blame from himself. As a result of Pierce no longer enabling his false narrative, she was pushed aside and, upon information and belief, he was attempting to get her direct reports to blame her.

78.     Once allowed on the call, Pierce said to CEO Garg directly "we are not going to review data right now. We are going to align on the actions, your actions, ~~that~~which led to the lay-offs and the aftermath we are now dealing with. I am not going to let you rewrite history. You provided incorrect information to employees on the Company townhall, on Blind and then directly to reporters. You undermined your key leaders and have deflected blame for the decisions made. You made the decision to violate the WARN Act. You made the decision to fire everyone 3 weeks before Christmas. You were told repeatedly that the Company was going to cut beyond bottom performers. You cannot go back and decide you didn't because you don't like the backlash you are getting."

79.     On Tuesday December 7, 2021, CEO Garg hosted a follow up Townhall with senior leadership. Pierce asked him not to have the meeting, because Pierce did not believe CEO Garg

was prepared for it and, for the sake of the Company and the employees, she desperately wanted him to stop peddling this false information.

80.     CEO Garg proceeded with the townhall anyway. The Townhall was tense from the start. A VP of Finance started by stating he wanted to provide the full 60 days' pay mandated by the WARN Act to terminated employees effective immediately and he wanted answers as to why the Company did not do that in the first instance. CEO Garg deflected blame and said, "I didn't want to fire anyone, I wanted to reduce everyone's compensation by 30%, but I was told it would be better to do a lay off." This was completely untrue. Throughout the conversation CEO Garg continued to state he thought it was a performance review.

81.     Finally, Pierce came on the Zoom and stated clearly that "he made the decisions that led to this point. He decided to violate WARN. He knew we were firing more than bottom performers" and that "I would not allow him to rewrite history."

82.     From December 2, the day after the RIF event, and throughout the following week, many discussions on how to handle the backlash from the RIF took place. There were a series of meetings with the executive team, senior leadership team and there was an active "war room" set up for further discussions. At these meetings Pierce told CEO Garg and others the following:

1.  "You lied to the media and on Blind about employees stealing from the company and their productivity";

2.  "You made the decision to get us here, you misused the company's funds and made us overhire, you can't rewrite history now that it isn't working out"; and

3.  "There is no way we are going to achieve profitability by Q1 as you have been saying"

83.     On Wednesday evening, December 8th, CEO Garg met with the Board in a closed session, in which he disparaged Pierce as he sought to make her the scape-goat for his own bad acts. The morning after, Pierce received a forwarded email from CFO Ryan confirming that CEO Garg was attempting to make her the scape-goat for his poor decisions and legal violations. The original email was a communication from CEO Garg to the Board with a purported summary of their conversation in the form of a draft communication to be sent out to 30+ senior leaders, many of whom reported to Pierce.

84.     In this email CEO Garg stated that he and the Board decided to hire (among others): "B. COO and President – a seasoned operator who can help manage and drive

performance across business functions and help me and all of you learn how to build an inspirational leadership culture. Kevin and I know someone who might fit this bill. And there may be others." In so doing, CEO Garg was clearly making the statement that Pierce, the acting COO was being replaced because she was not a season operator, was not helpful in managing and driving performance, and was unable to build an inspirational leader-ship culture – all in direct contravention of the evidence of Pierce's actual performance and successes.

85.    CEO Garg also stated that "2. The board currently feels the metrics of the company are a black box and need to be managed much more carefully as we are in a loss making state and recent operational challenges have been difficult and we need to pivot from blitzscale mode to sustainable growth mode while the market environment remains volatile." As noted above, this characterization of the Company's metrics came from CEO Garg and was designed again to disparage Pierce, who counted the Company's metrics as one of her myriad responsibilities.

86.    CEO Garg's e-mail continued, "as such, we plan to form an Operations Review committee, with Steve and Dinesh acting as leads. Rebecca Li from GAC all help and work with our Bizops leaders to make sure we have an independent board reviewed set of metrics and operational rigor across the company. The board has selected CFO Kevin Ryan, with support from Bizops and Vikram Jaipuria to lead this effort on the Better teams side."

87.    Prior to the backlash of the layoffs and Pierce's clear statements that she did not endorse or enable CEO Garg's false narrative, Pierce was - as stated by CEO Garg - his number 2. In 5.5 years, Pierce never received below a 4 on a performance review and had received four promotions. One and a half months prior to these events, Pierce received her full bonus of $1,000,000 for her performance throughout 2021. Pierce had direct management over all of the Company's business lines and her core job function was very clearly to do exactly what CEO Garg was proposing the new "COO/President" would do: "manage and drive performance across business functions."

88.    For CEO Garg to state that the Company's metrics are a black box and that the solution was to set up an Operations Committee – led by CFO Ryan, and Vikram Jaipuria, the Head of Partnerships - neither of whom were even in the core business

functions and not, Pierce, the effective Chief Operating Officer, was a sudden and stark change in CEO Garg's description of Pierce's performance and is a clear move of scapegoating and retaliation on behalf of CEO Garg in response to Pierce's protected activity of speaking out against him.

89.    In reality, Pierce had been completely transparent about Better's metrics. It was CEO Garg who had ignored the metrics and repeatedly misrepresented them to the Board, shareholders, and the public, including potential investors.

90.    Ms. Pierce addressed this misstatement to the Board of Directors on December 9, 2021, advising it: "The company's metrics are not a black box. For 1.5 years we met every week to review the Company's position. I can send you all of these decks. We have known the refinance market is changing, yet Vishal continued to make decisions that got us here. If you, as a board, are not aware of the Company's metrics and financials, it is because Vishal did not communicate them to you." CFO Ryan specifically acknowledged that Garg was attempting to scape-goat Pierce for Garg's own improper actions.

91.    CEO Garg never corrected this public misrepresentation, instead, as indicated below, he retaliated against Ms. Pierce for her exposing his misleading pronouncements – pronouncements all aimed at duping investors and shareholders and permitting the SPAC transaction to move forward.

<u>Misrepresentation Regarding Time Horizon to Achieve Profitability</u>

92.    In Q4 of 2021 there was public skepticism regarding whether Better could thrive in a higher interest rate environment, in which one of Better's core businesses – refinances – typically falters. In anticipation of that higher rate environment, Pierce, who was then overseeing the Company's operations, in partnership with CFO Ryan and the finance department, prepared a detailed projection of the Company's performance, which included an anticipated reduction in force and projected when the Company – that was then losing money – would again achieve profitability.

93.    The analysis that Pierce presented to CEO Garg and the rest of the Senior Leadership Team detailed that, due to unfavorable market conditions, the Company could not expect to achieve profitability until, at the earliest, the third quarter of 2022. Pierce and

CFO Ryan, in fact, advised CEO Garg, and General Counsel Calamari, that it was unlikely that Better would achieve profitability in 2022. Despite this detailed analysis, commencing after December 1, 2021, and again to distract from his clearly improper acts, CEO Garg represented to the Board of Directors and investors – without any basis – that the Company would achieve profitability by the end of the first quarter 2022. These misrepresentations were knowingly false and misleading. Better continued to lose money through the first quarter of 2022.

94.     Again, Ms. Pierce confronted CEO Garg, expressing concern regarding CEO Garg's unsupported pronouncement. CEO Garg dismissed her concerns and continued to publish this false and misleading information – information contradicted by the analysis provided to him by Pierce.

95.     CEO Garg also made repeated knowingly false material misrepresentations concerning Better's proprietary electronic origination platform ("Tinman").  Tinman was designed, inter alia, to reduce the number of man hours necessary to process loan applications.

96.     With respect to assessing how well such a system is integrated in the overall operating scheme, an industry standard known as API (Application Programming Interface) is utilized.  When CEO Garg was questioned about his known representations to the Board, the public, and potential investors, that Tinman was full integrated, he retorted that at Better API should be defined as "Another Person in India."  CEO Garg never retracted or corrected his misrepresentations concerning Tinman – yet another securities law violation that Pierce duly complained about.

97.     Due to CEO Garg's continued insistence on spreading misinformation via reporters and his reaction to feedback by Pierce and other leaders, fifteen (15) senior leaders (not including anyone from the executive team), became incredibly concerned about the Company's viability with CEO Garg as CEO.

98.     Between the days of Tuesday December 7th and Thursday December 9th, these 15 leaders mobilized themselves and decided to write a letter to the Board stating that they would resign if CEO Garg did not, at a minimum, take an immediate leave of absence. Their primary concerns were that (1) the company was paralyzed by conversations about CEO Garg, rather than focusing on the business and (2) that the executive team and the

Board of Directors were not properly responding to CEO Garg's conduct and just stating "it will blow over."

99.     Two representatives from the 15 leaders told CFO Ryan, Ziggy Johnson (another executive team member), General Counsel Calamari and Pierce about their plans in hope that the executive team would support it.

100.    Pierce believed that the letter writers had a right, as employees, to express their position and that she supported them in bringing these concerns to the Board.

101.    General Counsel Calamari immediately became concerned that this letter could threaten CEO Garg's position as the  CEO and could give Softbank a reason to withdraw their capital commitment to the SPAC Transaction as, per the terms of the SPAC, a resignation of 15 senior leaders would constitute a material adverse change. General Counsel Calamari then engaged in active attempts to silence the employees. He told Pierce and the letter writers repeatedly that "they can't submit this letter" and that CEO Garg would "find out" who they were, implying that CEO Garg would retaliate against them if they submitted the letter.

102.    Pierce called a meeting of the executive team without CEO Garg, and stated that the management team needed to speak to the Board about what to do. Pierce proposed that in order to address the letter writers and take proper action in response to CEO Garg's behavior and lack of remorse, the executive management team should advise the Board that CEO Garg needed to take time off and allow the management team, as well as the Board, time to properly assess the situation and to make the proper decisions.

103.    On Thursday December 9th, Pierce and the executive management team spoke to several board members including, Aaron Schildkrout, Gabrielle Toledo, Dinesh Chopra and Rajeev Date, without CEO Garg. Pierce spoke first and stated clearly to the Board members that CEO Garg had made the business decisions that got the company into the loss-making position it was in, that he had misrepresented the company's targets/goals, and financial projections and performance, that he had made the decisions that led to the disgraceful lay off event, that he continued to lie to reporters, and that he had misstated to the Board that the company's metrics were a blackbox.

104.    Pierce recommended that CEO Garg take an immediate step back and that CFO Ryan step in, in the interim, to help put a plan/strategy together for 2022.

105. Though the other executive team members General Counsel Tuffin, CFO Ryan, General Counsel Calamari, Diane Yu (Chief Technology Officer), and Ziggy Jonsson did not speak to CEO Garg's misdeeds, they agreed that the right thing was for him to step back.

106. At this point, the Board had also been informed of the 15 senior leaders who planned to submit a letter of resignation. The Board did not wish to silence the leaders, like General Counsel Calamari had tried to do, but wanted to ensure it had properly addressed their concerns.

107. On December 10th, General Counsel Tuffin sent a company-wide communication explaining that CEO Garg would be taking time off and that CFO Ryan would be leading the day-to-day decisions of the Company in the interim.

108. During the week of December 6th it was also decided that the executive team, including CEO Garg, would address the Company in a company-wide Townhall on December 14th. After CEO Garg was put on leave, it was decided that the executive team would still address the Company on that date.

109. The script for the Townhall was heavily edited by members of the Board and Better's communication team. The original script for the Townhall again stated that "the company would launch an immediate search for a COO/President" (with additional language about running the business functions). This reference was in the script up to the day of the event.

110. Upon seeing this, Pierce stated to CFO Ryan, the communications team, and other executives that this would cause confusion as Pierce was known as the Chief Operating Officer and was well regarded. In response, the "immediate search" language was removed.

111. Over the course of the following days, Pierce spoke to CFO Ryan several times about this search and her role at the Company going forward. CFO Ryan agreed that CEO Garg had clearly "thrown her under the bus" and that the search was, indeed, for her replacement. CFO Ryan stated that one Board member had admitted "of course Sarah is going to be upset, she is getting layered."

112. Pierce was distraught and upset by how CEO Garg had cast blame for his decisions on her and the false narrative that a replacement was needed to competently perform her job.

113.    On Thursday December 16th, Pierce met with CFO Ryan to discuss her potential new role. Pierce said that, while the decision was upsetting, ultimately, if the Company and Board thought it was the right decision, she wanted to be helpful. Pierce suggested to CFO Ryan that she have a conversation with CEO Garg about his email to the board, and his scapegoating her, but ultimately that she would act as a good team player to support whatever needed to be done. Pierce's primary concern was the Company's ability to hire the right person.

114.    CFO Ryan, in an effort to make the transition to her replacement amicable, rather than speak to CEO Garg, instructed Pierce to email him (CFO Ryan) a proposal for a transition that he could forward to the Board, as CEO Garg did not have decision-making power at the time.

115.    In this conversation, Pierce stated to CFO Ryan that she wanted to understand what her role would be after the replacement and said she would be open to working on businesses outside of Better, such as Trussle (Better's UK acquisition). She made it abundantly clear to CFO Ryan that she was not resigning and had no intention of doing so. He indicated that he understood that she was not resigning, but, instead, was responding to Garg's announcement that the Company was hiring her replacement.

116.    On Friday December 17th, Pierce emailed CFO Ryan, as instructed, her transition proposal. As evidence of her desire to be nothing but helpful, she even proposed that she would give back to the company 1,100,000 stock options so that the company would have adequate equity to find and incentivize the best person possible to fulfil the duties that she had been completing as *de facto* COO.

117.    In her transition proposal, Pierce included a line stating that she would "use the information in my possession to be an advocate of the company and not an adversary," referring to her reasonable belief the laws had been violated and that she was being retaliated against for speaking up about these violations of law.

118.    When Pierce e-mailed the proposal, it was not a resignation. In fact, her original draft (which can be referenced) stated, "this is not a resignation." Pierce took that phrase out as redundant, given her explicit conversation with CFO Ryan to the contrary and her history of commitment to the Company.

119.    In conversations immediately following, it became incredibly confusing who was handling and making decisions on the transition proposal.

120.    On Sunday December 19th, Pierce spoke to CFO Ryan about the email. He stated that the Board wanted to involve General Counsel Tuffin and that she would serve as primary contact and that he would largely step back from the conversation.

121.    Pierce spoke to General Counsel Tuffin on December 19th. General Counsel Tuffin stated that the Board wanted to handle the proposal in two ways (1) conducting an interview to understand what "information" Sarah was referencing; and (2) negotiating the terms of the proposal. General Counsel Tuffin stated that she would handle the interview and CFO Ryan would handle the terms of the proposal. In that conversation, Pierce asked General Counsel Tuffin why an interview was necessary as all the information in her possession was already known by General Counsel Tuffin and the executive team.

122.    General Counsel Tuffin followed up with Pierce via email that afternoon only addressing the interview.

123.    Pierce followed up with CFO Ryan on the actual transition, as General Counsel Tuffin told her that he would be handling that issue. In a strange shift to the process, CFO Ryan then said that the Board had decided that the entire transition would be handled by outside counsel, an outside counsel who would be taking direction from General Counsel Calamari and CEO Garg.

124.    Pierce stated to CFO Ryan that she was confused why a role transition would be handled by outside counsel and expressed her preference that it be handled amicably and internally. CFO Ryan did not have any more information, but stated that this was what the Board had decided.

125.    General Counsel Tuffin gave Pierce the contact information of Julia Jordan, the company's counsel at Sullivan and Cromwell. Pierce passed this information to her counsel.

126.    Between the weeks of December 20-December 31 there was limited and cordial communication with Julia Jordan. During that time, it was Pierce's understanding that General Counsel Tuffin was Jordan's point of contact at the Company.

127.    During those weeks, Pierce continued to act as COO of the Company. She conducted numerous meetings with employees and discussed strategy/plans for 2022. Pierce

had several conversations with CFO Ryan during those two weeks about plans for the strategy and business going forward.

128.     During those conversations, CFO Ryan expressed that CEO Garg had asked him several times for the names of the individuals in the group of 15 letter writers and who had led it. CFO Ryan was growing increasingly concerned about CEO Garg's retaliation against the employees/management team members who had led to the Board's decision to put him on leave.

129.     During those weeks, CEO Garg, despite guidance that he was not allowed to, reached out to Pierce's direct reports, including Armando La Rocca, requesting metrics on Pierce's teams. He did not include Pierce in these requests.

130.     On January 3, 2022, there was a conversation between Ms. Jordan and Pierce's counsel, where Ms. Jordan, for the first time, characterized Pierce's transition proposal -- that she was directed to provide -- as a resignation. Pierce immediately corrected, for the record, that she did not resign and did not intend to resign.

131.     On January 3, 2022, having not received any direction that his leave had ended, CEO Garg unilaterally returned to work.

132.     On the morning of January 3, 2022, CFO Ryan told Pierce that the Company had reached out to an executive recruiting firm to commission a search for a COO/President. At the same time, Pierce had received no communication on her transition proposal. CFO Ryan confirmed that CEO Garg continued to state to him that he needed to "get her out."

133.     In the afternoon on January 3, 2022, Pierce had a regularly scheduled 1:1 with CEO Garg. Pierce was advised by his assistant that he would attend.

134.     In that meeting, Pierce stated to CEO Garg that she was aware he had "thrown her under the bus" but that she wished to support an amicable transition to her replacement in order to maintain stability at the Company. Pierce stated she just wished to be properly compensated for her 5.5 years of hard work via a share buyback of her vested equity.

135.     CEO Garg confirmed they were looking to hire a COO/President, but said he was being forced to do it and was forced to write the original email to the Board. Pierce believes that these were lies.

136.     CEO Garg stated that board member Gabrielle Toledo wanted to know if Pierce wanted "to stay or leave" --  further evidencing that there was no clear understanding that

Pierce's transition proposal was a resignation and that, in any event, the Company had not accepted her directed transition proposal as a resignation.

137.    CEO Garg then went on to ask Pierce for the names of the individuals who had written the letter and against asked if she "led" that effort. He stated, "what did you think, you'd be put in charge if I was gone." CEO Garg had found another – this time fictional basis – to go after Pierce improperly.

138.    Pierce did not give any names, but said that she did support the decision and stated that "everyone's goal was to give the Company space from the drama and get back to work."

139.    In the days following that call, Pierce, despite receiving no counter proposal three (3) weeks after her initial requested transition proposal and continued confirmation by CFO Ryan and others on recruiting, as well as CEO Garg, that the company was searching for her replacement, continued to fulfill her responsibilities to the Company. She had regularly scheduled meetings with her direct reports, began a series of new year skip level meetings (as confirmed by a slack she sent to her team stating she was beginning skip levels), and led a 2022 planning meeting with the executive team and several senior leaders.

140.    During that week, General Counsel Tuffin who had been Julia Jordan's main point of contact was out of office. At some point during that week, as confirmed by CFO Ryan, General Counsel Calamari took over as main point of contact to outside counsel.

141.    Coinciding with this shift to General Counsel Calamari, as well as after Pierce's conversation with CEO Garg in which she declined to reveal the letter writers' names, but confirmed that she supported the decision, the conversations between Ms. Jordan and Pierce's counsel became tense and hostile. The undersigned stated that Pierce believed she was being retaliated against due to her repeatedly speaking up about CEO Garg.

142.    Pierce continued to do her job and make plans for what she would spend 2022 focusing on as she had not yet been layered, much less otherwise demoted. As late as Wednesday January 5th, Pierce told Megan Bellingham, Head of Operations and one of her direct reports, that she would be spending the majority of her time on sales due to concerns about sales leadership and performance.

143.    At 5:30pm Eastern Time on January 6, 2022, Pierce called CFO Ryan for a regularly scheduled check in. On the call, he told her that "they" had decided to put her on

administrative leave. Incredibly confused, Pierce asked why. CFO Ryan clearly stated, "because you are claiming you're being retaliated against." Pierce asked for details about how her leave would be handled, including communicating with her direct reports, rescheduling meetings and reassigning work as well as when the leave would commence. CFO Ryan said he "did not have further details but that both parties' counsel should work out the details and you can continue to speak with your direct reports."

144.    Immediately following the phone call with CFO Ryan, Pierce went back to her computer to finish work for the day. She found she was locked out of her computer, email, and Slack. Pierce contacted CFO Ryan and Kenna Meyerhoff, Head of HR, to ask for details on how her leave was being handled given these new developments. Meyerhoff discovered that to other employees, it appeared that Pierce had been terminated on Slack – this despite the fact that the sole reason for her "leave" was her complaints of retaliation.

145.    Pierce texted CFO Ryan at 5:57 ET: "FYI – looks like I'm locked out so assuming that means leave is in affect." CFO Ryan replied "already? Wow fast I did talk to nick [General Counsel Calamari]. Did you get your lawyer?" Clearly, General Counsel Calamari acted outside of any established process to follow Garg's directive to "get her out" as soon as he had any opportunity to limit Pierce's ability to continue to complain about CEO Garg's bad acts.

146.    CFO Ryan confirmed in subsequent communications that General Counsel Calamari was responsible for placing Pierce on the leave immediately and directed IT to shut off her access to company systems.

147.    The manner that Pierce was put on leave was an attempt to intimidate her and embarrass her to her 8,500 employees, making it appear that she had been terminated.

148.    In the same text exchange with CFO Ryan, Pierce went on to say, "sounds like from Kenna, no comms for now?" CFO Ryan replied "My plan was no comms until it is clear what long-term plan is. No need for it. U agree?" This exchange clearly demonstrates that at the time Pierce was put on leave, there was no consensus that Pierce had resigned and certainly nothing to indicate that the Company had accepted any such "resignation."

149.    Under the understanding that she was still an employee of the company, on January 12, 2022 Pierce participated in an employee interview with General Counsel Tuffin. In the interview, Pierce stated that "This [the RIF event] is consistent with Vishal's

stewardship of the company in ignoring guidance from subject matter experts and making misleading statements regarding the company's position and data. For example, in December of 2021, business operations and finance presented a proposed business model for 2022 that projected the company could break even or achieve slight profitability for Q3-Q4 of 2022. These groups are subject matter experts in both our finance and business strategy. Despite their guidance that achieving profitability before Q3 would be near impossible, Vishal told investors and Board members we would be profitable in in Q1 2022. There are additional examples of Vishal providing misleading statements regarding the company's financial situation but I do not have access to my email or Slack so I cannot provide details. However, I do recall that on many occasions and specifically in email Vishal referred to GAAP accounting as "generally accepted asshole principles." I'd recommend you interview Kevin if you would like more information in that realm. In addition to the previously mentioned example where he ignored the guidance of HR and legal and directed the company to violate the WARN Act, he ignored the guidance of operations, strategy and finance about the oncoming contracting refinance market."

150.     Within days of this interview, Pierce received communication from Ms. Jordan that the company would "process her resignation" -- a resignation that she had repeatedly communicated she had not tendered and that the Company had demonstrated on multiple occasions it had not accepted.

<u>Pierce Engaged in Protected Activity for Which She Was Repeatedly Retaliated Against</u>

151.     As detailed hereinabove, CEO Garg and Better repeatedly misrepresented a key Company metric to the SEC, and business performance and financial projections to investors and the media. CEO Garg, and as a consequence Better, knowingly made these misrepresentations for the purpose of misleading investors and regulators so that Better could move forward with its plan to "go public."

152.     In each instance, Ms. Pierce raised concerns internally – to CEO Garg, CFO Ryan, General Counsel Calamari, General Counsel Tuffin, the Board of Directors, and other senior management – that CEO Garg and Better were violating federal securities laws by reason of these false and misleading financial disclosures, and the WARN Act, as well as common law

defamation, by reason of the 900 Employee Termination Call. CEO Garg and Better retaliated against Ms. Pierce for raising these concerns in four ways:

    a. On December 8, 2021 CEO Garg attempted to scapegoat her for the mishandled RIF and circulated a memo to the Board of the Directors and planned to circulate it to the senior leadership team, indicating that she was incompetent, that she had not, and could not, measure the Company's financial performance, and that a search committee was being formed to hire her replacement. In response to CEO Garg's indication that they were searching for Ms. Pierce's replacement, among other things, Ms. Pierce went to speak to CFO Ryan. She indicated to CFO Ryan, that, while the decision to replace her was upsetting, if the Company and Board wanted to replace her, she would aid in the transition, but that she wanted to be fairly compensated for her years of exemplary work. She made it very clear to CFO Ryan that she was not resigning. He agreed that CEO Garg had clearly "thrown her under the bus." He further admitted that the Board acknowledged that she was "of course going to be upset, she is getting layered." CFO Ryan suggested that, rather than speaking to CEO Garg, Pierce send CFO Ryan a proposal for her transition out of her role, which should include two components: severance and buy out of her vested equity. On December 17, 2022 Ms. Pierce sent CFO Ryan precisely what he asked for. Until January 6, 2022, when she was placed on administrative leave, Ms. Pierce continued diligently to do her job, attended meetings and oversaw the Company's operations. On January 12, 2022, at the Company's request, Ms. Pierce attended an interview with General Counsel Tuffin, at which she laid out, again, her concerns regarding CEO Garg's and Better's violations of law;

    b. On January 6, 2022 the Company, in an act led by CEO Garg and General Counsel Calamari, placed Ms. Pierce on administrative leave, locked her out of her work computer and her e-mail and shut off her Slack access. When she asked why she was being placed on leave, CFO Ryan advised her, in textbook retaliation, that she was being placed on leave for claiming that she had been retaliated against;

    c. Better took the position, notwithstanding her explicit statement to CFO Ryan to the contrary and Ms. Pierce's repeated requests that she be allowed to return to work, that her transition proposal was a "resignation." In a third act of retaliation, on January 15, 2022, the Company's outside counsel advised Pierce's counsel that the Company

would "process her resignation" – a resignation that she never tendered – and that her last day of employment at the Company would be January 18, 2022. The Company unilaterally extended this date to allow Ms. Pierce time to consider an objectively paltry severance proposal; and

d. On February 4, 2022, just two weeks after Ms. Pierce gave an interview to the General Counsel in which she again detailed her reasonable belief or suspicion that CEO Garg and Better had violated securities laws and regulations by publishing knowingly false and misleading financial information and the WARN Act by not paying terminated employees 60 days' notice pay, the Company terminated Ms. Pierce's employment, with no severance or continued benefits. In addition, Better used her illegal termination to prematurely call a loan it had made to her to purchase some of her equity options.

<u>Post-Termination Violation and Ongoing Retaliation</u>

153.   At the time of Pierce's improper termination on February 4, 2022, she had pending two grants of options that had partially vested and two loans that had been granted in conjunction with the same.

154.   At that time the two option grants were for 150,000 and 300,000 shares respectively (Total 450,000 shares).  The respective loan amounts were $759,000.00 and $1,518,000.00 (Total $2,277,000.00).  The respective number of vested shares were 68,750 and 112,500 (Total 181,250 shares).  The respective number of unvested shares were 81,250 and 187,500 (Total 268,750 shares).   The respective loan values attributable to vested shares were then $347,875.00 and $569,250.00 (Total $917,125.00).

155.   The terms of the loan agreements were clear: the unvested portion of the loan will be paid back via the Company recouping the unvested shares.  The Company has repeatedly acknowledged this provision.

156.   The agreements also provided that Better only had personal recourse as to 51% of the loans. Which means, given the percentages above that the vested portion of the shares and loans, being less than 49% of the total are non-recourse: "The holder of this Note [Better] will have no personal recourse against Borrower [Pierce] as to any additional indebtedness owing under this Note that exceeds the Recourse Portion (the "Non-Recourse Portion"), including any principal

amount in excess of the Recourse Portion under this Note. The holder of this Note's recourse with respect to the Non-Recourse Portion shall be limited only to the Pledged Collateral (as defined in the Pledge Agreement) pursuant to the terms of this Note and the Security Agreement, and the Company shall have no further recourse against Borrower or any real, personal, tangible or intangible assets of Borrower, with respect to the Non-Recourse Portion."

157.    The agreements also provided that, the Due Date in this instance would be 120 days after Pierce's termination.

158.    Despite this clear language, in clear breach of the terms of the Agreements, on March 30, 2022, some 65 days before the Due Date, Better wrote to Pierce asserting that her loan had come due and demanding payment for the same.

159.    In that same correspondence, Better did offer (a) to repurchase the unvested shares via a cancellation of the related portion of the loan balance; and (b) to repurchase the vested shares in order to settle the loan.

160.    At the time the last agreed upon stock price was $16 per share, leaving the value of the vested portion of Pierce's relevant stock at $2,900,000 well in excess of the $917,125.00 allegedly owed.

161.    Pierce ultimately accepted Better's proposal.

162.    However, upon the filing of the OSHA Complaint and the instant proceeding, Better reneged on its agreement.

163.    Instead, Better demanded that Pierce repay the entirety of the loan balance, in complete disregard of their earlier agreement, as well as in complete disregard of the non-recourse elements of the loans.

164.    Better stated position in contravention of the explicit agreement, as well as its common practice with other similarly situated employees who had not raised Labor Law §740 claims, was to proceed as per the terms of their March 30, 2022 accepted offer.

165.    Better has now compounded this retaliatory breach of contract and filed a public action against Pierce as part of its ongoing retaliatory scheme against Pierce.

166. In addition, subsequent to her improper termination, CEO Garg has further defamed and retaliated against Pierce by publicly and repeatedly asserting with knowledge of the falsity of his own statements that Pierce was "cooking the books" at Better and that she repeatedly represented to him that the cost of loan processing for Better was $900.00 a loan.

167. The true price – as related on numerous occasions by Pierce to CEO Garg -- was in excess of $2,000.00 per loan.

168. CEO Garg made these knowingly false statements to impugn Pierce's character, affect her future employment possibilities, and besmirch her name in response to her having attempted to protect her rights and continue to bring to light his improper and illegal actions.

## AS AND FOR A FIRST CAUSE OF ACTION

(Violation of New York Labor Law § 740 Against Better)

169. Plaintiff repeats and realleges each and every allegation contained in Paragraph 1 through 168 of this Complaint as if repeated and restated verbatim herein.

170. New York Labor Law §740 provides in pertinent part as follows:

"Prohibitions: An employer shall not take any retaliatory action against an employee whether or not within the scope of employee's job duties, because such employee …"

(a) Discloses or threatens to disclose to a supervisor … an activity, policy, or practice of the employer that the employee reasonably believes is in violation of law, rule, or regulation …"

171. §740 further provides that "an employee who has been the subject of a retaliatory action in violation of this section may institute a civil action …" for the following relief:

    a. the reinstatement of the employee to the same position held before the retaliatory action … or front pay on lieu thereof;

    b. the reinstatement of full fringe benefits and seniority rights;

    c. the compensation for lost wages and other remuneration;

    d. the payment by the employer of reasonable costs, disbursement, and attorneys' fees;

      e.   a civil penalty of an amount not to exceed ten thousand dollars and/or,

      f.   the payment by the employer of punitive damages, if the violation was willful, malicious, or wanton.

172.    §740 further provides, in relevant part, that a "Retaliatory action" is "an adverse action taken by an employer or his or her agent to discharge, threaten, penalize, or in any other manner discriminate against any employee or former employee exercising his or her rights under this section, including (i) adverse employment actions or threats to take such adverse employment actions against an employee in the terms of conditions of employment including but not limited to discharge, suspension, or demotion; (ii) actions or threats to take such actions that would adversely impact a former employee's current or future employment…"

173.    As detailed above, Ms. Pierce disclosed to her supervisors' activities of Better and CEO Garg that she reasonably believed were in violation of law. Ms. Pierce was unequivocal: (a) She indicated to her supervisors that CEO Garg's and Better's misrepresentations to shareholders, investors, and the SEC, regarding the Company's financial performance, financial projections, and financial controls violated federal securities law and regulations; and (b) She indicated to her supervisors that CEO Garg's unseemly mishandling of the December 1, 2021 RIF, violated, at least, the California WARN Act and constituted a mass defamation of many of the terminated employees.

174.    As also detailed above, in direct retaliation for the complaints and her continued perseverance in making these complaints, protecting those individuals who also made complaint and in not agreeing to walk away from his position or obligations, on February 4, 2022, CEO Garg, with the assistance of General Counsel Calamari, finally succeeded in persuading Better to terminate Pierce.

175.    Thereafter, CEO Garg continued to retaliate against Pierce by publicly defaming her to the Board, CFO Ryan, and other individuals by knowingly falsely impugning her business acumen, her business abilities, and her integrity, by repeatedly asserting that she cooked the books at Better and repeatedly misrepresented the processing costs of loans to Better.

176. CEO Garg's actions in this regard are attributable to Better as further retaliation under *respondeat superior* and in direct contravention of the protections of §740 for former employees.

177. In addition, Better itself continued its retaliation against Pierce by reneging on, and violating the terms of its loan agreements.

178. Better's recent demands for cash payments to satisfy the entirety of the loans – even the non-recourse portions – as well as its more recent publicly filed suit against Pierce for the same relief despite the explicit terms of the loan agreements and her prior acceptance of Better's offer for resolution of those same agreements, smacks of bad faith; is clearly retaliatory; and represents manifest disparate treatment as no other similarly situated employees have been so harassed, publicly humiliated, or sued. Upon information and belief, all other employees who were terminated without cause were offered the repurchase option with respect to both the vested and unvested portion of their loans.

179. These retaliatory acts violated New York Labor Law § 740. These violations were willful, malicious, and wanton, intended to silence and discredit her. As a direct and proximate result of these violations, Pierce has suffered significant damages, included but not limited to, lost wages (front and back pay), lost fringe benefits, and significant attorneys' fees.

WHEREFORE, Pierce respectfully requests judgement on this cause of action against CEO Garg and Better for compensatory damages in an amount to be determined at trial, but believed to be not less than $25 million, punitive damages in an amount to be determined at trial, but believed to be not less than $50 million, together with a $10,000 civil penalty, interest, and costs, including reasonable attorneys' fees.


## AS AND FOR A SECOND CAUSE OF ACTION

(Breach of Fiduciary Duty Against CEO Garg On Behalf Of Better and Better's Shareholders)

180. Plaintiff repeats and realleges each of every allegation contained in Paragraphs 1 through 179 of this Complaint as if repeated and restated verbatim herein.

181. As an Officer, Director, and shareholder of Better, CEO Garg owed Better and its shareholders, a fiduciary duty of loyalty, trust and good faith.

37

182. CEO Garg breached the duties that he owed to Better by making knowing public misrepresentations regarding her managerial competence, the Company's financial performance, financial projections and financial controls. These misrepresentations put the Company's continued viability at risk and, at the very least, dramatically decreased the value, prospects, and marketability of the Company. In addition, CEO Garg's unseemly mishandling of the December 1, 2021 RIF and his knowing violation of, at least, the California WARN Act, as well as mass defamation, was a public relations nightmare, resulting in thousands of customer complaints, decreased sales, and irreparable reputational damage to the Company. His false and misleading comments following the December 1, 2021 RIF further exacerbated the financial and reputational harm that CEO Garg had inflicted on the Company.

183. CEO Garg undertook these actions for his own personal gain – financial and reputational – at the expense of the Company's and its shareholders' interests. CEO Garg was more interested in keeping his job than in complying with applicable law. His attempts to deflect blame for his misrepresentations and damaging conduct put his personal interests above the interests of the Company and its shareholders.

184. Each of these actions constituted a breach of the fiduciary duty that CEO Garg owed to Better and its shareholders.

185. Similarly, the Board participated in, *inter alia*, CEO Garg's scheme to mislead investors. They were made directly aware of the falsity of his claims concerning 1Q 2022 profitability. They were made aware of the falsity of his claims concerning Better's organic origination of loans, as well as the misrepresentations at to the effectiveness of Tinman.

186. The Board also allowed itself to be part of the scheme to suppress Pierce's concerns about CEO Garg's WARN Act violations and mass defamation of the terminated 900.

187. The Board abjectly shirked its duty to review such charges, as well as CEO Garg's scheme to cast Pierce as the scape-goat for his own acknowledged errors, much less take any (much less decisive) action to protect Better from clearly retaliatory actions on the part of its CEO against its acting COO.

188. There is no question that the Board owed a duty to Better to fulfill its duties in good faith.

189. The Board, in condoning and joining, the actions of CEO Garg, did not act to advance the best interests of the corporation, failed to act in the face of a known duty to act (as in

herein where public misstatements were being made to investors and shareholders), and demonstrated a conscious disregard for their duties.

190.     The Board which acted as one, clearly faces liability for neglecting their duties to address any of the claims (including this breach of fiduciary claim) against CEO Garg that would have been the subject of any pre-suit litigation demand.

191.     Given the Board's close relationship with CEO Garg, as evidenced by their routine rubber-stamping of any action he suggested and abject failure to take any action, or even investigate any of the various claims made against him individually and on behalf of Better itself, they have clearly demonstrated their lack of independence from CEO Garg.

192.     As such, it is clear that any pre-suit demand would have been futile.

193.     As a direct proximate result of CEO Garg's and the Board's breaches of duty as aforesaid, Better, as well as its shareholders, including Pierce, suffered damages, including lost wages, a dramatic diminution in the value and marketability of its stock value and the shareholders' respective holdings; and reputational injury.

WHEREFORE, Pierce respectfully requests judgment on the cause of action in favor of Better and its shareholders and against CEO Garg for compensatory damages in an amount to be determined at trial, and punitive damages in an amount to be determined at trial, but believed to be not less than $50 million, together with interest, and costs, including reasonable attorneys' fees.

## AS AND FOR A THIRD CAUSE OF ACTION

(Defamation against CEO Garg and Better)

194.     Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 193 of this Complaint as if repeated and restated verbatim herein.

195.     At a December 8, 2021 meeting of the Company's Board of Directors and in an e-mail of the same date distributed to some of the Company's senior managers and, some of its Board Members, including CFO Ryan, Liz Bowyer, Aaron Schildkrout, and Gabrielle Toledo, CEO Garg attempted to deflect blame for the consequences of his disastrous December 1, 2021 mass Zoom firing, by scapegoating Pierce. In the process, he defamed her by:

      a.    Insinuating that she was incompetent and needed to be replaced. He stated that the Company needed to "hire experienced and seasoned executives [to replace Pierce]

… to support [him] in helping to manage and grow Better," and that the Company needed "… seasoned operators [to replace Pierce] who can help manage and drive performance across business functions … and help ... building an inspirational leadership culture."

      b.     Stating that, as the head of operations, Pierce had not created any "metrics" to measure the Company's financial performance and that, as a result, she had not been able properly to manage the Company's operations. CEO Garg stated, in words or substance, that "the metrics of the Company are a black box and need to be managed much more carefully as we are in a loss making state … and we need to pivot from blitzscale mode to sustainable growth mode while the market environment remains volatile," and

      c.     Proposing the formation of an Operations Review committee to establish and review a new set of financial "metrics" to ensure "operational rigor across the company" that explicitly excluded Pierce. The clear implication of these statements was the false narrative that Pierce was somehow to blame for the Company's faltering performance and that she had done a poor job in managing the Company's operations and in tracking its financial performance.

196.    Each of these statements – particularly when viewed in context and considered with the totality of the circumstances – was false when made and CEO Garg knew they were false at the time he made them. Pierce was not incompetent and had, in fact, been a key leader in the Company's unprecedented growth for the previous five (5) years. The Company's metrics were not a black box. Indeed, those metrics and the result of operations were reviewed with, and signed off by, CEO Garg on a weekly basis. Pierce was not to blame for Company's reversal of fortunes. Instead, it was CEO Garg who single handedly caused the "loss making state" of the Company, repeatedly ignoring, and overriding, Pierce's operational directives.

197.    These statements represent defamation per se because they injured Pierce, and impugned her reputation, in her trade, business, or profession.

198.    CEO Garg also consistently and repeatedly defamed Pierce to other executives in the Company, including Pierce's direct reports and, particularly Megan Bellingham, Armando LaRocca, Stephen Rosen, and CFO Ryan, General Counsel Calamari, General Counsel Tuffin, the Board of Directors, and the Head of HR, by stating the following:

a.     That Pierce was the leader of "a coup, that attempted to get rid of CEO Garg" so that she could replace him as CEO. CEO Garg repeated this comment throughout the first quarter of 2022;

b.     That in her December 17, 2021 transition proposal, Pierce had "resigned from the Company," "abandoned" it in its time of need, and that she sought to "extort" money to which she was not entitled from the Company. These statements were made repeatedly during the period December 18, 2021 through Pierce's retaliatory termination, on February 4, 2022; and

c.     That, because Pierce supposedly did no work for the Company and contributed no managerial services of any value, her title should have been "Cheerleader in Chief."

199.     Each of these statements – particularly viewed in context and considered with the totality of the circumstances – was false when made and CEO Garg knew they were false at the time he made them. Pierce never sought to undermine CEO Garg or to permanently replace him nor did she seek to foment discontent at Better. She never resigned and, on numerous occasions, reiterated that point and asked to return to work in her prior role. Also, CEO Garg knew that Pierce had contributed great value to the Company and he recognized and rewarded those contributions.

200.     These statements also represent defamation *per se* because they injured Pierce, and impugned her reputation, in her trade, business, or profession.

201.     Subsequent to her unlawful termination, from February 4, 2022 and continuing incessantly to date, CEO Garg continued to defame Pierce to Better's senior leadership, CFO Ryan, the Senior Management Team, including Meghan Billingham, and the Board of Directors and anyone else who would listen by stating that Pierce had been "fudging the numbers," including incorrectly reporting to him that Better was incurring "labor cost of only $900.00 per loan."

202.     Each of these statements was false when made and CEO Garg knew they were false at the time he made them. Pierce had never "fudged" any numbers and had truthfully and accurately reported the results of operations to the finance department. Pierce had consistently reported to finance, CEO Garg, and General Counsel Calamari, that Better was incurring labor costs of over $2,000, not $900.00, per loan. These defamations were a continuation of CEO Garg's attempt to "scapegoat" Pierce for the Company's deteriorating financial condition and its failure

to meet CEO Garg's false, misleading, and unsupported financial projections regarding, among other things, profitability.

203.     These statements also represent defamation per se because they injured Pierce, and impugned her integrity and honestly, and her reputation in her trade, business, or professions. CEO Garg accused Pierce of "cooking the books," something she did not do, and could not have done.

204.     As a direct and proximate result of CEO Garg's defamations, also attributable to Better under the doctrine of *respondeat superior*, as aforesaid, Pierce has suffered damages and injury, including lost wages, diminution of her earning capacity, public humiliation and ridicule, and irreparable damages, to her reputation.

WHEREFORE, Pierce respectfully requests judgement on this cause of action against CEO Garg and Better for compensatory damages in an amount to be determined at trial, but believed to be not less than $5 million, punitive damages in an amount to be determined at trial, but believed to be not less than $10 million, together with interest and costs, including reasonable attorneys' fees.

## AS AND FOR A FOURTH CAUSE OF ACTION

(Intentional Infliction of Emotional Distress against CEO Garg and General Counsel Calamari)

205.     Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 204 of this Complaint as if repeated and restated verbatim herein.

206.     As soon as Pierce made complaint about Garg's improper actions and statements made to the public, potential investors, and the Board surrounding the 900 terminated employees and his attempts to create after-the-fact justifications for his comments and actions, Garg embarked on a campaign of harassment and abuse.

207.     Garg was not satisfied with just replacing Pierce.  He determined that he needed to destroy her legacy; not only to denigrate her, but to minimalize all of the work that she had done and all of the successes that she had achieved at, and for, Better; to isolate her from her colleagues; to smear her good reputation with the Board and in the industry; to take every opportunity to make her time at Better as humiliating and difficult as possible.

208.     By way of example only, on January 6, 2022 Better, at CEO Garg's and General Counsel Calamari's insistence, placed Pierce on administrative leave. The leave was sudden, shocking and done without a clear communication plan, thereby giving the impression, to the entire

Company, that she had done something wrong or illegal and had been terminated. In fact, Calamari cut off her work access so abruptly that anyone attempting to reach her would be forced to believe that she had been terminated and likely for some misfeasance. Meanwhile, Calamari and Garg knew that they had orchestrated that leave solely to silence Pierce and limit her ability to continue to expose Garg's acts of misfeasance.

209. Thereafter, CEO Garg and General Counsel Calamari created a false narrative that on December 17, 2021 Pierce had allegedly resigned her employment with the Company. Pierce did not resign her employment. To the contrary, as was well known by CEO Garg and General Counsel Calamari, she advised Better, several times, orally and in writing, that she did not resign, and repeatedly asked to be allowed to return to work. On January 16, 2022 Better, again at CEO Garg's and General Counsel Calamari's insistence, threatened to "process her resignation," even though Pierce had never tendered a resignation and, as set forth above, repeatedly asserted that she did not resign.

210. Thereafter, CEO Garg and General Counsel Calamari brought about Pierce's termination on February 4, 2022.

211. However, the retributive campaign of harassment did not stop even then.

212. Rather, CEO Garg continued to defame and knowingly falsely impugn Pierce in a continued attempt to malign Pierce, ruin her career, and attempt to prevent anyone from taking any of her legitimate and truthful complaints about CEO Garg seriously.

213. Upon information and belief, CEO Garg played a role in the decision to file a public lawsuit against personally seeking the full amount of the loans in direct contravention of the terms of her loan agreements with Better, in direct contravention of the fact that portions of the loans are non-recourse, in violation of Better's earlier accept offer, and in abject retaliation for her complaints under §740, and pursuit of the OSHA and the instant complaints. In any event, it is clear that he has taken no steps to stop such a retaliatory and abusive action.

214. This pattern of harassment and abuse was undertaken for the sole purpose of denigrating Pierce and ruining her reputation among her peers, in her field, and before the public.

215. These actions were extreme, unjustified, shocking and outrageous, and exceeded all reasonable bounds of decency.

216. In carrying out their personal attack on Pierce, her employment with the Company, and her reputation, Defendants Garg and Calamari intended to – and did – cause her harm and

injury, including severe emotional distress and irreparable harm to her reputation and career trajectory.

WHEREFORE, Pierce respectfully requests judgement on this cause of action against CEO Garg and General Counsel Calamari for compensatory damages in an amount to be determined at trial, but believed to be not less than $5 million, punitive damages in an amount to be determined at trial, but believed to be not less than $10 million, together with interest, and costs, including reasonable attorneys' fees.

## AS AND FOR A FIFTH CAUSE OF ACTION

(In the Alternative, Tortious Interference with a Contract against CEO Garg and General Counsel Calamari)

217.    Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 216 of this Complaint as if repeated and restated verbatim herein.

218.    Pierce had an employment agreement with Better.

219.    Both CEO Garg and General Counsel Calamari were aware of Pierce's agreement.

220.    CEO Garg and General Counsel Calamari misrepresented that Pierce had resigned from Better.

221.    CEO Garg acted intentionally to bring about Pierce's termination from Better for personal motives.

222.    CEO Garg acted intentionally to improperly bring about Pierce's termination from Better by lying as to Pierce's performance and lying about the truthful statements that Pierce made about CEO Garg.

223.    CEO Garg acted intentionally to improperly effectuate Pierce's termination from Better to silence her complaints concerning him, to ensure that she would serve as a scape-goat for his improper actions, and to distract from his own bad acts.

224.    General Counsel Calamari providing substantial assistance to CEO Garg in the following ways:

a.  by attempting to silence, by intimidation by disclosing their identities and threatening retaliation, the fifteen executives who wrote a letter to the Board demanding that CEO Garg take a leave of absence and accusing Pierce of being the ringleader of those letter writers;

b.  by supporting and repeating, CEO Garg's false narrative regarding the 900-person Zoom call RIF and the methodology alleged used to select who would be terminated;

c.  by supporting, and repeating – and in the case of the S-4 filings, and drafts – the false and misleading financial information and financial projections that CEO Garg disseminated, despite analysis and data compiled by Pierce, and others, to the contrary;

d.  by orchestrating and executing through the IT department Pierce's unexplained administrative leave and her removal from the Company's e-mail system and Slack platform so that it looked like she was terminated;

e.  by supporting, and repeating, the knowingly false narrative that Pierce had resigned and threatening to "process" her resignation; and

f.  by erroneously advising the Board of Directors, and others, that the Company's failure to achieve profitability as predicted by CEO Garg and its dismissal financial performance was attributable to Pierce's incompetence, her manipulation and misreporting of the Company's actual financial performance, and her inability to track the actual results of operations.

g.  Supporting Garg's return to active employment and his stated intention to "get [Pierce] out" in retaliation for her voicing her concerns regarding potential illegal activity.

225.  All of this assistance was part of General Counsel Calamari's and CEO Garg's scheme to deflect blame for CEO Garg's failures to Pierce and to remove her from the Company and silence her.

226.  General Counsel Calamari not only acted through misrepresentations and improper motives, but also in his own nefarious self-interest to preserve his relationship with CEO Garg at Better.

WHEREFORE, Pierce respectfully requests judgement on this cause of action against CEO Garg and General Counsel Calamari for compensatory damages in an amount to be determined at trial, but believed to be not less than $5 million, punitive damages in an amount to be determined at trial, but believed to be not less than $10 million, together with interest, and costs, including reasonable attorneys' fees.

## AS AND FOR A SIXTH CAUSE OF ACTION

### (Breach of Contract Against Better)

227. Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 226 of this Complaint as if repeated and restated verbatim herein.

228. Pierce entered into two stock option agreements with Better.

229. Pierce entered into two Partial Recourse Note Agreements with Better.

230. The Note Agreements provided that they would not become due until 120 days after her termination from Better.

231. Pierce was terminated by Better on February 4, 2022.

232. In violation of the terms of the Notes, Better asserted that same were due and owing on March 30, 2022.

233. This claim constituted a peremptory breach of the Notes.

234. In addition, on March 30, 2022, Better made an offer to resolve any issues concerning the note agreements.

235. Despite this clear language, in clear breach of the terms of the Agreements, on March 30, 2022, some 65 days before the Due Date, Better wrote to Pierce asserting that her loan had come due and demanding payment for the same.

236. In that same correspondence, Better did offer (a) to repurchase the unvested shares via a cancellation of the related portion of the loan balance; and (b) to repurchase the vested shares in order to settle the loan.

237. At the time the last agreed upon stock price was $16 per share, leaving the value of the vested portion of Pierce's relevant stock at $2,900,000 well in excess of the $917,125.00 allegedly owed.

238. Pierce ultimately accepted Better's proposal.

239. However, upon the filing of the OSHA Complaint and the instant proceeding, Better reneged on its agreement.

240. Instead, Better demanded that Pierce repay the entirety of the loan balance, in complete disregard of their earlier agreement, as well as in complete disregard of the non-recourse elements of the loans.

WHEREFORE, Pierce respectfully requests judgement on this cause of action against CEO Garg and General Counsel Calamari for compensatory damages in an amount to be determined at

trial, but believed to be not less than $2.7 million, together with interest, and costs, including reasonable attorneys' fees.

## **JURY DEMAND**

241.    Pierce demands that her claims be tried before a jury of her peers.

Dated:  New York, New York
        November 1, 2022

                    Respectfully,

                    THE LAW OFFICES OF NEAL BRICKMAN, P.C.

                    _____

                    By: Neal Brickman (0874)
                    420 Lexington Avenue, Suite 2811
                    New York, New York 10170
                    (212) 986-6840
                    Attorneys for Plaintiff Sarah J. Pierce