**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

SARAH J. PIERCE

      Plaintiff,

    v.

BETTER HOLDCO, INC., VISHAL
GARG, and NICHOLAS CALAMARI,

      Defendants.

---

Case No. 1:22-cv-04748-AT

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS THE CONSOLIDATED AMENDED
COMPLAINT**

THE LAW OFFICES OF
NEAL BRICKMAN, P.C.
Neal Brickman (NB0874)
Ethan Leonard (EL2497)
420 Lexington Avenue - 2811
New York, New York 10170
Telephone: (212) 986-6840
Facsimile: (212) 986-7691
neal@brickmanlaw.com

*Attorneys for Plaintiff Sarah J. Pierce*

## <u>TABLE OF CONTENTS</u>

**Page(s)**

Table of Authorities …………………………………………………………… iii

Preliminary Statement ………………………………………………………… 1

The Claims Pleaded in the Consolidated Amended Complaint ……………… 2

Factual Background …………………………………………………………... 4

Applicable Standards for a Motion to Dismiss ……………………………….. 10

Argument ……………………………………………………………………... 11

Point I

PLAINTIFFS HAS STATED A CLAIM FOR VIOLATIONS
OF NEW YORK LABOR LAW §740 SUFFICIENT TO
SURVIVE A MOTION TO DISMISS ……………………………….. 11

A. Defendants' Improper Retaliatory Termination of Plaintiff ………….. 12

B. Defendants' Improper Retaliation through Post-Termination Actions.. 17

C. Pierce Clearly Engaged in Protected Whistleblower Activities
Under NYLL §740.…………………………………………………… 19

D. Defendants Clearly Retaliated Against Pierce ……………………….. 20

Point II

PIERCE HAS STATED A CLAIM FOR VIOLATIONS
OF SOX SUFFICIENT TO SURVIVE A MOTION
TO DISMISS.…………………………………………………………. 21

Point III

PIERCE HAS STATED A CLAIM FOR VIOLATIONS
OF DODD-FRANK SUFFECENT TO SURVIVE A
MOTION TO DISMISS.……………………………………………… 28

Point IV

PIERCE HAS STATED A DERIVATIVE CLAIM
FOR BREACH OF FIDUCIARY DUTY SUFFECENT
TO SURVIVE A MOTION TO DISMISS.…………………………… 29

i

Point V

      PIERCE HAS STATED VARIOUD CLAIMS FOR
      DEFAMATION SUFFICENT TO SURVIVE A
      MOTION TO DISMISS ………………………………………….      32

  A.  General Standards for Defamation Claims …………………………      32
  B.  Defamation By Garg ……………………………………………...      33
  C.  Defamation By Better …………………………………………….      37

Point VI

      PIERCE HAS STATED A CLAIM FOR BREACH
      OF CONTRACT SUFFICENT TO SURVIVE A
      MOTION TO DISMISS…………………………………………..      41

Point VII

      PIERCE HAS STATED A CLAIM FOR TORTIOUS
      INTERFERENCE WITH A CONTRACT SUFFICENT
      TO SURVIVE A MOTION TO DISMISS…………………………….      42

Point VIII

      PIERCE HAS STATED A CLAIM FOR INTENTIONAL
      INFLICTION OF EMOTIONAL DISTRESS SUFFICENT
      TO SURVIVE A MOTION TO DISMISS…………………………….      44

Conclusion …………………………………………………………..      45

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*3P-733, LLC v. Davis*,
   187 A.D.3d 626 (1st Dept 2020) ……………………………………………   32

*Allen v. Admin. Review Bd.*,
   514 F.3d 468 (5th Cir. 2008) ………………………………………………   22

*Alloy Advisory, LLC v. 503 West 33rd Street Associates, Inc.*,
   195 A.D.3d 436 (1st Dept 2021) …………………………………………   41

*American Protein Corp. v. AB Volvo*, 844 F.2d 56 (2nd Cir), *cert. denied*,
   488 U.S. 852 (1988) …………………………………………………………..   43

*Andaya v. Atlas Air*,
   2012 WL 1871511 (SDNY 2012) ……………………………...……………   23

*Armstrong v. Simon & Schuster*,
   85 NY2d 373 (1995) ………………………………...………………………   32

*Ashcroft v. Hammond,*
   197 N.Y. 488 (1910) ………………………………...………………………   36

*Ashcroft v. Iqbal,*
   129 S. Ct. 1937 (2009) …………………………...…………………...   10,11

*Ashmore v. CGI Grp. Inc.*,
   No. 11 Civ. 8611 (LBS), 2012 WL 2148899
   (S.D.N.Y. June 12, 2012)……………………………………………………   23

*Ashmore v. CGI Group Inc.*,
   138 F.Supp.3d 329 (SDNY 2015) ………………………...………………   22

*Baldwin v. Goddard Riverside Comm. Ctr.,*
   53 F.Supp.3d 655 (SDNY 2014) ………………………...……………..   21

*Bank of New York v. Berisford Int'l*,
   190 A.D.2d 622 (1st Dept 1993) ………………………………………   43

*Beers v. Kaiser Permanente Ne. Div.*,
    No. 98 Civ. 1121, 1999 WL 126419 (NDNY 1999) …………………..    21

*Bechtel v. Administrative Review Board.*,
    710 F.3d 443 (2nd Cir. 2013) ……………………….…………….    21

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ………………………………………………    10,11

*Beltran v. Brentwood North Healthcare Ctr., LLC*,
    426 F. Supp. 2d 827 (N.D. Ill. 2006) ………………………..………    18

*BIB Constr. Co. Inc. v. City of Poughkeepsie*,
    204 A.D.2d 947 (3rd Dept 1994) ………………………………….    43

*Biro v. Conde Nast*,
    883 F.Supp.2d 441 (S.D.N.Y. 2012) ……………………..………    32,35,40,41

*Brehm v. Eisner*,
    746 A.2d 244, 259 (Del. 2000) …………………….…………….    30

*Caronia v. Phillip Morris, USA, Inc.*,
    715 F.3d 417 (2nd Cir. 2013)……………………..………………...    22

*Chambers v. Time Warner, Inc.*,
    282 F. 3d 147 (2d Cir. 2002) ……………………..……………..    10

*Chardon v. Fernandez*,
    454 U.S. 6 (1981) ……………………..……………………    16

*Christopher Lisa Matthew Policano, Inc. v. North American Precis Syndicate, Inc.*,
    129 A.D.2d 488 (1st Dept 1987) ………………………..…………..    32

*Cohen v. Davis*,
    926 F.Supp. 399 (SDNY 1996) …………………………..…………    42,43

*Constantin Assoc. v. Kapetas*,
    17 Misc. 3d 1137(A), 851 N.Y.S.2d 68 (S.Ct. NY Cty 2007) ………….    32

*Continental Collieries, Inc. v. Shober*,
    130 F.2d 631 (3rd Cir. 1942) …………………………..……………    11

*Cooper v. Parsky,*
    140 F. 3d 433 (2nd Cir. 1998) …………………………..…………………    11

*Daniel Goldreyer, Ltd. v. Van de Wetering,*
    217 A.D.2d 434 (1st Dept 1995)………………………………………..    40

*D'Annunzio v. Ayken, Inc.,*
    876 F.Supp.2d 211 (EDNY 2012)………………………………………..    40

*Delaware State College v. Ricks,*
    449 U.S. 250 (1980) …………………………..……………………    16

*DiFolco v. MSNBC Cable L.L.C.,*
    2010 WL 3911330 (2nd Cir. 2010) …………………………..………..    11

*Dougherty v. Memorial Sloan-Kettering,*
    No. 00 CV 4083 (JGK), 2002 WL 1610916 (SDNY, July 22, 2002)…    20,21

*Dunson v. Tri-Maintenance & Contractors, Inc.,*
    171 F.Supp.2d 103 (EDNY 2001) …………………………..………..    36

*Dykstra v. Wyeth Pharmaceuticals,*
    454 F. App'x 20 (2nd Cir. 2012) …………………………..…………..    16

*EEOC v. Ambercrombie & Fitch,*
    575 U.S. 768 (2015) …………………………..……………………    21

*Fei v. WestLB AG,*
    2008 U.S. Dist. LEXIS 16338 (SDNY 2008) ………………………...    18

*Flamm v. Van Nierop,*
    56 Misc.2d 1059 (Westchester Cty. S.Ct. 1968) ………………………    45

*Flatley v. Hartmann,*
    138 A.D.2d 345 (2nd Dept 1988) …………………………..………..    45

*Frank v. National Broadcasting Co., Inc.,*
    119 A.D.2d 252 (2nd Dept 1986) …………………………..………..    32

*Fraser v. Fiduciary Trust Co. Int'l,*
    417 F. Supp. 2d 310 (SDNY 2006) …………………………..………..    21,22,23

*Gantler v. Stephens*,
    965 A.2d 695 (Del. 2009) ……………………..…………………… 29

*Garrison v. Toshiba Bus. Sol.*,
    907 F.Supp.2d 301 (EDNY 2012)……………………………………… 39

*G.D. Searle & Co. v. Medicore Communications, Inc.*,
    843 F.Supp. 895 (S.D.N.Y.1994) ……………………..…………….. 43

*Gross v. FBL Fin. Svs.*,
    557 U.S. 167 (2009) ……………………..…………………….. 21

*Guard-Life Corp. v. S. Parker Hardware Manufacturing Corp.*,
    50 N.Y.2d 183 (1980) ……………………..…………………… 42

*Guttman v. Huang*,
    823 A.2d 492 (Del. Ch. 2003) ……………………..……………… 30

*Halio v. Lurie*,
    15 A.D.2d 62 (2nd Dept 1961) ……………………..……………… 45

*Halloum v. Intel Corp.*,
    ARB Case No. 04-068, 24 IER Cases 50, 2006 DOL
    Ad. Rev. Bd. LEXIS 46 (ARB Jan. 31, 2006) ………………………… 22

*Harris v. Seward Park Hous. Corp.*,
    79 A.D.3d 425 (1st Dept 2010) ……………………………………… 41

*Highland Capital Mgmt, L.P., v. Dow Jones & Co., Inc.*,
    178 A.D.3rd 572 (1st Dept 2019)……………………………………… 40

*Hoeppner v. Dunkirk Print. Co.*,
    254 N.Y. 95 (1930) ……………………..…………………… 36

*Holmes v. Gary Goldberg & Co., Inc.*,
    40 A.D.3d 1033 (2nd Dept 2007)…………………………………... 38

*Howell v. New York Post Co.*,
    81 N.Y.2d 115 (1993) ……………………..…………………… 44

*In re Orchard Enterprises, Inc. Stockholder Litig.*,
    88 A.3d 1 (Del. Ch. 2014) ……………………..………………… 29

*In re Walt Disney Co. Derivative Litig.,*
    906 A.2d 27 (Del. 2006) …………………………..…………………..      29,30

*In re Wonderwork, Inc.,*
    611 B.R. 169 (US Bankr. Ct, SDNY 2020) ……………………………      29

*John Langenbacher Co. v. Tolksdorf,*
    199 A.D.2d 64 (1st Dept 1993) …………………………..……………      33

Judith M. v. Sisters of Hope Charity Hosp.,
    93 N.Y.2d 932 (1999)………………………………………………….      39

*Kasachkoff v. City of New York,*
    485 N.Y.S.2d 992 (1st Dept 1996) …………………………..………..      36

*KForce, Inc. v. Alden Personnel, Inc.,*
    288 F. Supp. 2d 513 (S.D.N.Y. 2003) …………………………………      10

*Kreinik v. Showbran Photo, Inc.,*
    No. 02–cv–1172, 2003 WL 22339268 (S.D.N.Y. Oct. 14, 2003) ……..      17,18

*Langenkamp v. New York University,*
    2012 WL 12540277 (SDNY March 15, 2012) …………………………      33,35,36

*Lawson v. FMR LLC,*
    571 U.S. 429 (2014) ……………………………..…………………...      25

*Leshinsky v. Televent GIT, S.A.,*
    942 F.Supp.2d 432 (SDNY 2013) ………………………………………      22,23

*Levine v. Gurney,*
    149 A.D.2d 473 (2nd Dept 1989) …………………………..…………      45

*Liberman v. Gelstein,*
    80 N.Y.2d 429 (1992) ……………………………..…………………      36,40

*Lovejoy-Wilson v. NOCO Motor Fuel, Inc.,*
    263 F.3d 208 (2nd Cir. 2001) …………………………..……………...      18

*Mahony v. Keyspan Corp.,*
    2007 WL 805813 (EDNY Mar 12, 2007) ………………………...……      22

*Matchett v. Stark*,
    2016 N.Y. Misc. LEXIS 2584, 2016 NY Slip Op.
    31302 (U) (SCt., NY Cty, 2016)……………………………………..     32,35

*Matsushita Electronics Corp. v. Loral Corp.*,
    974 F.Supp. 345 (SDNY 1997) …………………………..……………     19

*McNally v. Yarnall*,
    764 F.Supp. 853 (S.D.N.Y.1991)………………………………………     40

*McRedmond v. Sutton Place Restaurant & Bar, Inc.*,
    48 A.D.3rd  258 (1st Dept 2008)………………………………………..     40

*Mira v. Kingston*,
    218 F.Supp.3d 229 (SDNY 2016) …………………………..…………     18

*Moniodes v. Autonomy Capital (Jersey) LP*,
    NO. 20-CV-5648 (GHW), 2021 WL 3605385 (SDNY 2021) ………...     28

*Nielsen v. Aecom Tech. Corp.*,
    762 F.3d 214 (2nd Cir. 2014) …………………………..………………     23

*Nolley v. Swiss Reinsurance Am. Corp.*,
    857 F.Supp.2d 441 (SDNY 2012) ……………………………………..     21

*November v. Time Inc.*,
    13 N.Y.2d 175 (1963) …………………………..…………………...     33,35

*Ocean State Seafood, Inc. v. Capital Newspaper, Div. of Hearst Corp.*,
    112 A.D.2d 662 (3rd Dept 1985)……………………………………...     40

*Orenstein v. Figel*,
    677 F.Supp.2d 706 (SDNY 2009) …………………………..…………     36

*Pantchenko v. C.B. Dolge Co., Inc.*,
    581 F.2d 1052 (2nd Cir. 1978) …………………………..……………     17

*Passaic Valley Sewerage Comm'rs v. United States Dep't of Labor*,
    992 F.2d 474 (3rd Cir.1993) …………………………..………………     22

*Perks v. Town of Huntington*,
    251 F.Supp.2d 1143 (E.D.N.Y.2003)…………………………………     39

*Pozner v. Fox Broadcasting Co.*,
    2019 WL 6117960 (SCt NY Cty, November 18, 2019) …………………     19

*Primetime 24 Joint Venture v. National Broadcasting Company*,
    219 F.3d 92 (2nd Cir. 2000)…………………………..………………..     19

*Riddell Sports Inc. v. Brooks*,
    872 F.Supp. 73 (SDNY 1995) ………………………..………………     43

*Rodgers v. Lenox Hill Hospital*,
    251 A.D.2d 244 (1st Dept 1998) ………………………..……………     20

*Scheuer v. Rhodes*,
    416 U.S. 232 (1974) ………………………..………………………..     11

*Schultz v. Congregation Shearith Israel of New York*,
    867 F.3d 298 (2nd Cir. 2017) ………………………..……………...     16

*Sellify v. Amazon.com, Inc.*,
    2010 WL 4455830 (SDNY 2010)…………………………………..     39

*Seymour v. New York Elec. & Gasoline Corp.*,
    627 N.Y.S.2d 466 (3rd Dept 1995) ………………………..………...     36

*Sharkey v. J.P. Morgan Chase & Co.*,
    805 F.Supp. 2d 45 (SDNY 2011) ………………………..…………    21,23

*Sherman v. County of Suffolk*,
    71 F.Supp.3d 322 (EDNY 2014) ………………………..…………     21

*Sherry Bender v. City of New York, et al.*,
    78 F.3d 787 (2nd Cir. 1996) ………………………..………………..     45

*Silver v. Mohasco Corp.*,
    602 F.2d 1083 (2nd Cir.1979) ………………………..………………     17

*Singh v. NYCTL 2009-A Trust*,
    No. 14 Civ. 2558, 2016 WL 3962009 (SDNY 2016) ………………..     19

*Smith v. Corning Inc.*,
    496 F. Supp. 2d 244 (WDNY 2007) ………………………..………     22

*Stepanov v. Dow Jones & Co., Inc.,*
    120 A.D.3d 28 (1st Dept 2014) …………………………..…………………    32

*Stern v. Cosby,*
    645 F.Supp.2d 258 (S.D.N.Y.2009)……………………………………...    40

*Stone v. Ritter,*
    911 A.2d 362 (Del. 2006) …………………………..…………………    29

*Stillman v. Ford,*
    22 N.Y.2d 48 (1968) …………………………..…………………    36

*Sweet v. Sheahan,*
    235 F. 3d 80 (2nd Cir. 2000) …………………………..…………………    10

*Tompkins v. Metro-North Commuter RR,*
    No. 16 Civ. 9920, 2018 WL 4573008 (SDNY 2018) ……………………    21

*United Food and Commercial Workers Union and Participating Food
Industry Employers Tri-State Pension Fund v. Zuckerberg Eyeglasses,*
    262 A.3d 1034 (2021) …………………………..…………………………..    31

*Wanamaker v. Columbian Rope Co.,*
    108 F.3d 462 (2nd Cir. 1997) …………………………..………………    17

*Welch v. Chao,*
    536 F.3d 269 (4th Cir. 2008) …………………………..…………………    22,23

*Wiest v. Lynch,*
    710 F.3d 121 (3rd Cir. 2013) …………………………..………………    23

*Williams v. JPMorgan Chase & Co.,*
    21-CV-09326 (JSR) (SDNY July 26, 2022) ……………………………...    22

*Williams v. Williams,*
    23 N.Y.2d 592 (1969)……………………………………………………..    40

*Wright v. Stern,*
    450 F.Supp. 2d 335 (SDNY 2006) …………………………………………    18

*Wutherich v. Rice Energy Inc.,*
    2018 U.S. Dist. LEXIS 171113 (WDPA 2018) ……………………….…..    23

*Yang v. Navigators Group, Inc.*,
674 F.App'x 13 (2nd Cir. 2016) …………………………..………………. 21,23

*Yankelevitz v. Cornell Univ.,*
1996 U.S. Dist. LEXIS 11298, 1996 WL 447749 …………………….... 18

*Statutes*:

17 C.F.R. § 240.21F–9(a)……………………………………………………. 28

72 N.Y.Jur.2d: Interference § 42 at 238……………………………………... 43

2 N.Y. PJI 236–37 (Supp.1996)……………………………………………… 43

15 U.S.C. § 78u–6(h)(1)……………………………………………………... 28

18 U.S.C. § 1514A(a)(1) …………………………………………………….. 22

FRCP 8(a) ……………………………………………………………………… 10

FRCP 12(b)(6) ……………………………………………………………………… 10

New York Labor Law § 215 ………………………………………………… 18

New York Labor Law §740 …………………………………………………. passim

Plaintiff Sarah Pierce ("Pierce"), by and through her attorneys, The Law Offices of Neal Brickman, P.C., respectfully submits this consolidated Memorandum of Law in Opposition to (a) the Motion to Dismiss of Better Holdco, Inc. ("Better"); and (b) the joint Motion to Dismiss filed on behalf of Vishal Garg ("Garg") and Nicholas Calamari ("Calamari). Defendants' motions should be denied in their entirety.

<u>Preliminary Statement</u>

Defendants' motions to dismiss each of the nine (9) causes of action detailed in the Consolidated Amendment Complaint (the "CAC") are entirely without merit. These are pre-answer motions to dismiss and, while defendants give lip service to the proper legal standards to be employed in considering their motions, they do not, as they must, accept as true the CAC's factual allegations.

Instead, they improperly personally attack the plaintiff and attempt to impugn her credibility and professional accomplishments.[1] The motions also mischaracterize certain of the well-pleaded allegations of the CAC and simply ignore other facts that do not fit neatly into Defendants' false narrative.[2] Finally, the motions seek impermissibly to heighten plaintiff's pleading requirements in an effort to make it virtually impossible for her to sufficiently plead any sustainable causes of action.[3] Defendants employ the age old adages of (1) blaming the victim; (2)

---

[1] For instance, Defendants' characterizations of plaintiff as a "disgruntled employee" who decided "to leave Defendant Better … after she no longer liked her role" and who then allegedly attempted "to extract unearned compensation from her former employer" are completely irrelevant to the proper consideration of these motions to dismiss. Pierce was not disgruntled, she did resign her employment, she was terminated, and she did not attempt to extract anything. Rather, she attempted, unsuccessfully, to settle her disputed claims.

[2] Defendants refuse to recognize the detailed allegations of the CAC that explain that Pierce never resigned and that she explicitly advised the Chief Finance Officer of that fact. Defendants also fail to acknowledge that Plaintiff details in her CAC the time periods, and, in some instances the explicit dates, of the alleged defamations and the people to whom the defamatory comments were published.

[3] By way of example, Defendants argue that Plaintiff's allegations that the defamatory statements were "false" are supposedly too conclusory to support those causes of action. However, defendants neglect to mention that the CAC explains why they were false and seek instead to argue, without any relevant citation, that, to sustain these claims, Plaintiff must allegedly produce evidentiary proof of their falsity. This is not required to defeat these pre-answer motions.

obfuscating and attempting to confuse the court regarding the operative facts; and (3) distorting and inaccurately recounting those facts. Stripped of their bluster, Defendants' motions demonstrate nothing more than that there are a multitude of disputed questions of fact that not only immunize this case from dismissal on a pre-answer motion, but that make it immune from dismissal on summary judgment.[4] Defendants improperly attempt to create an entirely new narrative and to substitute that narrative for the well-pleaded allegations of the CAC. They also mischaracterize the applicable law. Their attempts run afoul of clear and long-standing case law and jurisprudence for determining pre-answer motions to dismiss in this jurisdiction.

Defendants' extensive discussion of prior iterations of the CAC is also irrelevant. The only Complaint to which the motions are, or should be, addressed is the CAC. Surmise about the reasons for the amendment and whether or not prior motions to dismiss previous complaints would have been successful are an exercise in futility. Those prior complaints and previous arguments are not relevant to consideration of the instant motions, and by amending, or consolidating, those complaints, Plaintiff concedes nothing. Nor is Defendants' feigned confusion regarding what claims are asserted against what defendants relevant to the current motions. Each of the claims is supported by detailed factual allegations that more than satisfy the requirements to plead those causes of action. None are insufficient or wanting as a matter of law, and none are properly the subject of dismissal on a pre-answer motion to dismiss.

<u>The Claims Pleaded in the Consolidated Amended Complaint</u>

The following claims are pleaded against Better:

---

[4] By way of example only, Defendants repetitively assert that – contrary to a myriad of the allegations in the CAC – Pierce resigned on December 17, 2021 and attempt to use this fictional "fact" to bolster virtually all of their arguments for dismissal. Pierce did not resign. She explicitly asserted that she was not resigning. Defendants' knowing misrepresentation of Pierce's acknowledgement that Garg and Better were demoting her (even if due to their improper retaliation against her), does not mean that she resigned. Such disingenuous attempts to rewrite history do not provide a justification for dismissal.

- Count I for alleged violation of the anti-retaliation provisions of New York Labor Law §740. This claim is limited to the acts of retaliation that occurred after January 26, 2022, the effective date of the amendment to the statute that expanded what constitutes protected activity.[5]

- Count II for alleged violation of the anti-retaliation provisions of the Sarbanes Oxley Act ("SOX"). This claim seeks redress for all of Better's acts of retaliation (commencing in early December 2021) after Pierce voiced concerns about Better's dissemination of false and misleading information to the regulators and the investing public.

- Count III for alleged violation of the anti-retaliation provisions of the Dodd Frank Act. This claim seeks redress for the acts of retaliation that occurred after May 28, 2022, the date that Pierce formally registered with the SEC as a whistleblower and alerted it to her reasonable belief that Better had violated securities laws and rules designed to project the investing public from fraud and deceit.[6]

- Count VI for defamation. This claim addresses the statements that Better made to the press that appeared in a November 9, 2022 article falsely impugning Pierce's honesty, as well as Better's liability for the statements made by Garg as Better's CEO.

- Count IX for breach of contract. This claim addresses Better's breach of two separate contracts: The December 2021 written Partial Recourse Promissory Notes and a July 2022 oral agreement pursuant to which Better agreed to re-purchase all of Pierce's shares (vested and unvested) to extinguish the entirety of her loan balances.

The following claims are pleaded against Garg and Calamari:

- Count IV is a derivative claim (asserted on behalf of Better and all of its shareholders) for

---

[5] The acts of retaliation supporting this claim are Pierce's February 4, 2022 termination, Better's improper attempt to "call" the entirety of the Partial Recourse Promissory Notes, and its repeatedly defaming Pierce. (CAC¶¶175-84).
[6] Better knew about Pierce's contact with the SEC because it caused the SEC to commence, and expand, its investigation of Better, a fact dutifully disclosed by Better in its S-4 filing.

breach of fiduciary duty. It is addressed to these Defendants' corporate malfeasance and self-dealing as Officers and Directors of the Company. They disregarded area specialists and knowingly violated various laws, putting the Company at great risk with, among others, the SEC. Their malfeasance was intended to preserve their employment and to inflate the value of their own personal substantial stock holdings, without regard to the interests of the Company.

- Count V for defamation. This claim – which is also asserted against Better under the theory of *respondeat superior* -- is addressed to three (3) separate defamations: Garg's December 8, 2021 announcement falsely impugning Pierce's business competence and transparency; Garg's repeated comments falsely accusing Pierce, after her termination, of betraying the Company and failing diligently to perform her job; and Garg's accusation, after her termination, that Pierce allegedly falsified the Company's records and misrepresented the results of operations.[7]

- Count VII for Intentional Infliction of Emotional Distress ("IIED"). This claim is based on the entire series of unjustified adverse actions taken against Pierce, which were intended to silence and discredit her and cause her emotional distress.

- Count VIII for Tortious Interference with Contract. This claim is based on Garg's and Calamari's relentless campaign to discredit Pierce and to get her terminated from Better. In the process they interfered with Pierce's employment agreement with Better.

Factual Background[8]

Plaintiff was highly successful at, and a material contributor to the success of, Better. (CAC¶¶32-5).  Contrary to the current assertions of Defendants, up until her retaliatory leave on January 6, 2022, Pierce oversaw a team of 9,000 employees. She was the *de facto* COO and highly

---

[7] This claim is asserted against Garg only, not Calamari.
[8] The operative facts are detailed with excruciating precision in chronological order in the CAC. Only those facts most relevant to the instant motions are summarized herein.

compensated for her contributions. Mere months prior to her termination, the CEO Garg touted Pierce as the "number 2" executive at the Company and awarded her a $1,000,000 discretionary bonus. All of this changed after December 1, 2021, when Pierce first made complaint about Garg's illegal defamation of former employees, intended violation of the WARN Act, and misrepresentations concerning the finances of the Company and took steps to protect other employees from his retaliatory acts; and, thereafter, made complaint of the retaliatory acts taken against her.  (CAC¶¶32-5,89).

Better grew exponentially during Pierce's tenure and in May 2021 announced that it planned to go public via a Special Purpose Acquisition Company ("SPAC").  Better planned to go public by merging with a shell corporation Aurora Acquisition Corp. ("Aurora"), but all filings with the SEC and all representations to the public concerning this potential investment were made based on data provided by and concerning Better. (CAC¶¶36-8).  Subsequent to the announcement, Garg, on behalf of Better, in multiple filings with the SEC, made several material misrepresentations about Better, including its horizon to profitability (CAC¶¶84,94-5,151), its "organic traffic revenue" (CAC¶¶42-43), and the capabilities and functionality of Tinman, its allegedly proprietary software. (CAC¶¶39-40,44,97-8).  Pierce duly made complaint concerning each of these misrepresentations believing them to constitute violations of federal securities laws designed to protect shareholders, investors, and potential investors from fraud. (CAC¶41,96,98,151,153-4).

During this same time, Garg undertook improper management decisions that ultimately led, despite being warned against taking such action, to his terminating 900 employees on a then publicly disseminated zoom meeting. (CAC¶¶45-55).  In so doing and in the direct aftermath of such action, Garg publicly, knowingly, and purposefully defamed those employees; directed that

Better not comply with its obligations under the WARN Act; and began to make false statements as to the bases for the terminations to the public.  (CAC¶¶51,55-7,59-71,78-82,151). When Pierce questioned and complained about these activities[9], Garg excluded her from meetings and then – as corroborated by Better's CFO, Kevin Ryan ("Ryan") – used Pierce as a scape-goat for his actions to the Board. (CAC¶¶57,72-77,79-81,83-4,85,113,115,154).

Garg improperly maligned Pierce to the Board, Senior Management, and thirty other executives (including those who reported to Pierce) (CAC¶¶85,113).  Specifically, he called for the hiring of a "seasoned" executive who could "help manage and drive performance across business functions" and "build an inspirational leadership culture" as COO instead of, and in place of, Pierce. (CAC¶¶86,88-9).  He further denigrated Pierce's actions as COO by asserting to the Board, and then improperly represented that the Board believed, that "the metrics of the Company are a black box." (CAC¶87,90-3).  In reality, Pierce had been completely transparent about Better's metrics.  It was Garg who had ignored the metrics and repeatedly misrepresented them to the Board, shareholders, and the public, including potential investors. (CAC¶¶89-93).  When Pierce corrected Garg and demonstrated that she would never promulgate or perpetuate his knowing lies and wrote to the Board on December 9, 2022, Garg decided to take further steps to "get rid of" Pierce. (CAC¶134). Contrary to the current allegations of Defendants, the pleadings are clear that Garg's desires to get rid of Pierce did not, at that time, equal a determination by Better, but rather were the self-serving desires of Garg personally.

On December 10, 2021, Garg was placed on leave, and Ryan assumed his duties, but Garg improperly continued to seek information on Pierce and her team. (CAC¶¶106,109,131).  Ryan

---

[9] Even while Pierce remained adamant that Garg should not be allowed to rewrite history, a number of senior leaders approached her out of concern for Garg's actions and statements.  When Pierce advocated for these workers' rights, Calamari warned her to shut up or face the consequences. (CAC¶¶95-106). Thereafter, Garg repeatedly sought the names of these senior leaders who questioned his judgment. (CAC¶130).

told Pierce to create a proposal to deal with her potential demotion and transition to a new COO. (CAC¶¶113-6).  In the context of that request, Pierce made it clear to Ryan that she was NOT resigning, and that she had no intention to resign, and Ryan indicated that he understood. Pierce was and remained consistent in this position. (CAC¶¶117,120,132,154). She did assert that she believed she was being retaliated against in the form of her proposed demotion. (CAC¶117,120,132,154).  Pierce informed Ryan that she wanted to remain at Better, but also complied with his directive to provide a transition proposal. (CAC¶¶117-20,154).   True to her word, Pierce continued to fulfill all of her duties as acting COO through the end of 2021 and through January 6, 2022, despite being shuttled first between in-house counsel and then, at the explicit direction of the Board, to outside counsel. (CAC¶¶121-9,141,144,154).

On or about January 3, 2022, Pierce met with Garg who had unilaterally decided, without any pushback from the Board, that he had taken enough time off. (CAC¶133).  In that meeting, Garg blamed the Board for her proposed demotion, sought the names of the senior leaders who questioned him, and blamed Pierce for instigating them against him. (CAC¶¶135-40).  At that juncture, the Board still wanted to know if Pierce wanted to stay or leave. (CAC¶138).  Calamari took over the negotiations concerning Pierce's ongoing role with Better in light of the presumptive decision to demote her and Garg's pronouncement to get rid of her (*i.e.* "get her out"). (CAC¶¶134,147-8).   Pierce continued to fulfill all of her duties as, *inter alia*, acting COO. (CAC¶¶142,144). On January 6, 2022, Pierce was put on administrative leave because, according to Ryan, she was claiming that she was "being retaliated against."  No wrongdoing on the part of Pierce was alleged at that, or at any other, time.  (CAC¶¶145-6). Better was obviously further retaliating against Pierce for complaining that she was the subject of retaliation. Ryan later confirmed that Calamari had directed the immediate leave and her disconnection from her

computer, messaging and team: both in such a way as to disparage Pierce (CAC¶¶147-9).

On January 12, 2022, while she still awaited a counter-proposal for her re-situation within the Company (CAC¶150), Pierce sat for an employee interview in which she reiterated many of her claims against Garg, as well as Calamari and Better, as identified above, including his dissemination of false and misleading information to the regulators and investing public and his intention to violate the notice/pay requirements of the WARN ACT. (CAC¶151). Within days, in clear retaliation for Pierce's actionable complaints under SOX, as well as the WARN Act, Better's outside counsel asserted that they were going to accept Pierce's non-existent "resignation." (CAC¶152,154). It was directly reiterated that Pierce had never resigned. When Pierce maintained this position, Calamari and Better made the decision on or about February 4, 2022 to summarily terminate Pierce. (CAC¶154). No additional reasons were ever provided for Pierce's termination. Garg had finally, after over two (2) months, coerced Better into terminating Pierce without basis or *bona fide* reason, but rather to satisfy his own personal vendetta and attempt to besmirch Pierce so that he could continue to attempt to cover-up his own bad acts and illegal activities. During this period, December 17, 2021 through February 4, 2022, Garg also repeatedly and publicly asserted, with knowledge of the falsity of the allegations, that Pierce was the leader of a "coup," that she had "resigned," that she "abandoned" Better and her team; that she attempted to "extort" money that she was not entitled to from Better; that she had done nothing for Better; that she had contributed no managerial services of any value; and that her title should have been "Cheerleader in Chief." (CAC¶¶139-40,171-3,217-26,228-33).

The retaliation and defamation continued against Pierce after her termination in ongoing

violation of §740, SOX, Dodd Frank and common law.[10]   Specifically, subsequent to her termination, Garg repeatedly knowingly and purposefully lied to Ryan, members of the senior leadership team, and the Board in asserting that Pierce had been "fudging the numbers" at Better and that she had told him that Better was incurring a "labor cost of only $900.00 per loan."  Garg was specifically and personally aware that Pierce had never fudged the numbers or cooked the books and had routinely iterated that labor costs per loan were over $2,000. (CAC¶¶171-3,223-5). Better itself also publicly defamed Pierce to the Press and the public in November 2022. (CAC¶¶228-33). These ongoing and repeated knowing lies constituted actionable defamation *per se*. Such statements will inevitability effect Pierce's future employment opportunities. (CAC¶173).

Better has also repeatedly retaliated against Pierce for her complaints while at Better, as well as her filing of the OSHA Complaint and the instant action, by improperly "calling" her loan agreements and by treating her differently, and less favorably, than other terminated employees with the same type of loan agreements. (CAC¶¶155-170).  Specifically, initially Better claimed that the Notes were due and sought payment for the same some sixty-five days early. (CAC¶¶159-60).  However, in making the early demand in breach of the terms of the agreements, Better agreed on March 30, 2022 to repurchase both the vested and unvested shares and to extinguish Pierce's entire loan balance (i.e. "settle the loan"). After due consideration, Pierce accepted this offer. (CAC¶¶161-3).  However, after the OSHA Complaint and the instant action were filed, in direct and clear retaliation for the same, Better reneged and demanded cash repayment of the entire loan amounts in direct contravention of not only the terms of the loan agreements, but the agreement offered by Better and ultimately accepted by Pierce. (CAC¶¶164-167,257-69).  Even after Pierce

---

[10] Better has also steadfastly refused to correct Pierce's 2021 W-2 to reflect her permanent address in New Hampshire. Again, this is a routine matter that is normally *pro forma*.  It is only because of Pierce's complaints and ongoing attempts to protect her rights that Better has retaliated against her by not providing a corrected tax form.

agreed to execute a completely new repurchase agreement for her unvested shares (that Better still holds) that was not required of any other similarly situated employees, and which resulted in the expenditure of unnecessary material time and expense to Pierce, Better has now actually commenced an action against Pierce personally seeking the full amount of the loans in direct contravention of the terms of the loan agreements, in direct contravention of the fact that portions of the loans are non-recourse, in violation of Better's earlier accepted offer, and in abject retaliation for her complaints under §740, and pursuit of the OSHA and the instant complaints.  (CAC¶¶169-70,257-69).  On these facts alone, the instant motions to dismiss should be denied in their entirety.

<u>Applicable Standards for a Motion to Dismiss</u>

The Federal Rules of Civil Procedure require only that a claim for relief contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  FRCP 8(a)(2). A complaint may be dismissed only to the extent that it clearly "fail[s] to state a claim upon which relief can be granted."  FRCP 12(b)(6).  "In considering a motion to dismiss pursuant to Rule 12(b)(6), the court should construe the complaint liberally, 'accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor.'"  *KForce, Inc. v. Alden Personnel, Inc.,* 288 F. Supp. 2d 513, 515 (S.D.N.Y. 2003), *quoting Chambers v. Time Warner, Inc.,* 282 F. 3d 147, 152 (2nd Cir. 2002). The drastic remedy of "dismissal is only appropriate when 'it appears beyond doubt that the plaintiff can prove no set of facts which would entitle him or her to relief.'"  *Id.,* quoting *Sweet v. Sheahan,* 235 F. 3d 80, 83 (2nd Cir. 2000).

To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." A claim has facial plausibility when, as here, the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.  *Ashcroft v. Iqbal,* 129 S. Ct. 1937, 1949 (2009) (*quoting Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). In other words, a complaint is not

required to have "detailed factual allegations, but it demands more than an unadorned, the defendant-unlawfully-harmed-me accusation." *Id*. In its formulation of the Twombly/Iqbal requirements for a statement of claim, the Supreme Court has established the following protocol to be followed in determining whether or not the pleading is adequate: "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *DiFolco v. MSNBC Cable L.L.C.,* 2010 WL 3911330 (2nd Cir. 2010) (emphasis supplied). "It is only where well-pleaded facts do not permit the court to infer more than mere "possibility of misconduct" that "a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth.'" *Iqbal*, *supra* at 1949.

In ruling on a motion pursuant to Fed.R.Civ.P. 12(b)(6), the duty of a court "is merely to assess the legal feasibility of the complaint, not to assess the weight of the evidence which might be offered in support thereof." *Cooper v. Parsky*, 140 F. 3d 433, 440 (2nd Cir. 1998) (internal citation and quotation marks omitted). "No matter how likely it may seem that the pleader will be unable to prove his case, he is entitled, upon averring a claim, to an opportunity to try to prove it." *Bell Atlantic, supra, quoting Continental Collieries, Inc. v. Shober*, 130 F.2d 631, 635 (3rd Cir. 1942). See, also, *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974): a district court weighing a motion to dismiss asks "not whether a plaintiff will ultimately prevail, but whether the claimant is entitled to offer evidence to support the claims." *Id.*   Here, it is not even a close call.  Plaintiff has clearly set forth valid claims for relief. None of the CAC's claims are properly subject to dismissal.

<u>Argument</u>
<u>Point I</u>
PLAINTIFF HAS STATED A CLAIM FOR VIOLATIONS OF NEW YORK LABOR LAW §740 SUFFICIENT TO SURVIVE A MOTION TO DISMISS

New York Labor Law §740, as amended, provides in pertinent part as follows:

1.      Definitions.  For the purposes of this section, unless the context specifically indicates otherwise:

e.      a "Retaliatory action" means an adverse action taken by an employer or his or her agent to discharge, threaten, penalize, or in any other manner discriminate against any employee or former employee exercising his or her rights under this section, including (i) adverse employment actions or threats to take such adverse employment actions against an employee in the terms of conditions of employment including but not limited to discharge, suspension, or demotion; (ii) actions or threats to take such actions that would adversely impact a former employee's current or future employment…"

2.      Prohibitions: An employer shall not take any retaliatory action against an employee whether or not within the scope of employee's job duties, because such employee …

(a)      Discloses or threatens to disclose to a supervisor … an activity, policy, or practice of the employer that the employee reasonably believes is in violation of [any] law, rule, or regulation…

4.      Violation; remedy.

(a) An employee who has been the subject of a retaliatory action in violation of this section may institute a civil action in a court of competent jurisdiction for relief as set forth in subdivision 5 of this section within two years after the alleged retaliatory action was taken.

5. Relief. In any action brought pursuant to subdivision 4 of this section, the court may order relief as follows:

a.      an injunction to restrain continued violation of this section;

b.      the reinstatement of the employee to the same position held before the retaliatory action … or front pay in lieu thereof;

c.      the reinstatement of full fringe benefits and seniority rights;

d.      the compensation for lost wages and other remuneration;

e.      the payment by the employer of reasonable costs, disbursements, and attorneys' fees;

f.      a civil penalty of an amount not to exceed ten thousand dollars; and/or,

g.      the payment by the employer of punitive damages, if the violation was willful, malicious, or wanton.

A.      <u>Defendants' Improper Retaliatory Termination of Plaintiff</u>:

In the instant matter, Pierce was terminated on February 4, 2022, some nine (9) days after the effective date of the amended NYLL §740.  The CAC clearly reflects that Pierce made clear complaints about, *inter alia*, violations of the WARN Act and defamation of some 900 employees. Pierce also made complaint about actions and statements by Garg that constituted securities law

violations and knowing misrepresentations to shareholders and the investing public concerning, *inter alia*, the projected profitability of Better and the percentage of loans that originated by "organic traffic." These complaints were clearly disclosures by Pierce to her supervisor regarding activities by Better that she reasonably believed constituted violations of law.

Within days of her complaints, Garg began a self-serving concerted campaign to defame, denigrate, diminish, and orchestrate first her demotion and then, ultimately her termination. While Garg manipulated others around him, it was not until February 4, 2022 that he, with the assistance of Calamari, ultimately succeeded in persuading Better to terminate Pierce. In a related part of his scheme, Garg and Calamari promoted the knowingly false narrative that Pierce had resigned. While this characterization led to additional complaints by Pierce of additional abuse and retaliation in addition to those suffered for her prior complaints of, *inter alia*, SEC violations, it led to her January 6, 2022 suspension which was premised solely on her complaints of retaliation. She was specifically told by an Officer, and acting CEO, of Better that she was being placed on leave because of her complaints of retaliation. While Defendants go to great lengths to promulgate their contention that Pierce resigned, the evidence, Pierce reported and documented assertions, and the CAC clearly tell a different story. By recognizing that Garg, Better, and its Board had decided to retaliate against her for her SOX protected complaints by seeking her demotion, Pierce neither conceded that her proposed demotion was proper, nor tendered her resignation. Her contrary position was reiterated repeatedly and widely. However, it was not until February, after Defendants recognized that Pierce, as she had repeatedly asserted, had not resigned and did not intend to resign, that Better, under ongoing pressure from Garg and Calamari, actually decided to terminate Pierce. Defendants' attempts to obfuscate these facts are addressed below.

In addition to her improper termination, Pierce also suffered further retaliation at the hands

of Better in direct contravention of NYLL §740.  Specifically, Garg continued to retaliate against

Pierce by publicly defaming her to the Board, members of senior management, CFO Ryan, and

other individuals by knowingly and falsely impugning her business acumen, her business abilities,

and her integrity, by repeatedly asserting – with personal knowledge that his statements were false

-- that (i) she "cooked the books" at Better and (ii) repeatedly misrepresented to him that processing

costs of loans to Better were $900 when they were over $2,000.  In addition, Better itself continued

its retaliation against Pierce by reneging on, and violating the terms of its loan agreements.  On

March 30, 2020 and thereafter.  Better's recent demands for cash payments to satisfy the entirety

of the loans – even the non-recourse portions – as well as its more recently publicly filed suit

against Pierce for the same relief despite the explicit terms of the loan agreements and her prior

acceptance of Better's offer for resolution of those same agreements, smacks of bad faith; is clearly

retaliatory; and represents manifest disparate treatment as no other similarly situated employees

have been so harassed, publicly humiliated, or sued.  Finally, Better also directly retaliated against

Pierce in its November, 2022 public statements to the press.

These facts are well more than sufficient to set forth a cause of action under NYLL §740

sufficient to survive a pre-answer motion to dismiss and none of Better's arguments or cited case

law warrant a different determination.

As an initial, and dispositive, matter, Better – just as the individual Defendants attempt to

do – improperly attempts to create its own narrative that completely ignores material allegations

in the CAC in a desperate attempt to avoid liability for its actions.  Better's first argument[11] is that

Pierce resigned on December 17, 2021.  As discussed above, this fabrication completely ignores

---

[11] Better makes numerous statements which seek solely to paint Pierce negatively and bias the Court against her.  As same are irrelevant to the issues actually before the Court, we trust that same will be properly ignored and only the most pertinent misrepresentations will be individually addressed.

the undisputed facts that CFO Ryan, then acting CEO, directed Pierce to provide a proposal for her transition assuming that a replacement was hired to fulfill the duties of COO that she had been handling and that Pierce advised CFO Ryan that she was <u>not</u> resigning.  Notably, no such hire had been made during Pierce's employ.  It is equally undisputed that Pierce continued to fulfill all of the duties of COO until she was placed on leave for her complaints of retaliation on January 6, 2022. Better's contention concerning the "resignation" is also belied by the undisputed facts that Pierce both directly prior to, and at all times after, her good faith provision of the required transition proposal stated that she was not resigning and had no intention of resigning.  When Better first raised this contention, on or about January 3, 2022, Pierce denied it and has continued to do so since then. Better's position is also belied by its own abandonment of its theory after its outside counsel proclaimed that Better would accept Pierce's resignation within two days of her January 12, 2022 employee interview and Pierce's denial, again, that she had ever resigned.

It was only after Garg understood that Pierce was not going to resign that he convinced Better -- which determined that it no longer wanted Pierce even in a demoted position or a position outside of New York -- to then terminate her on February 4, 2022, the date she was terminated not the date when some non-existent resignation was accepted. This is at best for Better a highly contested issue of fact sufficient to survive summary judgment, much less a pre-answer motion to dismiss. On this motion, the CAC's allegations must be accepted as true.  The CAC specifically asserts that Pierce told Ryan, and Ryan acknowledged, that she was NOT resigning and that she did not intend to resign. Better's argument flies directly in the face of these ignored allegations.

Better's second and related argument is that the decision to terminate Pierce had been made well before February 4, 2022.  Again, this argument ignores – rather than accept as true – the well-pleaded allegations of the CAC.  In making this argument, Better conflates a disputed defense that

it might later assert, with the recognized standards for reviewing a pre-answer motion to dismiss. Pierce does not dispute that Garg might have wanted here gone before then, but Better did not make the decision to terminate her or notify her of any termination before February 4, 2022.  This is not the instance in which an employee is notified of his/her termination on a specific date and that the termination will not then be effective at some later date, as in each of the cases cited by Better.  See, *e.g., Delaware State College v. Ricks*, 449 U.S. 250, 258 (1980); *Chardon v. Fernandez,* 454 U.S. 6, 8 (1981); *Schultz v. Congregation Shearith Israel of New York*, 867 F.3d 298, 305 (2nd Cir. 2017).  Even in *Dykstra v. Wyeth Pharmaceuticals*, 454 F. App'x 20, 22-3 (2nd Cir. 2012), which Better asserts stands for the principal that when a suspension is part of the termination process, where the terminations "flows as an inevitable consequence" from an earlier suspension, Court's look to the earlier date to determine the accrual of the action. The earlier date in that case was the one on which Dykstra was given "notice of suspension pending discharge for falsifying GMP documents." *Id.* at 21.  These cases are simply non-dispositive as their fact patterns are materially different that the instant matter.  Pierce was placed on administrative leave, she was not terminated.  Pierce's termination did not flow "as an inevitable consequence" from her administrative leave. First, Pierce was never given a notice of termination prior to February 4, 2022. At most, she was told that Better would be accepting her non-existent resignation on or about January 15, 2022.[12]  However, outside counsel was in error as Pierce had never resigned:  a fact recognized when Better then reversed outside counsel's position, in the face of Pierce's steadfast position that she had not resigned.  There simply is no evidence – much less admissible uncontroverted documentary evidence -- that precludes, as a matter of law, any factual question as

---

[12] Better's reliance on reference to their outside counsel asserting on or about January 15, 2022 that Pierce was to be terminated was based solely on outside counsel's misunderstanding that Pierce had resigned.  There was no other determination to terminate Pierce that had been effected at that time.

to when Better ultimately and finally decided to terminate Pierce, prior to its notice to Pierce of her termination on February 4, 2022.[13]  All that is currently known is that (i) Pierce never resigned; (ii) that any purported acceptance of a resignation in January was moot and, in addition, was withdrawn; (iii) that notice of her termination was made on February 4, 2022, after the effective date of the revised statute; and (iv)  Defendants' post-termination acts of retaliation are actionable.

B.      Defendants' Improper Retaliation through Post-Termination Actions:

In the instant case, Plaintiff has clearly alleged post-termination retaliation in the form of disparate treatment concerning her loan agreements, the filing of a frivolous action concerning the same, and ongoing and repeated acts of defamation.  The CAC also alleges that each such act also have affected Pierce's job prospects, marketability, and were designed to dissuade future or additional complaints – each such act also constituting retaliation under §740.  Again, these allegations set forth a claim sufficient to survive a pre-answer motion to dismiss.

In response, Better's initial argument that no retaliation claims can be maintained based on post-termination actions in belied by the plain language of the statute (which asserts protect for "former employees") and the inapposite cases that Defendants themselves cite. See *e.g., Wanamaker v. Columbian Rope Co.,* 108 F.3d 462, 466 (2nd Cir. 1997); *Silver v. Mohasco Corp.,* 602 F.2d 1083, 1090 (2nd Cir.1979), *rev'd* on other grounds, 447 U.S. 807 (1980) (retaliation if company "blacklists" former employee); *Pantchenko v. C.B. Dolge Co., Inc.,* 581 F.2d 1052, 1054–55 (2nd Cir. 1978) (retaliation if wrongfully refuses to write a recommendation or otherwise sullies the former employee's reputation); *Kreinik v. Showbran Photo, Inc*., No. 02–cv–1172, 2003 WL 22339268 (SDNY Oct. 14, 2003) (denying dismissal of claim that defendant retaliated by filing frivolous counterclaims because such claims could impact plaintiff's future job prospects);

---

[13] Better's position, if accepted, would also provide no explanation for the February 4, 2022 notice as there would have been no purpose for such a notice if the termination had already been effected.

see also, *Mira v. Kingston*, 218 F.Supp.3d 229, (SDNY 2016) (Plaintiff alleged non-specified bad acts with only conclusory connection to her prior employer as sole basis for post-termination retaliation).[14]

Better's second argument that Pierce's claims based on Defendants' retaliatory filing of an action based on the notes are precluded by the *Noerr-Pennington* doctrine is also inapposite.  The relevant law is clear: the filing of frivolous actions can constitute actionable retaliation.  See, *e.g.,* *Yankelevitz v. Cornell Univ.,* No. 95 CV 4593, 1996 WL 447749, at *4 (SDNY Aug. 7, 1996) (Wherein the Court has expressly refused "to adopt a rule stating that…counterclaims, or any other legal cause of action, cannot, as a matter of law, constitute retaliation in violation of the employment discrimination laws" and determining that the Plaintiff therein had sufficiently stated facts to support a claim for retaliation based on the filing of a counter-claim in response to discrimination complaint); *Kreinik*, 2003 WL 22339268 (Upholding claim for retaliation based on filing of counter-claim in response to discrimination complaint); *Fei v. WestLB AG*, 2008 U.S. Dist. LEXIS 16338 (SDNY 2008) (Upholding claim for retaliation based on filing of counter-claim in response to discrimination complaint);  *Lovejoy-Wilson v. NOCO Motor Fuel, Inc*., 263 F.3d 208, 223 (2nd Cir. 2001) (Lawsuits in response to a former employee's attempt to vindicate his rights can constitute retaliation); *Beltran v. Brentwood North Healthcare Ctr., LLC*, 426 F. Supp. 2d 827, 833 (N.D. Ill. 2006) (employer's lawsuit filed with a retaliatory motive rather than in good faith may constitute an adverse action and a basis for a retaliation claim). NYLL specifically prohibits actions taken in retaliation against employees who engage in protected activity by attempting to vindicate their rights. See *e.g.,* N.Y.L.L. § 215; *Wright v. Stern*, 450 F.

---

[14] Better's conclusory allegations that Pierce had gained subsequent employment are not dispositive, especially on a motion to dismiss.  There is no evidence as to the nature, pay structure, benefits, or any other aspect of Pierce's alleged subsequent job.

Supp. 2d 335, 372 (SDNY 2006).

None of the case cited by Defendants stand for a contrary assertion (and none address the disparate treatment or defamation claims as to retaliation).  *See e.g., Singh v. NYCTL 2009-A Trust*, No. 14 Civ. 2558, 2016 WL 3962009 *4 (SDNY 2016) (*Noerr-Pennington* doctrine cited as bar to action based on pre-suit demand correspondence); *Primetime 24 Joint Venture v. National Broadcasting Company*, 219 F.3d 92, 100 (2nd Cir. 2000) (*Noerr-Pennington* doctrine cited as bar to action based on SHVA notice, but recognizing exceptions for sham litigations); *Pozner v. Fox Broadcasting Co.*, 2019 WL 6117960 (SCt NY Cty, November 18, 2019) (*citing* to *Matsushita Electronics Corp. v. Loral Corp.,* 974 F.Supp. 345, 355 (SDNY 1997) concerning exceptions to *Noerr-Pennington* doctrine for sham litigation and recognizing "[s]ham litigation in this context is defined as 'litigation that is both (1) objectively baseless and (2) not 'sincerely and honestly felt or experienced,' i.e., brought in bad faith'").  Seeking personal recourse on the non-recourse portion of a partial recourse note certainly fits this bill, as does suing an employee for return of stock that never left the possession of the employer.

C.     Pierce Clearly Engaged In Protected Whistleblower Activities Under NYLL §740:

Better then argues that Pierce never engaged in any whistleblowing activities.  The Court need not even delve into the question of whether numerous SEC rules and regulations were violated, including those concerning fraud on shareholders and prospective investors (they were) or even determine whether the misrepresentations constituted violations of rules and regulations or misunderstandings between colleagues.[15]  Better's arguments in this regard constitute

---

[15] If the Court decides to make such a determination, it must rely solely on the allegations in the CAC, which make it clear that as the individual responsible for maintaining Better's records and metrics, Pierce was the person in the position to know the percentage of loans generated by organic traffic and the potential for profitability.  Notably, Pierce's determinations in these regards were corroborated and shared by CFO Ryan and others.  It should also be noted that the CAC specifically relates that it was only after December 1, 2021 that Garg began to falsely project profitability in Q1 2022.

quintessential red herrings.  The specific complaints made by Pierce are detailed in several places in the CAC. According to Better, Pierce's complaints to, *inter alia*, the Board, Garg, CFO Ryan (who served as the acting CEO), and Better's General Counsel that she reasonably believed these actions were violative of law and statute did not sufficiently constitute whistleblowing under NYLL §740.  Similarly, ineffectually, Better contends that because there was no proof submitted that Better ultimately violated the WARN Act, that no cause of action can be maintained.  That contention is simply wrong and belied by the plain language of the statute as set forth above.  Pierce need only show that she – like the other area experts involved – reasonably believed that Better was in violation of any "law, rule, or regulation."  It is undisputable that at the time Pierce raised her concerns about the directives that Garg was making would have resulted in a violation of the WARN Act.  Even if Better later corrected its actions (which cannot be considered on the instant motion to dismiss), but still retaliated against Pierce (as it did retaliate), it would still be liable, and the cause of action would survive.  Garg's witch hunt for senior leaders who dared oppose him and his vendetta against Pierce for protecting their rights as employees are also clearly protected.

D.      Defendants' Clearly Retaliated Against Pierce:

While again misconstruing the plain allegations of the CAC, Defendant rely on various cases that stand for the position that employers who can establish that they terminated an employee on a basis other than the employee's exercise of any rights protected by § 740 may escape liability. See *e.g., Rodgers v. Lenox Hill Hospital*, 251 A.D.2d 244 (1st Dept 1998); *Dougherty v. Memorial Sloan-Kettering*, No. 00 CV 4083 (JGK), 2002 WL 1610916 * 6 (SDNY, July 22, 2002).  In the instant case, Better's CFO, and acting CEO, explicitly told Pierce that she was being put on leave because of her complaints of retaliation.  The sole acts that Pierce undertook between that time (January 6, 2022) and her termination (February 4, 2022) were her appearance at an employee

interview on January 12, 2022 at which she reiterated her whistleblower complaints and her charges of retaliation; and her ongoing denial that she ever resigned.  She was then terminated without any other stated basis whatsoever.  The claim for retaliation could not be clearer as a matter of law.  Her claims in this regard are not subject to summary judgment on these facts[16], much less dismissal on a pre-answer motion to dismiss.

Better's arguments on this point are not compelling, much less dispositive.  Its motion to dismiss this claim must be denied.[17]

Point II
### PIERCE HAS STATED A CLAIM FOR VIOLATIONS OF SOX SUFFICIENT TO SURVIVE A MOTION TO DISMISS

To set forth a SOX whistleblower retaliation case, a plaintiff must only  assert that (i) plaintiff engaged in protected activity; (ii) the employer was aware of such activity; (iii) plaintiff suffered an unfavorable personnel action; and (iv) circumstances exist to suggest that the protected activity was a contributing factor to the unfavorable action. See *e.g., Sharkey v. J.P. Morgan Chase & Co.,* 805 F. Supp. 2d 45 (SDNY 2011); *Yang v. Navigators Group, Inc.*, 674 F.App'x 13, 14 (2nd Cir. 2016); *Bechtel v. Administrative Review Board,* 710 F.3d 443 (2nd Cir. 2013); *Fraser v.*

---

[16] Better ultimately relies on a large number of cases decided on summary judgment and the now disproved trope that Pierce resigned.  See *e.g.*, *Beers v. Kaiser Permanente Ne. Div*., No. 98 Civ. 1121, 1999 WL 126419 *4 (NDNY 1999) (no allegations of pretext yet only determined on summary judgment); *Dougherty*, 2002 WL at 1610916 (SDNY 2022) (No FDA violation, no pretext alleged, and legitimate reason for termination, yet only determined on summary judgment); *EEOC v. Ambercrombie & Fitch*, 575 U.S. 768, 772-3 (2015) (summary judgment denied where need for a religious accommodation found to be one motivating factor in hiring decision); *Sherman v. County of Suffolk*, 71 F.Supp3d 322, 348 (EDNY 2014) (Title VII retaliation claims governed by a but for standard on summary judgment); *Gross v. FBL Fin. Svs.,* 557 U.S. 167, 177-8 (2009) (post-judgment jury verdict; *Tompkins v. Metro-North Commuter RR*, No. 16 Civ. 9920, 2018 WL 4573008, at *7 (SDNY 2018) (specific bases for termination identified, yet only decided on summary judgment); *Nolley v. Swiss Reinsurance Am. Corp.,* 857 F.Supp.2d 441, 461-2 (SDNY 2012) (under Title VII protected act need not be sole cause of adverse action as determined on summary judgment); *Baldwin v. Goddard Riverside Comm. Ctr.,* 53 F.Supp.3d 655, 674 (SDNY 2014) (short time between protected active and adverse action insufficient on its own to survive summary judgment if there is no question that termination proceedings began prior to protected activity).

[17] In addition, the CAC alleges additional retaliation and disparate treatment following Pierce's improper termination, her ongoing complaints, and her filing of the instant action, as well as her OSHA filing, which only further demonstrate why dismissal is wholly unwarranted.  The subsequent acts of retaliation clearly fall squarely within the protections of NYLL §740.

*Fiduciary Trust Co. Int'l*, 417 F. Supp. 2d 310, 322 (SDNY 2006). Courts have routinely agreed that SOX is to be construed broadly. *Leshinsky v. Televent GIT, S.A*., 942 F.Supp.2d 432, 440-1 (SDNY 2013); *Mahony v. Keyspan Corp.*, 2007 WL 805813, at *5 (EDNY Mar 12, 2007); see also, *Williams v. JPMorgan Chase & Co.,* No. 21 CV 09326 (JSR) (SDNY July 26, 2022) (Recent case denying summary judgment of SOX Retaliation Claim in Southern District).[18]

In order to maintain a SOX claim, a plaintiff "need not show an actual violation of the law, nor must a plaintiff cite a particular statute that he believed was being violated." *Mahony*, 2007 WL 805813, at *5; see also *Fraser*, 417 F. Supp. 2d at 322 (finding demonstration of violation of law not necessary). Rather, a plaintiff is protected for providing "information which the employee 'reasonably believes constitutes a violation' of any SEC rule or regulation or 'Federal law relating to fraud against shareholders.'" *Fraser*, 417 F. Supp. 2d at 322 (citing 18 U.S.C. § 1514A(a)(1)); see also, *Caronia v. Philip Morris, USA, Inc.,* 715 F.3d 417, 427 (2nd Cir. 2013); *Passaic Valley Sewerage Comm'rs v. United States Dep't of Labor*, 992 F.2d 474 (3rd Cir.1993) (finding intracorporate disclosures of perceived oversights based on employee misunderstanding still protected); *Smith v. Corning Inc.,* 496 F. Supp. 2d 244, 248 (WDNY 2007); *Welch v. Chao*, 536 F.3d 269, 277 (4th Cir. 2008); *Halloum v. Intel Corp.,* ARB Case No. 04-068, 24 IER Cases 50, 2006 DOL Ad. Rev. Bd. LEXIS 46 at *13 (ARB Jan. 31, 2006); *Allen v. Admin. Review Bd.,* 514 F.3d 468, 477 (5th Cir. 2008)). No particular "magic words" or phrasing referencing specific legal

---

[18] Summary judgment, much less motions to dismiss, should be stringently considered in SOX cases to effectuate the remediative purposes of the statute. See *e.g., Ashmore v. CGI Group Inc.*, 138 F.Supp.3d 329, 340 (SDNY 2015); *Leshinsky*, 942 F.Supp.2d at 441.

violations are required, as the purpose of the whistleblower retaliation statute is to protect reports of potential malfeasance so that a full investigation may be made. See, *Leshinsky*, 942 F.Supp 2d at 943 ("*Procedures for the Handling of Discrimination Complaints under the Sarbanes–Oxley Act*," 69 Fed.Reg. 163, 52106 (Aug. 24, 2004) (noting that the purpose of a protected report is not to expose illegality, but to '"trigger an investigation to determine whether evidence of discrimination exists'"); see also, *Sharkey,* 805 F. Supp. 2d at 45 (Myriad of allegations when combined "prevent a finding, at this stage, that [Plaintiff's] belief that Suspect Client was engaged in violations of the enumerated SOX statutes was unreasonable"); *Wutherich v. Rice Energy Inc.,* 2018 U.S. Dist. LEXIS 171113 (WDPA 2018) ("[Plaintiff's] belief, that the data's retention and use was a securities violation, was reasonable because a securities violation does occur when a company intentionally misrepresents or omits certain facts to investors, which were material and which risked loss. (See, *Nielsen v. Aecom Tech. Corp.*, 762 F.3d 214, 223 (2nd Cir. 2014) *quoting Wiest v. Lynch*, 710 F.3d 121, 135-37 (3rd Cir. 2013)").   "Regardless of whether it applies, the employee is not required to communicate to *the employer* which laws the employer's conduct allegedly violated. *Andaya v. Atlas Air*, 2012 WL 1871511, at *3 (SDNY 2012) (*citing Fraser*, 417 F. Supp. 2d at 322. The employee's communication need only "identify the specific conduct that the employee believes to be illegal." *Ashmore v. CGI Grp. Inc.*, No. 11 Civ. 8611 (LBS), 2012 WL 2148899, at *6 (S.D.N.Y. June 12, 2012) (emphasis added) (quoting *Welch*, 536 F.3d at 276; see also, *Yang*, 674 Fed.Appx. at 13 (reversing summary judgment in finding that conflicting

reports as to employee performance post whistleblower complaints raised issue sufficient require further review).

Once the Aurora acquisition was announced, Better had a reporting obligation under section 15(d) of the Securities Exchange Act of 1934. It was Better's representations and Better's documents that were presented to, and relied upon by, investors.  From at least August 2021 through January 12, 2022 (as well as her actual OSHA complaint filed on or about June 1, 2022), Pierce made several complaints that constituted protected activity under SOX:

1.     Better's misrepresentation regarding the percentage of Better's mortgage originations that came from "organic traffic." Garg repeatedly and publicly asserted a 30% metric including in the August 3, 2021 S-4 filing and the three (3) additional amended S-4 filings it has made to date. Pierce raised this concern both before and after the original S-4 was filed.

2.     Better's misrepresentation regarding its financial projections, including that it would re-achieve profitability by the first quarter of 2021 and, then again, by the first quarter of 2022. Garg made these misrepresentations to investors and potential investors, and to Aurora, in the 4th quarter of 2020 and, again, in the 4th quarter of 2021.  Again, these statements were made contrary to data provided by Pierce who contradicted and complained about these misrepresentations.

3.     Better's misrepresentations as to the viability, effectiveness, and functionality of its proprietary software, Tinman;

4.     Better's misrepresentations – released to the press – in December 2021 that its "metrics" to measure the financial results of operation were a "black box" and that the Company needed to create internal controls properly to measure and monitor its financial results. Pierce immediately – on December 9, 2021 – raised her concerns regarding this misrepresentation and

pointed to the weekly "market call" meetings to refute it. This concern also implicates, at least, one of the six categories of misconduct – lack or ineffectiveness of internal controls – covered by the whistleblower protections of SOX.

The CAC also clearly identifies several adverse employment actions that resulted directly from these protected complaints, including, Pierce's demotion; her suspension for complaints of retaliation; the threat, on January 15, 2022, to "process" Pierce's non-existent "resignation," which it knew she never tendered; her termination on February 4, 2022; Better's post-termination defamation; and its calling the entirety of two partial recourse notes.  Pierce has thus set forth viable claims for violations of SOX sufficient to survive a motion to dismiss.

Better's sole defense to this claim is its conclusory announcement that Better is allegedly not subject to the strictures of SOX as it was neither a publicly traded company at the time of Pierce's complaints and Better's retaliation against her, nor required to make filings with the SEC. Defendants' citation to *Lawson v. FMR LLC*, 571 U.S. 429, 433 (2014) is an accurate recitation in as much as the Supreme Court has extended SOX Whistleblower protection beyond just the employees of a publicly traded company. While *Lawson* stands for the proposition that Whistleblower protection under the Sarbanes–Oxley Act extends to employees of private contractors and subcontractors serving public companies, *Lawson* also represents the expansion of those whistleblower protections.  Moreover, SEC Staff Statements clearly reflect that the "SEC is keenly focused on protecting investors" and that "high quality financial reporting...is a key component of investor protection." Moreover, "whether a company enters the public markets through a merger with a SPAC...or other process, the quality and reliability of financial reporting...is vital to [the SEC's] efforts to protect investors."  See

https://www.sec.gov/news/public-statemenUmunter-spac-20200331.[19]

Contrary to the contentions of Better, logic and sound public policy dictate that Better – a SPAC target – should be responsible for the honest and accurate reporting of its financials and Better's employees should be protected from retaliation for whistleblowing when Better abrogates that responsibility. The SEC proposed rules of May 2022 reinforce that Pierce's claims under SOX are in line with the statutory intent, as the proposed new rules clarified the ambiguity regarding whether the SPAC and its target company should be treated as co-registrants for the purpose of financial reporting and regulatory compliance. Indeed, it is axiomatic that the statutory intent of SOX 806 was to provide protections against whistleblower retaliation, where, as here, a whistleblower comes forward to report violations of securities laws upon which the investing public would rely. There is no denying that the financial information which Pierce raised concerns over—Better's misstated financials – was included in regulatory filings nominally made by Aurora.  For these reasons, Better, as a co-registrant, is governed by SOX and is responsible to Pierce for, among other things, her wrongful and retaliatory termination.

Further, as to the proposed May 2022 Rules, Better's repeated assertion that under current law, SPACs and their target companies are treated as distinct until they are merged, appears nowhere within the text of the cited source. Rather, these proposed rules state that: "The proposed specialized disclosure and other requirements with respect to SPAC registered offerings and de-SPAC transactions are intended to improve the usefulness and clarity of the information provided to investors so that they can make better informed decisions as to whether to purchase securities

---

[19] Notably, neither the Staff Statement on Select Issues Pertaining to Special Purpose Acquisition Companies, nor the SEC Financial Reporting and Auditing Considerations of Companies merging with SPACs, specifically opine on when the obligations for honest and accurate financial reporting of a SPAC target company begins.  See https://www.sec.gov/news/public-statemenUdivision-cf-spac-2021-03-31  and https://www.sec.gov/news/public-statemenUmunter-spac-20200331.

in SPAC registered offerings, or in secondary trading markets, and in voting, investment and redemption decisions in connection with de-SPAC transactions. They are also intended to enhance, without altering the existing statutory language, investor protections as well as provide additional clarity regarding the legal obligations of target companies and others in connection with a de-SPAC transaction." See https://federalregister.gov/d/2022-07189/p-1369.

It is this lack of clarity of the law which Better is attempting to assert as a defense out of whole cloth, and which Better contends shields it from liability under SOX as it relates to Pierce's retaliatory firing. While these proposed rules are illustrative, they are by no means controlling or even relevant to Pierce's allegations, let alone outcome determinative on a motion to dismiss. However, to the extent that the SEC's proposed new rules bare relevance, we note that they state, reflecting the SEC's current and existing viewpoint, "in our view, a private operating company's method of becoming a public company should not negatively impact investor protection." *Id*. In fact, the proposed rules state in part, "new Article 15 of Regulation S-X, as well as related amendments, [seek] to more closely align the financial statement reporting requirements in business combinations involving a shell company and a private operating company with those in traditional initial public offerings. This is consistent with our view that the manner in which a company goes public should not generally result in substantially different financial statement disclosures being provided to investors.   https://www.federalregister.gov/d/2022-07189/p-174 Additionally, "the proposed amendments to Regulation S-X would generally codify existing staff guidance on financial statement requirements for certain business combinations involving shell companies, and based on staff analysis of disclosures in these transactions, we believe that most companies    already    report    consistent    with    this    staff    guidance." https://www.federalregister.gov/d/2022-07189/p-1372.  Again, this proposed amendment only

clarifies and codifies what is already expected of the companies engaging in the pre-SPAC transaction.   This is the only result – that Better is subject to the whistleblower protection provisions of SOX – that makes any sense. The recent statements by the SEC only support this clear common- sense result.  No change in the rules is required; only a clarification of the existing rules with the mandate to protect investors.  Dismissal of this cause of action is not warranted.

Point III<br>
<u>PIERCE HAS STATED A CLAIM FOR VIOLATIONS OF DODD-FRANK<br>
SUFFICIENT TO SURVIVE A MOTION TO DISMISS</u>

The 2010 Dodd–Frank Wall Street Reform and Consumer Protection Act ("Dodd–Frank") provides retaliation protection to employees who report violations of the securities laws to the SEC. See 15 U.S.C. § 78u–6(h)(1). To qualify as a whistleblower, an employee must (1) possess information about violations of the securities laws; and (2) provide that information to the SEC in a manner established by SEC rules, including through the filing of a TCR to the SEC. See § 78u–6(a); 17 C.F.R. § 240.21F–9(a); see *e.g., Moniodes v. Autonomy Capital (Jersey) LP*, NO. 20-CV-5648 (GHW), 2021 WL 3605385 *3 (SDNY 2021).   It is beyond dispute that Dodd-Frank precludes retaliation for filing a TCR with the SEC. See *e.g., Id.*

As detailed above, on or about May 28, 2022, Pierce filed a Form TCR with the SEC, registering as a whistleblower and setting forth her allegations of misconduct, including violations of SEC Rules and Regulations on the part of CEO Garg and Better.  Thereafter, on or about June 1, 2022, Pierce filed a claim with the Department of Labor.  Also as set forth above, directly after participating in this clearly protected activity, Better, for the first time, demanded cash payments to satisfy the entirety of Pierce's loans – even the non-recourse portions – and has since sued Pierce for the same relief despite the explicit terms of the loan agreements and her prior acceptance of Better's offer for resolution of those same agreements. Such actions smack of bad faith; are clearly

retaliatory; and represent manifest disparate treatment as no other similarly situated employees have been so harassed, publicly humiliated, or sued.  Upon information and belief, all other employees who were terminated without cause were offered the repurchase option with respect to both the vested and unvested portion of their loans. Better's ongoing campaign of retaliatory defamation also constitutes further actionable retaliation in contravention of Dodd-Frank's anti-retaliation whistleblower protections.

Better's sole defense is that it allegedly did not know of Pierce's filings with the SEC.  This defense is belied by the fact that Better knew of Pierce's OSHA complaint and that as a result of Pierce's reporting, the SEC commenced, or expanded, its investigation of Better.   Better subsequently acknowledged that ongoing investigation in regulatory filings.  Better's conclusory assertion to the contrary is not dispositive on this pre-answer motion to dismiss.  Better's motion should be denied as to this cause of action as well.

Point IV
PIERCE HAS STATED A DERIVATIVE CLAIM FOR BREACH OF FIDUCIARY DUTY
SUFFICIENT TO SURVIVE A MOTION TO DISMISS

There is no question that both Garg, as CEO, and the Board owed Better and its shareholders a fiduciary duty and a duty of care. See *e.g., In re Wonderwork, Inc*., 611 B.R. 169, 194 (US Bankr. Ct, SDNY 2020); *Gantler v. Stephens*, 965 A.2d 695, 709 (Del. 2009).  It is equally clear that a violation occurs when a "fiduciary intentionally acts with a purpose other than that of advancing the best interests of the corporation." *In re Walt Disney Co. Derivative Litig.,* 906 A.2d 27, 67 (Del. 2006); see also,  *In re Orchard Enterprises, Inc. Stockholder Litig.,* 88 A.3d 1, 33 (Del. Ch. 2014).  Officers and Board members are required to act in "good faith" (see *e.g., Stone v. Ritter*, 911 A.2d 362, 370 (Del. 2006)) which is an element of the requisite duty of loyalty, which similarly requires that fiduciaries act with a good faith belief that their actions are in the

corporation's (not any individual's) best interests. *Id.;* see also, *Guttman v. Huang*, 823 A.2d 492, 506 n.34 (Del. Ch. 2003)); *In re Walt Disney Co. Derivative Litig*., 907 A.2d 693, 749 (Del. Ch. 2005), *aff'd*, 906 A.2d 27 (Del. 2006); *Brehm v. Eisner*, 746 A.2d 244, 259 (Del. 2000). The allegations in the CAC more than satisfy these requirements, in that they specifically address the failure to exercise appropriate attention, the failure to exercise reasonable oversight, the failure to take any acts to prevent or in any way mitigate the bad acts and decisions of Garg which in violating various basis legal standards and SEC rules and regulations have materially diminished the value of Better.

Defendant Garg submits two bases for his motion to dismiss: (1) Plaintiff has allegedly failed to demonstrate demand futility; and (2) Plaintiff has failed to meet a heightened pleading standard (as set forth under new York law).  Contrary to Garg's current assertions, the CAC does address this standard and clearly sufficiently alleges improprieties by the Board sufficient to specifically identify actionable breaches of duty, as well as factual predicates to legally demonstrate the futility of any pre-suit demand.  By way of example only, the behavior of the Board (i) in participating in and condoning the suppression of Pierce's concerns about CEO Garg's WARN Act violations and mass defamation of the terminated 900; (ii) in allowing Garg to disseminate false and misleading financial information to the public; (iii) in shirking its duty to review such charges; in taking no action to quash, or even address, much less mitigate the damages arising from, Garg's scheme to scape-goat Pierce for his own acknowledged errors; (iv) in condoning and joining, the actions of CEO Garg, did not act to advance the best interests of the corporation, failed to act in the face of a known duty to act (as in herein where public misstatements were being made to investors and shareholders), and demonstrated a conscious disregard for their duties; (v) in routinely rubber-stamping any action – including any personnel action – that Garg

suggested without undertaking any meaningful or reasonable oversight and thereby demonstrating their clear lack of independence from Garg; and (vi) in acting as one clearly faces liability for neglecting their duties to address any of the claims (including this breach of fiduciary claim) against CEO Garg that would have been the subject of any pre-suit litigation demand, demonstrates that as a matter of law, the demand requirement should be excused as futile.  See *e.g., United Food and Commercial Workers Union and Participating Food Industry Employers Tri-State Pension Fund v. Zuckerberg Eyeglasses*, 262 A.3d 1034, 1059-60 (2021) (Identifying the current standards for determining futility which even Garg admits are the proper standards).

Under *Zuckerberg*, demand futility is established if any one of three circumstances are plead concerning a majority of a Board (1) received a material personal benefit from the alleged misconduct; (2) would face a substantial likelihood of liability on any of the claims that would be the subject of the litigation demand; or (3) lacks independence from someone who received a material benefit from the alleged misconduct, or would face a substantial likelihood of liability on any of the claims that are the subject of the litigation demand. *Id*.  Under the facts asserted in the CAC, it is clear that Better's Board clearly lacked any independence from Garg; that Garg received numerous material benefits from his alleged misconduct, including the artificially inflated price of his personal shareholding; that Garg faces, at a minimum, a substantial likelihood of liability for the bad acts asserted; and that the Board itself -- based on the allegations in the CAC -- faces a substantial likelihood of liability for its negligence and ceding all authority to Garg without completing even a modicum of due diligence to examine, much less restrain, Garg's bad acts.   The other cases cited by Defendants only bolster this position.

The supposed failure to meet the heightened pleading requirement is another red herring. The CAC pleads Garg's self-serving breach of duty with more than sufficient specificity, and the

instant motion to dismiss should be denied.

Point V

PIERCE HAS STATED VARIOUS CLAIMS FOR DEFAMATION
SUFFICIENT TO SURVIVE A MOTION TO DISMISS

A.  General Standards For Defamation Claims:

To make out a claim for defamation, a plaintiff need only set forth a false statement concerning plaintiff by defendant, (2) publication by the defendant of such statement to a third party, and (3) injury. See, *e.g., Constantin Assoc. v. Kapetas*, 17 Misc. 3d 1137(A), 851 N.Y.S.2d 68 (S.Ct.  NY Cty 2007); *Christopher Lisa Matthew Policano, Inc. v. North American Precis Syndicate, Inc.,* 129 A.D.2d 488 (1st Dept 1987); *3P-733, LLC v. Davis*, 187 A.D.3d 626 (1st Dept 2020) (reversing lower court's granting of dismissal and reinstating claim for defamation).  As the Appellate Division First Department noted in *Stepanov v. Dow Jones & Co., Inc.,* 120 A.D.3d 28, 34 (1st Dept 2014), "[o]n a motion to dismiss a defamation claim, the court must decide whether the statements, considered in the context of the entire publication, are reasonably susceptible of a defamatory connotation;" see also, *Armstrong v. Simon & Schuster*, 85 N.Y.2d 373, 379 (1995) (if any view of allegations could support defamation, complaint survives motion to dismiss); *Frank v. National Broadcasting Co., Inc.,* 119 A.D.2d 252, 256 (2nd Dept 1986) (Denial of motion to dismiss warranted unless the court determines that the contested statements are incapable of any defamatory meaning as a matter of law); *Matchett v. Stark*, 2016 N.Y. Misc. LEXIS 2584, 6-8, 2016 NY Slip Op. 31302 (U) (SCt., NY Cty, 2016) (rejecting dismissal of defamation claims and recognizing role of jury in determining defamation); *Biro v. Conde Nast*, 883 F.Supp.2d 441 (S.D.N.Y. 2012) ("challenged statements are not to be read in isolation, but must be perused as the average reader would against the 'whole apparent scope and intent'"" of the statement which must not be interpreted in "their mildest and most inoffensive form so as to hold them nonlibelous."

32

(quoting, *November v. Time Inc.,* 13 N.Y.2d 175 (1963)); *Langenkamp v. New York University*, 2012 WL 12540277 *3 (SDNY March 15, 2012).   Notably, where, as here, the defamatory statement could cause harm to a plaintiff's trade or profession, the plaintiff need not plead or prove special damages. See *e.g., John Langenbacher Co. v. Tolksdorf*, 199 A.D.2d 64 (1st Dept 1993).

B. <u>Defamation By Garg</u>:

The CAC specifically alleges how Garg, in response to Pierce's complaints concerning his dissemination of false and misleading financial information and his improper acts during and related to the 900 employee termination zoom, commenced a pattern of harassment and abuse to minimize and silence Pierce and set her up as the scape-goat for his own bad acts.   His first step in that regard was to defame Pierce to the Board by impugning her business capabilities and belittling her prior work.   Specifically, Garg called for the hiring of a replacement for Pierce who, unlike Pierce, would be a "seasoned" executive who could "help manage and drive performance across business functions" and "build an inspirational leadership culture" as COO .   He further denigrated Pierce's actions as COO by asserted to the Board, and then improperly represented that the Board believed, that "the metrics of the Company are a black box."   In reality, Pierce had been completely transparent about Better's metrics. Indeed, those metrics and the result of operations were reviewed with, and signed off by, Garg on a weekly basis. Pierce was not to blame for Company's reversal of fortunes. Instead, it was Garg who single handedly caused the "loss making state" of the Company, repeatedly ignoring, and overriding, Pierce's operational directives.

Garg also consistently and repeatedly defamed Pierce to other executives in the Company, including Pierce's direct reports and, particularly Megan Bellingham, Armando LaRocca, Stephen Rosen, and Ryan, General Counsel Calamari, General Counsel Tuffin, the Board of Directors, and the Head of HR, by asserting, with specific knowledge of the falsity of each statement, that Pierce

had irresponsibly lead a coup against him; that Pierce had abandoned Better, them, and her job duties and responsibilities; that Pierce was an extortionist; and that given her lack of actual contributions she should be known as the "Cheerleader in Chief."

In addition, subsequent to Pierce's termination, Garg repeatedly knowingly and purposefully lied to Ryan and the Board of Directors in asserting that Pierce had been "fudging the numbers" at Better and that she had told him that Better was incurring a "labor cost of only $900.00 per loan."  Garg was specifically and personally aware that Pierce had never "fudged the numbers" and had routinely iterated that labor costs per loan were over $2,000.  These ongoing and repeated knowing fabrications also constituted actionable defamation *per se* in that they impugned her integrity and directly implied that she had committed financially based crimes. Such statements will inevitability effect Pierce's future employment opportunities just as they were designed to do.  The CAC specifically alleges that these knowingly false statements by Garg were made for the purpose of harming Pierce so as to scapegoat her for his own bad acts and to silence and discredit Pierce.

Garg makes several arguments in support of his request for dismissal. None have any merit. First, Garg asserts that none of the alleged statements were defamatory.  In so concluding, Garg only addresses certain of the alleged defamatory statements.  He first contends that the "black box" comments were not defamatory as they were made by the Board and not false statements.  This characterization ignores the fact that the CAC alleges that not only was this one of Garg's characterizations, but that Garg specifically knew of its falsity based on weekly meetings and that he pushed this false statement on the Board so as to impugn Pierce for his own nefarious purposes. Just because Garg again attempts to ignore the specific allegations in the CAC and proposes an alternative reality in his motion papers, does not make it so.  Nor is such an alternative version

properly relied upon to support a motion to dismiss. Moreover, in addressing the black box comments as well as the denigrations of Pierce's professional abilities, Garg improperly fails to consider either the context of the comments or to read them in their entirety. Both failures are fatal to his argument. See e.g., *Matchett*, 2016 N.Y. Misc. LEXIS at 6-8; *Biro*, 883 F.Supp.2d at 441; *November*, 13 N.Y.2d 175; *Langenkamp*, 2012 WL 12540277 *3.

Garg's arguments concerning his post-termination defamation asserting that Pierce had been "fudging the numbers" at Better are internally inconsistent and completely misstate the applicable law. As the CAC makes clear, Pierce has repeatedly alleged that Garg knew that his statements about Pierce (including that pertaining to "fudging the numbers") were false when he made them. Garg's instant argument is abjectly baseless. Garg's argument that the cause of action should be dismissed because the CAC allegedly fails to assert facts to support her "inferences" that Garg's statements were false must fail. First, such proofs are well beyond any pleading requirement for defamation, much less the federal notice pleading standard. The argument must fail on this basis alone. Second, the CAC never asserts that Garg believed that Pierce's reports were incorrect. To the contrary, the CAC relates – as it is true – that Garg knew that Pierce's reports were wholly correct, but intentionally chose to lie about them. Pierce does not assert that Garg was confused, but that he purposefully told knowing lies about her so as to impugn her character, her abilities in her field, and to otherwise harm her. In addition the CAC does not raise inferences concerning Garg's statements, it specifically and directly asserts their abject, known falsity. Defendants' conclusory assertions concerning the purportedly inadequacies of this cause of action are factually and legally incorrect.

Garg's final argument is that even if his knowingly false statements about Pierce were defamatory (which they indubitably were) that they were allegedly subject to a qualified privilege.

As an initial, and dispositive, matter, the post-termination statements attributed to Garg do not fall under any of the asserted bases for a qualified privilege.  As such, these statements are unequivocally actionable, and the cause of action is not subject to dismissal.

Second, and also dispositive, even if the statements are considered to be subject to a qualified privilege,[20] any one of several exceptions noted in the *Kasachkoff* case cited by Garg and Calamari would apply so as to avoid any form of summary dismissal. *Id.* ((a) "actual malice",  see *e.g., Stillman v. Ford*, 22 N.Y.2d 48, 53 (1968); (b) "ill-will," see *e.g., Ashcroft v. Hammond,* 197 N.Y. 488, 495) (1910); or (c) "personal spite…or culpable recklessness or negligence," see *e.g., Hoeppner v. Dunkirk Print. Co.,* 254 N.Y. 95, 106 (1930)). Each of the cases cited by Garg and Calimari acknowledge that these and similar exceptions void any qualified privilege. See *e.g., Orenstein v. Figel*, 677 F.Supp.2d 706,711 (SDNY 2009); *Dunson v. Tri-Maintenance & Contractors, Inc.,* 171 F.Supp.2d 103, 117 (EDNY 2001) (recognizing malice as fatal to qualified privilege); *Langenkamp*, 2012 WL 12540277 *3[21].  In fact, there are two types of malice that overcome any qualified privilege: malice can mean being made (i) with "spite or ill will;" or (ii) with "knowledge that the statement was false or reckless disregard of whether it was false or not." *Id.,* quoting, *Liberman v. Gelstein*, 80 N.Y.2d 429, 437-8 (1992).  In the instant case, and despite Garg's continued attempts to ignore the plain language of the CAC, each of the statements attributed to Garg was plead to have been made by Garg with his specific knowledge of their falsity.  Moreover, although not required or necessary to survive a motion to dismiss, the specific bases for Garg's knowledge of the falsity of his lies are noted in the CAC.  Moreover, as each of

---

[20] None of the cases cited on behalf of Garg and Calamari concern circumstances wherein the complained of statements were considered subject to a qualified privilege where, as herein, they were disseminated to 30 people – in various parts of a Company and amongst whom were direct and secondary reports of the subject of the defamatory statements. See  *e.g., Kasachkoff v. City of New York*, 485 N.Y.S.2d 992 (1st Dept 1996).

[21] In addition, as Garg "may be said to have made the allegedly false statements within the scope of his employment, [Better] may be liable under respondent superior and cannot be dismissed at this stage." *Langenkamp*, 2012 WL 12540277 *3; see also, *Seymour v. New York Elec. & Gasoline Corp.*, 627 N.Y.S.2d 466, 468 (3rd Dept 1995).

the complained of statements were part of Garg's scheme to discredit, impugn, and harm Pierce, each complained of statement meets both standards for malice.  Thus, even if the qualified privilege was held to be applicable, Pierce has clearly overcome any qualified privilege.  As a matter of law, this cause of action should proceed.

C. <u>Defamation By Better</u>:

On November 9, 2022, a Better spokesperson made the following statement to the Press:

"Sarah borrowed more than $2M from the company pursuant to two promissory notes to purchase shares. These notes are due and payable under their terms. Sarah has not paid anything back to the company, nor returned any of the shares she purchased with money the company loaned to her. The company is simply seeking to enforce the notes in accordance with their terms. Additionally, we find Sarah's claims doubly spurious given that she had no trouble buying and maintaining a $11.5M ski chalet in Aspen at the same time she was unable to pay the company back the loan she owes."

In making this statement, Better intentionally and knowingly lied about Pierce solely for retributive purposes and to cast her in a negative light.  First, Better is plainly aware that it never provided any shares to Pierce and that it has always retained possession of all shares in question as collateral pursuant to an Escrow Agreement.  As such, the statement that Pierce never "returned any of the shares she purchased" is disingenuous and in the context of the entire statement is clearly intended to give the impression – albeit a false one – that Pierce has refused to return property owed to, or owned by, Better.  Better knew such statement was abjectly false.  Second, Better's assertion that it is "simply seeking to enforce the notes in accordance with their terms" is also knowingly false as the Notes specifically provide for Recourse and Non-Recourse elements which, by their explicit terms preclude recovery of, at a minimum, 49% of the loans as against Pierce.  Clearly, a suit seeking approximately 2x the maximum amount due under the terms of the Notes is not one seeking to enforce the "notes in accordance with their terms." Third, as Better is specifically aware, Pierce never bought a ski chalet in Aspen, much less one valued at 11.5M. The Aspen property

37

was purchased for Pierce by her husband, a fact that Pierce has repeatedly told CEO Garg. In reading the entirety of the paragraph in context, the allegation that Pierce had lied (spurious "Not being what it purports to be, false, or fake") in conjunction with the Notes in some manner is clearly defamatory, constituting defamation *per se*, and seeks to harm Pierce's personal and professional reputation and impugn her integrity and honesty in connection with monetary matters relating to her job.

Better makes several arguments as to why it should not be subject to liability for defamation. None are persuasive.

(1)    Better's Liability For Garg's Statements:    Better asserts two defenses as to these statements. First, it asserts that Garg's arguments should prevail. Clearly, as set forth above this is incorrect and erroneous as a matter of fact and law. Second, Better argues that it cannot be liable for Garg's statements under *respondent superior* as Garg made the complained of statements for his own personal gain and this was necessarily acting outside the scope of his employment. This argument must also fail.

First, and dispositively, the quotation cited from the CAC in an attempt to bolster this argument is drawn from the derivative breach of fiduciary section and is directed towards the actions, not defamatory statements, of Garg concerning, *inter alia*, his breach of fiduciary duty and the SOX violations alleged.

Second, and also dispositively, "[a]n act is considered to be within the scope of employment if it is performed while the employee is engaged generally in the business of his employer, or if his act may be reasonably said to be necessary or incidental to such employment." *Holmes v. Gary Goldberg & Co., Inc.,* 40 A.D.3d 1033, 1034 (2nd Dept 2007) (finding that acts which the employer could reasonably have foreseen are within the scope of the employment and

thus give rise to liability under the doctrine of *respondeat superior*, even where those acts constitute an intentional tort or a crime); see also, *Judith M. v. Sisters of Hope Charity Hosp.,* 93 N.Y.2d 932, 933 (1999) (If foreseeable, employee's acts or negligence impute liability to employer). The cases cited by Better do not support any contrary determination.  In making this argument, Better fatally ignores the fact that Garg is Better's CEO.  He speaks for Better as a matter of fact and law. In this case, the complained of statements are those of a company's CEO speaking -- albeit falsely -- about the professional competence of an employee of the same company who reported directly to him.  This is clearly within the scope of his employment, and it is not relevant whether such statements are in the best interest of Better or not.  See *e.g. Perks v. Town of Huntington*, 251 F.Supp.2d 1143, 1166 (E.D.N.Y.2003) (employers liable for even "quite improper" acts of employees acting within the scope of their employment); see also *Garrison v. Toshiba Bus. Sol.,* 907 F.Supp.2d 301 (EDNY 2012). The current circumstances do not involve statements by a service technician speaking on matters unrelated to his service  but the CEO commenting on the professional competence of a direct report. This argument must fail.

Third, and also dispositively, the Court is addressing a motion to dismiss, not one for summary judgment. See *e.g., Garrison*, 907 F.Supp.2d at 307; *Sellify v. Amazon.com, Inc.,* 2010 WL 4455830 (SDNY 2010).  Better is clearly liable for the defamatory statements of Garg.

(2)    <u>Better Is Liable For Its Own Defamatory Statements</u>:      Better makes three arguments why its statements should not result in liability: (1) they constitute protected statements as fair and true reporting of a judicial proceeding; (2) the statements do not constitute per se defamation; and (3) Pierce has not plead special damages as to Better's direct statements to the press.  None are meritorious, much less warrant dismissal on a pre-answer motion to dismiss.

First, it is clear that the Section 74 privilege does not apply, as a matter of law, if the public

statement read in its entirety suggests more serious conduct than that in the judicial proceeding (see *e.g., Daniel Goldreyer, Ltd. v. Van de Wetering*, 217 A.D.2d 434, 436 (1st Dept 1995); *Ocean State Seafood, Inc. v. Capital Newspaper, Div. of Hearst Corp.,* 112 A.D.2d 662, 666 (3rd Dept 1985) (the Section 74 privilege inapplicable if account adds "other facts or opinions to imply wrongdoing")).  Moreover, Section 74 does not allow a person to "maliciously institute a judicial proceeding alleging false and defamatory charges, and to then circulate a press release or other communication based thereon and escape liability by invoking the statute." *Williams v. Williams*, 23 N.Y.2d 592, 599 (1969); see *McNally v. Yarnall*, 764 F.Supp. 853, 856 (S.D.N.Y.1991). Better's defense shatters on either one of these two bases.

None of the cases cited by Better assert to the contrary.  *D'Annunzio v. Ayken, Inc.,* 876 F.Supp.2d 211 (EDNY 2012); *McRedmond v. Sutton Place Restaurant & Bar, Inc*., 48 A.D.3rd 258 (1st  Dept 2008); *Highland Capital Mgmt, L.P., v. Dow Jones & Co., Inc*., 178 A.D.3rd 572 (1st Dept 2019) (report that substantially describes decision in material aspects including that the complainant actually committed the bad acts described in the article was protected). As set forth above, the CAC specifically set forth the falsity of various statements within the press release, as well as the totality of the piece.  See *e.g., Biro*, 883 F.Supp.2d at 441

Second, and as also set forth above, contrary to the current assertions of Better, the CAC clearly asserts that the defamatory statements by Better were specifically designed to injure Pierce in her trade, business, or profession.  A statement that "tend[s] to injure another in his or her trade, business  or  profession"  is  defamatory  *per se*. *Stern  v.  Cosby*,  645  F.Supp.2d 258,  273 (S.D.N.Y.2009) (citing *Liberman v. Gelstein,* 80 N.Y.2d 429, 435 (1992)).  The statements were not mere reflection on her character, but specifically called out her professionalism, her honesty and trustworthiness in dealing with monies -- an integral part of her job as a COO. They accuse

her of theft of corporate assets and of attempting to defraud Better of assets procured as its acting COO.  These statements had only one purpose, just as Garg's statements above, to impugn Pierce's professional reputation and damage her professional prospects and opportunities.

Third, as the complained of statements -- especially when read in their totality (see *e.g., Biro*, 883 F.Supp.2d at 441) -- clearly constitute defamation *per se*, there is no requirement that Pierce plead special damages.  As such, it is clear that the claim for direct defamation against Better must survive the instant motion to dismiss.

Point VI

PIERCE HAS STATED A CLAIM FOR BREACH OF CONTRACT
SUFFICIENT TO SURVIVE A MOTION TO DISMISS

A claim for breach of contract in New York is made out with allegations of (1) the existence of a contract, (2) the plaintiff's performance, (3) the defendant's breach, and (4) resulting damages. See *e.g., Alloy Advisory, LLC v. 503 West 33rd Street Associates, Inc*., 195 A.D.3d 436 (1st Dept 2021);  *Harris v. Seward Park Hous. Corp.,* 79 A.D.3d 425, 426, 913 N.Y.S.2d 161 (1st Dept. 2010).  In the instant case, Pierce makes complaint concerning two separate sets of contracts with Better: (1) the Partial Recourse Promissory Notes; and (2) the written offer pursuant to which Better agreed to re-purchase all of Pierce's shares (vested and unvested) to extinguish the entirety of her loan balances.

The note agreements had specific terms.  Pierce performed all of her obligations under the agreements.  In contravention of the plain terms of the note agreement, Better breached the agreements when it attempted to collect on the notes before they came due.  It is equally axiomatic that an offer and acceptance constitute a binding agreement.  Second, on March 30, 2022, Better made an offer to resolve the outstanding note agreements.  Pierce accepted that offer, making a binding contract.  A request for a response is not a binding term for the acceptance of a contract.

41

Better knows this.  Had Better wanted to require a response within five (5) days it could have simply said so.  Contracts are always read as they are written.  Better did not assert that its offer was only open for five days and then would be withdrawn.  It did not assert that any five-day window was time of the essence.  Better cannot now write into its proffer terms that were neither material, integral, nor even definite at the time.  At best, there is a question of fact preclusive of dismissal.  In contrast, it is clear that Better then reneged on its offer and then compounded that breach by commencing a public suit against Pierce personally seeking the full amount of the loans in direct contravention of the terms of the loan agreements, in direct contravention of the fact that portions of the loans are non-recourse, in violation of both the express terms of the Notes and Better's earlier accepted offer, and in abject retaliation for her complaints under §740, and pursuit of the OSHA and the instant complaints.  This cause of action should not be dismissed.

Point VII
### PIERCE HAS STATED A CLAIM FOR TORTIOUS INTERFERENCE WITH A CONTRACT SUFFICIENT TO SURVIVE A MOTION TO DISMISS

Plaintiff has specifically and clearly alleged that Garg, as well as Calamari who was integral in assisting Garg, used wrongful means to effect the termination of her employment.  In order to state a claim for tortious interference with a contract, an at-will employee, such as Pierce, needs to allege that the defendant "used wrongful means to effect the termination such as fraud, misrepresentation, or threats, that the means used violated a duty owed by defendant to the plaintiff, or that the defendant acted with malice." *Cohen v. Davis*, 926 F.Supp. 399, 403 (SDNY 1996) (Denying motion to dismiss as to tortious interference claim against co-workers of at-will employee at Mount Sinai hospital based on defendants filing of false and misleading reports about her performance); *Guard-Life Corp. v. S. Parker Hardware Manufacturing Corp.,* 50 N.Y.2d 183, 194 (1980).  Similarly, co-workers can be held liable under tortious interference with a contract

42

when it is alleged that they were not acting in good faith when they causes the termination of co-worker plaintiff.  See *e.g., Cohen*, 926 F.Supp. at 405; see also, *BIB Constr. Co. Inc. v. City of Poughkeepsie*, 204 A.D.2d 947, 612 N.Y.S.2d 283, 285 (3rd Dept 1994) (employer's agent liable for tortious interference if "agent does not act in good faith and commits independent acts directed at another for personal pecuniary gain"); *Bank of New York v. Berisford Int'l*, 190 A.D.2d 622, 622, 594 N.Y.S.2d 152, 152 (1st Dept 1993) (motion to dismiss tortious interference with contract claim denied based on allegations that defendant "was not acting in good faith and committed wholly independent torts directed at plaintiff for personal pecuniary gain"); *Riddell Sports Inc. v. Brooks*, 872 F.Supp. 73, 78 (SDNY 1995) (Denying motion to dismiss as a "reasonable trier of fact could conclude that one or more officers and directors induced contractual breaches using improper means or motivated by malice...If it is the case that one or more officers or directors, motivated by malice and acting outside of the scope of their corporate representative capacities, induced a breach, then a claim for tortious interference with contractual relations properly lies"); *American Protein Corp. v. AB Volvo,* 844 F.2d 56, 63 (2nd Cir), *cert. denied*, 488 U.S. 852, 109 S.Ct. 136, 102 L.Ed.2d 109 (1988); *G.D. Searle & Co. v. Medicore Communications, Inc.,* 843 F.Supp. 895, 910–11 (S.D.N.Y.1994); 72 N.Y.Jur.2d: Interference § 42 at 238 (employer agent can be held liable for tortious interference if acts with malice, without justification, or contrary to the interest of the corporation); 2 N.Y. PJI 236–37 (Supp.1996).

Just as the defendants in *Cohen*, Garg and Calamari made numerous false and misleading reports, statements, and characterizations concerning Pierce: all so as to result in her unwarranted termination. None of the case cited by them – as the law above makes clear -- absolve them of liability. This cause of action should not be dismissed.

Point VIII

## PIERCE HAS STATED A CLAIM FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS SUFFICIENT TO SURVIVE A MOTION TO DISMISS

In order to set forth a claim for intentional infliction of emotional distress, a plaintiff must allege (1) extreme and outrageous conduct, (2) intent to cause severe emotional distress, (3) a causal connection between the conduct and the injury, and (4) severe emotional distress.  See *e.g., Howell v. New York Post Co*., 81 N.Y.2d 115, 121 (1993).  In the instant case, Pierce has alleged that Garg and Calamari took actions to knowingly and falsely blame Pierce for Garg's improper defamation and termination of 900 employees over a zoom call – an incident that garnered national and international news coverage and condemnation.  In addition, Garg and Calamari purposefully placed Pierce on administrative leave in specific fashion so as to make it appear to the entire workforce and the 8,500 employees for whom Pierce was responsible that Pierce had been terminated abruptly and in a fashion that suggested near criminal wrongdoing.  In attempting to make Pierce the scapegoat for their own illegal, improper, and universally condemned actions, Garg and Calamari sought to ruin Pierce's reputation in the field and across the globe.

Similarly, Garg's and Calamari's plan – including their characterization of Better's requested proposal as a "resignation" – to induce Pierce to resign was purely to cause her additional emotional distress.  Moreover, their ultimate effectuation of a knowingly improper and retaliatory termination of Pierce and attempted enforcement of economic sanctions against her in pure retaliation for her legitimate and good faith complaints was extreme and outrageous and designed solely to impugn Pierce and cause her severe emotional distress. The Defendants engaged in a year-long defamation fueled campaign to publicly debase Pierce, who weeks prior to their commencement had been touted as a superstar performer by Garg.

Courts have upheld claims for intentional infliction of emotional distress based on far less

malevolent facts.  See *e.g., Sherry Bender v. City of New York, et al.,* 78 F.3d 787 (2nd Cir. 1996); *Flatley v. Hartmann*, 138 A.D.2d 345, 346 (2nd Dept 1988) ("hang-up" telephone calls);  *Halio v. Lurie*, 15 A.D.2d 62, 67 (2nd Dept 1961) (taunting letter from former boyfriend, boasting of marriage);  *Flamm v. Van Nierop*, 56 Misc.2d 1059, 1061 (Westchester Cty. S.Ct.1968) (harassing plaintiff by driving too closely and making threatening looks); *Levine v. Gurney*, 149 A.D.2d 473, 473 (2nd Dept 1989). Given the highly improper motivation and the nearly year-long pattern of abuse and harassment that resulted not only in Pierce's ostracization at work, her ongoing public humiliation, her unwarranted termination, and Garg's campaign to impugn, discredit, and minimalize her, dismissal of this claim is also unwarranted.

## Conclusion

For all the foregoing reasons, both Better's motion to dismiss and Gargs' and Calamari's motion to dismiss should be denied in their entirety and Plaintiff awarded such other and further relief as this Court deems just and proper.

Dated: New York, New York
       March 1, 2023

                                        Respectfully Submitted,
                                        The Law Offices of Neal Brickman, P.C.


                                        *Neal Brickman*
                                        _____
                                        By: Neal Brickman (NB0874)
                                            Ethan Leonard (EL2497)